UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x

UNITED STATES of AMERICA,

-against- 09 Cr. 424

JOSE QUINOY,

Defendant.

-----------------------------------x

United States Courthouse
White Plains, New York

May 17, 2010

B e f o r e:

HON. KENNETH M. KARAS,
District Court Judge

A P P E A R A N C E S:

CYNTHIA DUNNE
DAVID KENNEDY
Assistant United States Attorneys

ANDREW QUINN
JOHN D'ALLESANDRO
Attorneys for Jose Quinoy

ANGELA A. O'DONNELL, RPR
Official Court Reporter

Detective Michael Hayes.

MICHAEL HAYES, having been duly sworn, was called as a witness and testified as follows:

THE CLERK: Please state and spell your name for the record.

THE WITNESS: Michael Hayes, M-I-C-H-A-E-L, H-A-Y-E-S.

THE COURT: Do you have a cell phone on you or something? We've been trying to figure out what's causing that static.

MR. QUINN: Could be my computer.

THE COURT: I don't think so, because it happened last week and your computer wasn't there.

THE CLERK: Do you have anything wireless or wires on you.

MS. DUNNE: I don't have anything wired on me. That I know of.

THE COURT: That you know of. Okay. All right. go ahead, Ms. Dunne.

DIRECT EXAMINATION

BY MS. DUNNE:

Q. Good morning, Detective Hayes, could you explain your employment?

A. Village of Sleepy Hollow Police Department.

Q. In what capacity are you employed there?

A. Detective.
Q. How long have you been with the Sleepy Hollow Police Department?
A. Since January of 2006.
Q. And what positions have you held?
A. I've held police officer from January 2006 to November 2009, and I've held detective from November 2009 to currently.
Q. I'm going to ask you to just keep the microphone a little closer to you, if you could bend it toward you a little bit so the court reporter can hear you. I appreciate it.
Before you joined the Sleepy Hollow Police Department, where were you employed?
A. City of New York Police Department.
Q. In what capacity?
A. Police officer.
Q. How long did you work at the New York City Police Department?
A. Two years.
Q. And when you came to the Sleepy Hollow Police Department, what were your duties and responsibilities as a patrol officer?
A. To anticipates radio calls that the desk would send us to.

Q. What's a radio call?
A. Just if somebody calls the police desk and they need a police officer's assistance, the desk would send us.
Q. You'd be in a patrol car or on the street?
A. Patrol car.
Q. Directing your attention to the evening of October 17, 2006. Were you on duty that night?
A. I was.
Q. Were you present during the course of the arrest of one Mario Gomez?
A. I was.
Q. And where did that occur?
A. On Beekman Avenue in front of the police station.
Q. In what town?
A. Village of Sleepy Hollow.
Q. Did there come a time you learned there was a federal investigation regarding the events of that night?
A. I did.
Q. Approximately when did you learn about the federal investigation?
A. January 2008.
Q. Do you recall how you learned about the investigation?
A. Rumors on the street.
Q. When you say the street.
A. People talking on the street.

Q. On the street or in the police department?
A. On the street and the police department.
Q. Did there come a time when you were contacted by a special agent from the FBI?
A. Yes.
Q. And who was that?
A. Special Agent Pena.
Q. And who was she?
A. She was an FBI agent for the United States.
Q. And did you have conversations with Agent Pena about what you witnessed that night?
A. I did.
Q. And in the course of her investigation, did she ask you to cooperate in the federal investigation of the events of the night of October 17, 2006?
A. She did.
Q. What specifically did she ask you to do?
A. She asked me to wear a body recorder.
Q. Did she tell you who she was going to ask you to wear the recorder against or in conversations with?
A. She did.
Q. And did you agree to do that?
A. I did.
Q. Did there come a time when she asked you to make recordings of Jose Quinoy?

A. She did.
Q. Approximately when was that?
A. April of 2008.
Q. How many recordings did you make of conversations with Jose Quinoy?
A. I believe three.
Q. Do you recall the specific dates of those recordings?
A. No, I don't.
Q. Okay. In front of you you have Government's Exhibits 1000, 1001 and 1002. Do you see them?
A. I do.
Q. By looking at those transcripts, do they refresh your recollection as to what dates you recorded conversations with Jose Quinoy?
A. They do.
Q. What were the dates of your conversations with Jose Quinoy?
A. April 3, 2008, April 4, 2008 and April 16, 2008.
Q. Other than those three conversations with Jose Quinoy, which you recorded, did you have any other conversations with Jose Quinoy pertaining to the events of the Mario Gomez arrest?
A. No.
Q. After making the recordings of Jose Quinoy, did there come a time you were asked to record other persons?

A. Yes.
Q. I'd just like to back up to what the process was of how you made recordings. Could you take us through, for example, the first recording? How did you receive the equipment?
A. Agent Pena would call me and have me meet her somewhere to pick up the recorder.
Q. And when you received the recorder, the recorders that you used in your conversations that you recorded, had you ever seen equipment like this before?
A. No.
Q. Have you ever worked with this kind of equipment in any of your positions either at Sleepy Hollow or New York City?
A. No.
Q. Had you ever seen a recording device like the one that Agent Pena gave you?
A. No.
Q. Did you have any access to any technology or equipment in which to access the recordings that were made by the recorder?
A. No.
Q. Were you able to play back any recordings from the recorders?
A. No.
Q. Did you ever take any of the recordings devices given

to you to any technological people to consult with how to access those recordings?
A. No.
Q. Or for any purpose whatsoever?
A. No.
Q. Do you have any idea what kind of cable or device is used to access those recorders?
A. No, I don't.
Q. Do you know what the name of the recording device you used in your conversations with Detective Quinoy and others, do you know what it's called, the device?
A. No, I don't.
Q. So when you were given a recording device to make a recording, what would you do with it?
A. I'd turn it on, stick it in my pocket.
Q. And how did you know how to turn it on?
A. Agent Pena showed me how to turn it on.
Q. And when would you turn it on?
A. Couple seconds before I'd start the conversation.
Q. Do you recall the total number of recordings you made of conversations with Jose Quinoy?
A. Three.
THE COURT: What did Agent Pena tell you about how to turn it on?
THE WITNESS: She just said you had to use like a

pin, and at the bottom of the device you pressed the pin and hit the button.

THE COURT: And how do you turn it off?

THE WITNESS: Same way, you hit the pin with the button again.

BY MS. DUNNE:

Q. And while it was playing, was there a way you could confirm that it was on?

A. Yes.

Q. And how was that?

A. A little red light would flash.

Q. And when you had it concealed on your person, was the red light visible to the public?

A. No.

Q. Directing your attention to Government's Exhibit 1000 and 1001. What are these documents?

A. These are transcripts of my recordings.

Q. Of which recordings?

A. With Jose Quinoy on April 3, 2008 and April 4, 2008.

Q. And have you reviewed these transcripts?

A. I have.

Q. And do they fairly and accurately depict the portions of the transcripts that they purport -- of the recordings they purport to transcribe?

A. They do.

Q. Are the persons identified in those transcripts the persons who spoke on the recordings whose voices you recognized?
A. They are.
MS. DUNNE: I would like to offer Government's Exhibits 1000 and 1001 into evidence.
MR. QUINN: Brief voir dire, Judge?
THE COURT: Sure.
VOIR DIRE EXAMINATION
BY MR. QUINN:
Q. Detective, you're testifying that these transcripts are transcripts of what you've heard on the recording, correct?
A. Yes.
Q. They are not transcripts of what you remember the conversations in 2008 to be by your own independent recollection, correct?
A. No.
Q. So, in other words, you listened to the tape and read the transcript and your testimony is that 1000, 1001 are transcripts of what's on the recording, not what you remember was said in 2008, correct?
A. No.
Q. You do remember what was said in 2008?
A. I remember brief conversations from 2008.
Q. Can you -- do you have an independent recollection that

what is on the transcript is what was exactly said between yourself and Detective Quinoy in 2008?

A. Not of everything but of most things.

Q. Some things, but not everything, right?

MR. QUINN: With that limiting qualification, Judge, I have no objection.

THE COURT: Okay, 1000 and 1001 received.

(Government's Exhibit 1000 and 1001 received in evidence)

DIRECT EXAMINATION

BY MS. DUNNE: (Cont'd)

Q. Okay. Let's direct your attention first to 1000 which is identified as 1D-1, Session 9.

MR. QUINN: Judge, I don't mean to interrupt, obviously, for the purposes of this hearing.

THE COURT: No, I know.

MR. QUINN: I still have reservations at trial.

THE COURT: That's a here-and-there problem. We're here, that's there.

MR. QUINN: I understand, I just want to make the record.

THE COURT: No problem.

BY MS. DUNNE:

Q. Government's Exhibit 1000, where it picks up, it says beginning in 33 minutes into the conversation. Where was

the conversation that's transcribed in Government 1000, where did it take place?

A. In the Sleepy Hollow Police Detective's office.

Q. Who was present at that time?

A. Myself, Detective Quinoy, Detective Zekus and Detective Checci.

MS. DUNNE: With the court's permission, may I play the recording?

THE COURT: Yes.

MS. DUNNE: It's relatively short.

Q. While we're queuing it up, the conversation as it picks up is discussing what, what was the subject matter being discussed?

A. The subpoena.

Q. Is this a federal investigation?

A. Yes, I'm sorry, federal investigation.

Q. Of the Gomez incident?

A. Yes.

MR. KENNEDY: Ready?

MS. DUNNE: Yes.

(Tape played)

MS. DUNNE: Can we pause for one second?

BY MS. DUNNE:

Q. The person identified as saying "Federal attorney's going to try to cut you off," and "that wasn't the

question," and you're like, "No, I didn't see that, but I did see when Mario Gomez was punching and kicking Detective Quinoy." Whose voice was that?
A. Detective Quinoy.
Q. Does the transcript, as transcribed, accurately reflect what he was saying at the time?
A. It does.
Q. And do you have an independent recollection of him making those statements at the time, as well?
A. I do.
MS. DUNNE: All right, sorry.
(Tape played)
BY MS. DUNNE::
Q. Following this conversation, did you have a follow-up conversation with Detective Quinoy?
A. I did.
Q. And was that one-on-one?
A. It was.
Q. Approximately what day was that?
A. April 4, 2008.
Q. The next day?
A. Yes.
Q. All right. Directing your attention to Government's Exhibit 1001 and the underlying tape recording.
MS. DUNNE: If we could begin at time marker

27:05. Give me a minute. Technical switching of disks.
BY MS. DUNNE:
Q. While he's waiting to queue it up, there's discussion on Government Exhibit 1000 regarding how many times you actually tased Mario Gomez?
A. Yes.
Q. Did you, in fact, tase Mario Gomez?
A. I did.
Q. And how many times did you tase Mario Gomez?
A. I believe at least four.
Q. And those were taser contacts where you contacted his body?
A. Yes.
Q. Again, on the April 4, 2000 conversation where we pick up here, what was the substance of what you were talking about?
A. The FBI investigation.
MR. D'ALLESANDRO: What page are we on the transcript?
MS. DUNNE: The front page.
THE COURT: It begins at 27:05 of the transcript.
(Tape played)
BY MS. DUNNE:
Q. We're going to forward over to page 15.
A. What page?

Q. Page 15 of the transcript. Before we do that, I want to go over the portion we just heard.

When the transcript reads, "Richie was there and when you kicked him, you kicked him in the" -- and Jose Quinoy says, "Did I?" On page 7 this is.

"Yeah, you kicked him in the back of the car."

And Jose Quinoy says, "You can't fucking say that."

Is that what Jose Quinoy said at the time?

A. It is.

Q. And have you listened to this recording in an enhanced version?

A. I have.

Q. And have you played it with headphones several times?

A. Yes.

Q. Do you also have an independent recollection of him saying that at the time?

A. Yes.

Q. And what did he -- what did you interpret him to be saying to you at the time?

A. That I can't tell the Grand Jury that I saw him punch and kick Mario.

MR. QUINN: Your Honor, is that a generalization or is he saying that was actually what my client said word for word?

THE COURT: I thought it was the latter.

MS. DUNNE: I asked him is it how he interpreted that statement.

BY MS. DUNNE:

Q. Backing up to page 5 in the middle where you say, "Yeah, so you see, did you see Detective Qui -- did you see Detective Quinoy punch him while he's in handcuffs?"

And he says, "No."

And what did you interpret that to mean?

A. I interpreted that to mean that I didn't see Detective Quinoy hit him.

Q. That you should say that?

A. Yes.

Q. And the following conversation about "Nobody knows what you saw but you." How did you interpret that, what did you interpret that to be saying, the defendant to be saying to you at that time?

A. That nobody can speak for what I saw.

Q. And let's fast forward to page 15. And just so that we're clear where we pick up, we're talk being a trap door. What is a trap door?

A. It's the door that's on the front of the taser cartridge.

Q. And what's the significance in the context of this case?

A. It seals in the prongs that come out of the taser.

Q. And what happened with the trap door to your taser, if anything?
A. After the taser malfunctioned, I moved the taser over and the taser finally went off. The trap door sprung out, hit the ground and hit Detective Quinoy.
Q. And where did it hit him?
A. In his face.
Q. And did it leave a visible mark?
A. It did.
MS. DUNNE: Okay.
(Tape played)
BY MS. DUNNE:
Q. Okay. Just backing up on the transcript. When you are talking about being outside the car as the defendant kicked Mario Gomez -- let's look at page 16. It's 15 carried over to 16. You say, "I just started walking back over from the, um, driver's side. I was standing at the door. I don't, I don't know what happened after that. Next thing I know, you're like, boom, kicked him the car, I just slammed the door shut and Richie D. ran to the driver's seat and took off."
From where did you observe the kick of Mario Gomez?
A. From the driver's side.
Q. And when you were making this statement on the tape, was it accurate?

A. No, it wasn't.
Q. At the time you made the statement, did you believe it to be accurate?
A. I did.
Q. What changed your recollection of the events?
A. After seeing the video.
Q. What video?
A. From the liquor store.
Q. What did you determine after observing the video?
A. I was on the driver's side.
Q. On the driver's side of the car?
A. Yes.
Q. Where were you on the driver's side of the car when the kick occurred?
A. I was sitting in the car.
Q. You were actually in the car?
A. Yes.
Q. Where were you in the car?
A. In the driver's seat.
Q. Did you, in fact, observe Jose Quinoy kick Mario Gomez?
A. I did.
Q. And when Jose Quinoy on page 16 says, "Have you told anybody that story," about the kick and the punches that you proceeded it while Mario Gomez was restrained, had you told that story to anybody else?

A. I have.
Q. Who had you told it to?
A. FBI Agent Pena.
Q. And then the following few pages where Detective Quinoy is saying, going through questions and answers, "Did you see when -- well, when I got there, he was on top of me, he was fucking trying -- they were trying to restrain him. They must have hit him, they must have hit him, I don't know. I'm assuming the guy, somebody hit him."
What did you understand him to be saying at that time?
A. At that time? I took it to understand he was telling me he didn't know who hit him.
Q. And did you interpret it to mean what you should say about what you observed?
A. Ah, yes, I did.
Q. And it goes on for several pages saying, "So when I rolled up," this is Detective Quinoy speaking on page 18, "when I rolled up, when I rolled up they were brawling." That refers to what you should say?
A. Yes.
Q. And it continues, "I don't know how it started, I don't know what the trouble was about. I just know it was a cops called for -- officers called for assistance."
Again, this is what Quinoy is telling you you should say?

A. Yes.

Q. And, again, carrying over from page 19 to 20, where you're talking about whether people were hitting each other, and following your statement that the first person that you haven't told this conversation to -- excuse me -- where you're saying, "I'm not going to say anything to anybody, you know, I'm not going to open my mouth."

And then he says, "If you ever have to tell anybody, you talk to me."

Yeah, I would say there was definitely a fight going on when I got there. There's no question that Quinoy hit me."

And then there's an inaudible portion followed by, "Don't want to say anything about." Followed by, "That's going to put me behind bars. Say, no, there's no question that Quinoy hit him."

What was he referring to when he says, "that's going to put me behind bars"?

A. He was referring to, if I said anything, he'd wind up getting arrested.

Q. Meaning about what you observed?

A. Yes.

Q. Meaning what portions of what you observed?

A. Him hitting him and kicking him.

Q. And at the time you observed him hitting him and kicking him, is he talking about when you arrived or after

Mr. Gomez was restrained?
A. After Mr. Gomez was restrained.
Q. Further down on page 20 when he mentions that he spoke to John Barbelet and Stiloski, who are they?
A. They're Tarrytown police officers.
Q. Ad what was their significance to the incident, the Gomez incident?
A. They were there that night.
Q. And does this portion on page 20 indicate that Detective Quinoy had spoken to them already?
A. Yes.
Q. And then page 21, referring to Gasko, who is Gasko?
A. He's a police officer in Sleepy Hollow.
Q. And, again, Detective Quinoy said he's spoken to him, as well?
A. Yes.
Q. And then, when there's discussion about the video showing nothing on page 21, what video is that talking about?
A. The liquor store video.
Q. And where was the liquor store video in relation to the incident?
A. To the left of the police station. I'm sorry, to the right of the police station.
Q. As you face the police station?

A. To the right.
Q. And is it across the street from the police station?
A. Yes.
Q. And did its camera have an unobstructed view of the incident?
A. I believe it was obstructed by a police car.
Q. And then referring to -- I'm sorry, let's fast forward to page 45 of the transcript. Again, you're still talking about your Grand Jury testimony?
MS. DUNNE: Picking up on the top of page 45.
(Tape played)
BY MS. DUNNE:
Q. All right. In the context of this conversation on page 45, the context where he says, "Your testimony's key," what is he referring to?
A. He's referring to what I saw, what I saw the night of October.
Q. And what portion of what you saw?
A. Him hitting him and kicking him while he was restrained.
Q. And the subsequent conversation which is on page 45, "Better talk to an attorney just to see if you're better off not testifying, saying you don't want to testify. If you get past the Grand Jury, the Grand Jury doesn't indict, that's it, then it's over."

What did you interpret him to be telling you?
A. To go talk to an attorney.
Q. And "If you get past the Grand Jury, the Grand Jury doesn't indict," what did you interpret that to mean?
A. If I told the Grand Jury the opposite of what I saw, they wouldn't indict him.
Q. And when you say "the opposite of what you saw," what do you mean?
A. That I didn't see him hit him or kick him while he was restrained.
Q. And did you, in fact, see him hit and kick Mr. Gomez while Mr. Gomez was restrained?
A. I did.
Q. All right. Just for purposes of completeness, you made a further recording, which is Government Exhibit 1002. You have that in front of you?
A. I do.
MS. DUNNE: I'm just going to offer that transcript at this time. I'm not going to go over it with the court, it's not one of those that we anticipate offering into evidence at trial. I'd like to offer the transcript at this time.
THE COURT: The same questions, he reviewed the transcript with the recording and checked it for being accurate for what he heard on the recording?

MS. DUNNE: Yes.

MR. QUINN: Same question, Judge.

THE COURT: Sure. Go ahead.

VOIR DIRE EXAMINATION

BY MR. QUINN:

Q. Detective, is it your testimony that, as you sit here today, you have an independent recollection of your conversation with Jose Quinoy from April 4, 2008 in that what is recorded in that transcript is exactly what was said between --

THE COURT: Just for the record, 1002 is April 16, right?

MS. DUNNE: I thought that one was already in evidence, Judge.

THE COURT: I've got 1000, 1001 --

MS. DUNNE: 1002 which is --

THE COURT: Right.

MR. QUINN: Apologize.

THE COURT: Same question, just change the date.

BY MR. QUINN:

Q. Same question. With respect to you -- you've reviewed Government Exhibit 1002?

A. Yes.

Q. And you've read it?

A. Yes.

Q. Fair to say within the past couple of days, if not today?
A. Yes.
Q. Is it your testimony you have an independent recollection that everything that is contained on that tape is what was said between yourself and Jose Quinoy verbatim?
A. Yes.
Q. You remember a verbatim conversation from April 4, 2008 -- I'm sorry -- April 16, 2008 on today's date, which is May 17, 2010?
A. I remember some of it.
Q. But there are portions in there that you don't recall verbatim, correct?
A. Yes.
Q. And you cannot testify whether or not anything has been deleted from that conversation, correct?
A. Yes.
Q. And you're not sure if it encompasses the entire conversation of that day, correct?
A. Yes.
Q. And you're not sure -- you don't know, as you sit here today, of your own independent recollection, that what is recorded in that tape is what was actually said between yourself and Officer Quinoy on April 16, 2008, correct?
A. Not the whole thing, no.

MR. QUINN: With that limited qualification for limited purpose of this hearing, Judge, I have no objection.

THE COURT: Okay. 1002 received.

(Government's Exhibit 1002 received in evidence)

DIRECT EXAMINATION

BY MS. DUNNE: (Cont'd)

Q. Other than the communications memorialized in Government's Exhibit 1000, 1001 and 1002, the three transcripts of you and Detective Quinoy, do you recall any conversations with Detective Quinoy about the substance of the Mario Gomez incident that are not recorded in those recordings and -- recorded in those recordings?

A. No.

Q. Did you have any conversations on any other dates than those three dates with Detective Quinoy about the Gomez incident?

A. No.

Q. When you made a recording for Special Agent Pena, how did you go about returning the equipment to her?

A. I would call her and meet her somewhere.

Q. And then what would you do?

A. I would hand the recording over to her.

Q. And what would she do?

A. She would then take it.

Q. After these three recordings with Detective Quinoy, did

Officer, Agent Pena ask you to make other recordings with other people in the police department?
A. Yes.
Q. On or about May 22 of 2008, did Agent Pena ask you to record a conversation with Officer D'Allesandro?
A. Yes.
Q. Who's Officer D'Allesandro?
A. He's a police officer in Sleepy Hollow.
Q. Was he present on the day of the Mario Gomez incident?
A. Yes, he was.
Q. When you met with Agent Pena on May 2008, did you have a conversation with her at that time about the recordings you were to make?
A. I did.
Q. And do you recall the details of that conversation?
A. Some of it.
Q. Excuse me?
A. Some of it.
Q. What part do you recall?
A. I recall talking to her about rumors that were being spread around the village.
Q. Did you have any conversation with her about Agent Spota?
A. I did.
Q. Who is Agent Spota?

A. He was the fire chief in Sleepy Hollow.
Q. Did he have another position, as well?
A. Yes, he was an FBI agent.
Q. What, if any, conversation did you have with Agent Pena on May 22, 2008 regarding Agent Spota?
A. I let Agent Pena know that Todd Spota came up to me the night before and started talking to me about the investigation.
Q. The night before you met with her?
A. Yes.
Q. And he had talked to you about what?
A. That somebody went to the FBI and told them that he was a fire chief of Sleepy Hollow.
Q. And did he confront you as to whether it was you?
A. He did.
Q. And when you had your conversation with Agent Spota, did he give you any directions if you were to be contacted by the FBI?
A. Yeah, told me not to tell Agent Pena that me and him spoke about the investigation.
Q. And then when you saw Agent Pena, did you, in fact, tell her about the contact?
A. I did.
Q. After you left Agent Pena, what did you do with the recording device?

A. I stuck it in my pocket.
Q. Is that what you normally did?
A. Yes.
Q. And where did you go next?
A. I started driving down Route 9 towards the back end of the Village.
Q. Were you on duty?
A. I was.
Q. And what did you do that afternoon, if you recall, or evening?
A. I answered a radio run for a disabled vehicle on County House Road.
Q. What does that mean?
A. Gentleman called that his vehicle was disabled and was in the roadway.
Q. And so you answered a call for roadside assistance?
A. Yes.
Q. And what else did you do?
A. I called my father.
Q. Did you call him on speakerphone or by telephone?
A. My cell phone.
Q. And you were in your car?
A. I was in the police car, yes.
Q. And what did you talk about with your father?
A. I let my father know that I spoke to Agent Pena about

the conversation me and Todd had.
Q. You and Todd?
A. Me and Todd Spota.
Q. Did your father know before that night that you were cooperating with the FBI?
A. He knew I was speaking with them, yes.
Q. Did he know you were wearing a recording device at times?
A. No.
Q. And when you spoke to him about your communications pertaining to Agent Spota, what did you tell him?
A. I told him I fucked Todd.
Q. I'm sorry, you told him what?
A. I fucked Todd Spota.
Q. And what did you mean?
A. That I fucked him because that I told Agent Pena that me and him had a conversation.
Q. Did there come a time you realized the recording device you had left with that day from Agent Pena was, in fact, on?
A. Yes.
Q. How did you come to that realization?
A. I pulled it out of my pocket and I saw the light flashing on.
Q. What did you do?
A. I attempted to turn it off. When I couldn't turn it

off, I called Agent Pena and told her the device was on. She told me I'd have to press the button harder to turn it off, I did. At that time it went off.
Q. Do you know how long the device was on?
A. Forty-five minutes.
Q. Do you recall, as you sit here today, every single thing you did while the recording device was on?
A. Not everything.
Q. Were there several radio calls on your tour of duty?
A. I believe there was a few.
Q. And prior to turning it off, you had already spoken with Agent Pena about the recording she was going to ask you to make?
A. Yes.
Q. And what was the recording she was asking you to make?
A. She was asking me to speak with Richie D.
Q. When you say Richie D is that D'Allesandro?
A. Richie D'Allesandro.
Q. Did there come a time when you reactivated the recorder to record a conversation with Richie D'Allesandro?
A. Yes.
Q. Do you recall a specific date that you did that?
A. Not the specific date.
Q. Do you recall the circumstances of when you did that?
A. Yes.

Q. What were the circumstances?
A. We were in the locker room changing.
Q. And do you recall what time of day it was?
A. It was just before midnight.
Q. And have you reviewed radio call -- I'm sorry, roll call reports to determine what specific date it was that you and Richie D'Allesandro had this communication?
A. Yes.
Q. I'm going to direct your attention to what's before you as Government Exhibit 1003. Do you recognize that?
A. Yes.
Q. What is it?
A. It's the roll-call sheets from the Sleepy Hollow Police Department.
Q. For what dates?
A. May 21, May 22, May 23 and May 24.
Q. And by reviewing the roll call reports, were you able to identify which date you contacted Richard D'Allesandro at a shift change for a conversation?
A. Yes.
Q. And what date was it?
A. Saturday, May 24.
Q. And how can you tell that by looking at this report?
A. Because I was on the desk when I recorded him.
Q. The day you recorded him?

A. Yes.
Q. You have an independent recollection of that?
A. Yes.
Q. And do these records, could you show us where these records indicated that you were on the desk on the 24th?
A. Right next to my name. "Hayes, Michael." It says "3E3."
Q. Where is that in this document?
A. "Shift."
Q. On the date of May 24 --
A. May 24.
Q. -- 2008?
A. Yes.
Q. The last two pages?
A. Yes.
Q. The last page or the next-to-last page?
A. The next-to-last.
Q. And your name says "desk"?
A. Yes.
Q. And what tour of duty were you on for the desk?
A. The 4-to-12 tour.
Q. Is that what 3E3 means?
A. Yes.
Q. And that's 4 to midnight?
A. Yes.

Q. What shift was Officer D'Allesandro on?
A. He was coming in for a midnight.
Q. And how can you tell that?
A. Because down here at the bottom he had already worked his first midnight Saturday morning and he was coming in for his second midnight on Sunday.
Q. Where does it indicate that?
A. It doesn't.
Q. How do you know that?
A. Because we work four shifts, four days straight.
Q. And how can you tell from here that he was on midnights that night?
A. No, you can't.
Q. How can you say that?
A. Because I had a recollection of him coming in that night.
MS. DUNNE: I'd like to offer Government's Exhibit 1003 into evidence.
MR. QUINN: No objection, Judge.
THE COURT: Received.
(Government's Exhibit 1003 received in evidence)
BY MS. DUNNE:
Q. When you spoke to Officer D'Allesandro, do you recall the specifics of what you spoke about?
A. Some.

Q. What do you recall speaking about?
A. The incident on October 2006.
Q. The Mario Gomez incident?
A. Yes.
Q. And what do you recall him saying?
A. I remember him -- I remember asking him if he saw Detective Quinoy punch Mario, and he said, no.
Q. While Mario was restrained?
A. Yes.
Q. Just to qualify. And did you ask whether he saw Detective Quinoy kick Mario Gomez while Mario Gomez was in the police car?
A. I did.
Q. Do you recall what his response was?
A. He said he didn't see that.
Q. Did he say in response to any of your questions, it didn't happen?
A. I don't believe so.
Q. When you were finished with the conversation, do you recall any of the specifics of the conversation?
A. Not really.
Q. After the recording was -- after your discussion was concluded, what did you do with the recording device?
A. I turned it off and put it in my pocket.
Q. And what did you do next?

A. I went home.
Q. Did there come a time you called Agent Pena?
A. Yes.
Q. When was that?
A. The next day.
Q. Did you make arrangements to return it to her?
A. I did.
Q. Do you recall when you returned it to her?
A. No, I don't.
Q. Do you recall how many days later you returned it to her?
A. A few days.
Q. Less than five days?
A. Yes.
Q. As you sit here today, you know this conversation with Officer D'Allesandro and the inadvertent recording is known as 1D-4? Do you know that?
A. I know now, yes.
Q. And when did you learn that this is known as 1D-4?
A. May 2010.
Q. Earlier this month?
A. Yes.
Q. And who notified you that this is called 1D-4?
A. The US Attorney's office.
Q. And as you sit here today, do you know what was or was

not recorded by the recording device on 1D-4?
A. No, I don't.
Q. Did you ever take any action to erase the contents of recording 1D-4?
A. No, I did not.
Q. Did you ever discuss with Agent Pena dumping or erasing or destroying the recording of 1D-4?
A. No.
Q. Did 1D-4 have any communications on it with Detective Quinoy?
A. No.
Q. Did there come a time in early June when Agent Pena contacted you to make another recording?
THE COURT: June of '08.
MS. DUNNE: I'm sorry, what did I say?
THE COURT: You said early June.
MS. DUNNE: Oh, I'm sorry. June of '08. Thank you, Judge.
A. Yes.
Q. And did you meet with her again?
A. I did.
Q. All right. And this recording has come to be known as 1D-5?
A. Yes.
THE COURT: Same thing you learned about that

earlier this month?

THE WITNESS: Yes.

BY MS. DUNNE:

Q. All right. And when you met with Agent Pena in early June of 2008, what did she ask you to do?

A. She asked me to record Michael Gasko.

Q. Who is Michael Gasko?

A. A police officer in Sleepy Hollow.

Q. Was he also present during the Gomez incident?

A. He was.

Q. Did there come a time when you learned that the 1D-5 recording device inadvertently had recorded a conversation between yourself and Agent Pena?

A. Yes.

Q. How did you learn about that?

A. From the US Attorney's office.

Q. And when was that?

A. May of 2010.

Q. Prior to being -- and how did you learn about it? Was it played for you?

A. Yes.

Q. Prior to hearing it in May of 2010, did you ever know that your conversation with Agent Pena had been recorded?

A. No.

Q. Had you ever discussed with Agent Pena that you had

inadvertently been recorded on that day?
A. No.
Q. In that conversation with Agent Pena, you made a statement that you had said something inappropriate on 1D-4; is that correct?
A. Yes.
Q. Do you recall making that statement?
A. Yes.
Q. And when you made the statement that you had said something inappropriate in 1D-4, what were you referring to?
A. I was referring to the fact that I fucked Todd Spota.
Q. That you had said you had fucked --
A. Yes, I said I fucked Todd Spota.
Q. And why was that an inappropriate comment to put on the recording?
A. Because I shouldn't have been discussing the case with anybody.
Q. And who were you discussing it with?
A. My father.
Q. And what was the concern that you had about being caught on tape having a discussion about the investigation with your father?
A. That they would find that I was talking to somebody.
Q. That who would find out?
A. Agent Pena.

Q. In fact, you told her, in any event.
A. I did.
Q. Prior -- pardon me. I withdraw that question.
Did there come a time when Agent Pena asked you to review transcripts of certain recordings?
A. She did.
Q. Could you describe the process of how the transcripts were reviewed?
A. She would call me in, I would sit in the US Attorney's office, the transcripts would be sitting at the table with the -- sitting at the table, not stapled, with the disk inside the laptop.
Q. So there was a -- were you in a conference room?
A. Yes.
Q. Were you by yourself?
A. Sometimes.
Q. And if you weren't by yourself, who would be there?
A. Agent Pena would be in the room.
Q. And how would you listen to the recordings?
A. Through headphones.
Q. Were they broadcast throughout the room or were they privately being heard by you?
A. They were privately being heard.
Q. When you entered the room, did you have any say as to which transcript or which pages of transcripts you were to

review?
A. No.
Q. And did you undertake any action to look at different tracks of what might have been on the computer?
A. No.
Q. How was it set up for you?
A. When I come in the room, the transcripts Agent Pena would ask me to review would be sitting on the desk and the disk would be in the computer being already set to play.
Q. So it would already be queued up to where you were supposed to start to listen to it?
A. Yes.
Q. And who queued it up for you?
A. Agent Pena would queue it up.
Q. What would you do when you listened to it?
A. I would sit there with the headphones on and I would make corrections on the transcripts if it needed it.
Q. How would you go about making corrections?
A. If there is a something that was inaudible that I heard, I would cross it out and write it in.
Q. If there was something erroneously transcribed, would you correct that, as well?
A. Yes.
Q. When you made the edits or when you went through this process of reviewing transcripts, did there come a time when

she asked you to review Session 2 of 1D-5, your conversation with Officer Gasko?

A. Yes.

Q. And when you reviewed the transcripts pertaining to 1D-5, Session 2, the conversation with Officer Gasko, did you ever hear the transcript of Session 1 which was the inadvertent overhear of you and Agent Pena?

A. I did not.

Q. That was never played for you?

A. No.

Q. And when you reviewed the transcript of Session 2, did you make revisions to it?

A. I did.

Q. And did you discuss those revisions with Agent Pena?

A. I did.

Q. And did there come a time when she asked you to sign a transcript, a more finalized transcript of 1D-5, Session 2?

A. She did.

Q. I'd like to direct your attention to the two documents, remaining documents that should be in front of you, Government's Exhibit 1004 and Government's Exhibit 1005. Start with 1004. Is that your signature that appears on the front page of that document?

A. It is.

Q. If I could direct your attention to page 2. Does this

transcript reflect a transcript that you reviewed?
A. No, it does not.
Q. And how can you be certain of that?
A. Because, if it was, I would have made corrections to it.
Q. For example?
A. At the bottom, the last "CP," it says, "Uh, is denying in questioning and he's really bad liar." I would have corrected the unaudible.
Q. Why?
A. When it was played for me, you could actually hear who was referred in that.
Q. And that's Catherine Pena speaking?
A. Yes.
Q. Did you ever discuss with Catherine Pena this portion of your conversation being recorded?
A. No.
Q. Did you ever see this page of this transcript prior to being shown it in May, excuse me, May of 2010?
A. No.
Q. But your signature appears on page 1.
A. Yes.
Q. When you signed page 1, was it stapled to the remainder of the document?
A. I believe it was.

Q. The remaining portion of the document, the remaining portion of the document, does it appears to be a transcript you reviewed?

A. It does.

Q. Is that Session 2 the remainder of the document?

A. Yes.

Q. In addition, on page 2, you have subsequently heard Session 1, you know it goes on much longer than what's depicted there?

A. Yes.

Q. And if you had been presented with this transcript, what would you have done?

MR. QUINN: Objection, Judge.

THE COURT: No, it's okay.

MR. QUINN: Withdrawn.

THE COURT: Go ahead. You can answer.

A. If I had been presented with the Session 1 of this, I would have made corrections to it.

Q. And would you have just let it stop in mid-sentence like this?

A. No.

Q. Directing your attention to Government Exhibit 1005. Is that your signature on the front page of that document?

A. It is.

Q. Looking to page 2, does that appear consistent with the

transcript that you reviewed?
A. It does.
Q. And have you compared 2000 -- I'm sorry, 1004, 1005, the first few pages, and is there a difference?
A. Yes.
Q. And what's the difference?
A. There's on Exhibit 1005 is missing the conversation between me and Agent Pena.
Q. Do you now how that came to be removed?
A. No, I don't.
Q. And do you have any recollection of ever reviewing Session 1?
A. No.
Q. Did you ever discuss it with Agent Pena, Session 1?
A. No.
MS. DUNNE: I'd like to offer 1004 and 1005 into evidence.
MR. QUINN: Just briefly. Just timeframe.
When? I'll save it for cross. No objection.
THE COURT: Okay. 1004 and 1005 received.
(Government's Exhibit 1004 and 1005 received in evidence)
MS. DUNNE: I'll just follow up on that for Mr. Quinn.
BY MS. DUNNE:

Q. On the dates under your signature, what is the significance of those dates?
A. Those are the dates I signed them.
Q. So 1004 was signed September 1, 2009?
A. Yes.
Q. And 1005 was signed September 28, 2009?
A. Yes.
Q. After 1D-5, did you make a few additional recordings for Agent Pena?
A. I don't recall.
Q. Did you ever record conversation with an Officer Nelson?
A. I did.
Q. And did you also record subsequent conversations with Officer Gasko?
A. I did.
Q. Other than that, do you recall any additional recordings that you made?
A. No.
Q. Did you ever have any additional conversations, recorded or not recorded, with Detective Quinoy regarding the Mario Gomez incident?
A. No.
Q. At any time in your contacts with Agent Pena, did she ever tell you what to say about what you observed at the

Gomez incident?
A. No.
Q. Did she ever tell you what other witnesses had said about the Gomez incident?
A. No.
Q. Did she ever suggest that you tailor your testimony to change what you told her you observed?
A. No.
Q. Did she ever suggest that you say anything other than what you actually observed?
A. No, she did not.
Q. Did she ever suggest that you attempt to influence anyone in their testimony?
A. No.
Q. Did you ever discuss the Luis Vilchez with Detective Quinoy, the Luis Vilchez event, incident?
A. No.
Q. Did you ever discuss the Rivera incident with Jose Quinoy?
A. No.
Q. And with regard to the recordings, the handling of the recording device that you testified about, did you follow that procedure on each and every recording that you made for Agent Pena?
A. Yes.

Q. And did you take any action whatsoever to alter or delete any of the recordings that you made for Agent Pena?
A. No.
MS. DUNNE: I have no further questions.
THE COURT: Okay. Cross examination?
CROSS EXAMINATION
BY MR. QUINN:
Q. You indicated that you had a conversation, recorded conversation with Officer Nelson?
A. Yes.
Q. What was the substance of that conversation?
A. The taser incident.
Q. How long did that conversation last?
A. Fifteen, twenty minutes.
Q. What did Officer Nelson say to you?
A. I don't recall at this time.
Q. You don't recall the details, independent recollection at all?
A. Some things. I just discussed -- we just discussed what happened that night.
Q. What did he tell you?
From your independent recollection, as you sit here today, what did Officer Nelson tell you about what he saw?
A. I remember him telling me that him and Detective Quinoy were standing on the corner and they saw a gentleman or a

child riding a bike down the sidewalk, and they told the child to get off the bike and walk it while he was on the sidewalk.

Q. What else do you remember?

A. That they -- the child took off on the bike and they chased him down the street.

Q. Anything else?

A. That's all I can remember.

Q. How many conversations did you have recorded with Officer Gasko?

A. To my recollection, at least two.

Q. Does that mean there could have been more?

A. No.

Q. Are you testifying under oath that you had two recorded conversations with Officer Gasko?

A. Yes.

Q. Where was the first conversation recorded? What are you looking at?

A. I don't recall where the first one was recorded.

Q. What were you looking at?

A. I was looking at the transcript.

Q. Okay. Can I have that back, please?

MS. DUNNE: May I approach?

THE COURT: You can approach and get it, yes.

MS. DUNNE: Can I have all the transcripts,

please?
BY MS. DUNNE:
Q. Where was the first recorded conversation you had with Officer Gasko?
THE COURT: Where or when?
MR. QUINN: Where.
A. If I recall, it was my cottage in Chappaqua.
Q. In your house?
A. Yes.
Q. What was the substance of that conversation?
A. Just to talk about what happened on the night of October 2006.
Q. How long did you record Officer Gasko?
A. I don't recall.
Q. What did he tell you during that first conversation at your home in Chappaqua?
A. Just what he saw that night.
Q. What did he tell you he saw that night?
A. That Mario Gomez came driving up in his truck, got out of the car and they went over to -- over to try and calm him down and arrest him.
Q. What else did he tell you?
A. We also discussed what he was looking for the night after the whole thing was over.
Q. Not what we discussed, what did he tell you?

A. He told me he was looking for his taser cartridge that he dropped.
Q. What else did he tell you?
A. I don't recall.
Q. You don't recall in terms of the first conversation you had in your home in Chappaqua, you don't recall how long it was, and other than what you just told us, you don't recall anything else Officer Gasko said to you, correct?
A. No.
Q. Is that correct, yes?
A. Yes.
Q. Where was the second conversation?
A. It was across the street from the police station.
Q. When was that?
A. I believe June of 2008.
Q. Were you using the same recording device that you had used when you recorded the Chappaqua conversation?
A. It was the same kind of device, yes.
Q. Was it the exact same device?
A. Not that I know of.
Q. Do you know?
A. No, I don't.
Q. So you're not sure, as you sit here today, whether than more than one conversation with Officer Gasko was captured on that same recorder, correct?

A. No, only on that one recorder, only one with conversation.
Q. You're sure of that.
How long did that conversation last?
A. Ten minutes maybe.
Q. What did Officer Gasko tell you during that conversation?
A. Same thing, just what happened outside.
Q. What did he tell you?
A. I don't recall.
Q. So as you sit here today, you don't have any independent recollection of anything Officer Gasko told you in June of 2008 during the ten-minute conversation that you recorded, correct?
A. Yes.
Q. And you're not able to recall independently anything he told you during that conversation, correct?
A. Not from that conversation.
Q. When you received the recorder from Officer Pena the first time, she instructed you how to use it, correct?
A. Yes.
Q. She told you how to turn it on, correct?
A. Yes.
Q. And she would instruct you as to who she wanted you to record, correct?

A. Yes.
Q. And she told you that the way to make certain that the recorder was on was that when noise came, the light would flash, correct?
A. Yes.
Q. And the way to test to make sure the recorder was on was to cough, correct?
A. You could cough or talk.
Q. And she told you you could cough, right?
A. Yes.
Q. And by coughing, the light would flash, right?
A. Correct.
Q. And when the light flashed, you would then know the recorder was on, correct?
A. Yes.
Q. And you did that on a number of occasions while you were wearing these recording devices, correct?
A. Yes.
Q. That was the common way that you would test it to make sure that it was working, so that when you recorded one of the subjects that you were interviewing, it would be captured on the recorder, correct?
A. Yes.
Q. The first recorder you wore you had a conversation with Officer Quinoy, correct?

A. Yes.
Q. And that conversation was actually took how long -- well, withdrawn.
When you first recorded Officer Quinoy, it was while you were present in headquarters, correct?
A. Yes.
Q. And there were a number of officers who were present making comments, correct?
A. Yes.
Q. And that entire conversation lasted approximately 45 or 46 minutes, correct?
A. Yes.
Q. And while you were making that recording, there were not only voices of Officer Quinoy himself but voices of other officers who were milling about the command, correct?
A. Yes.
Q. And that entire conversation took place in the public area of the command, correct?
A. Yes.
Q. So that all of the voices of everyone in the command was picked up on that recording, correct?
A. Yes.
Q. Did you do that intentionally?
A. No.
Q. So you turned the recorder on and let it run while you

were having conversations with many members of the department, correct?
A. Yes.
Q. Even though you were only supposed to be having a conversation with Officer Quinoy, right?
A. Yes.
Q. At what point did you realize that the recorder was on unintentionally?
A. I knew it was on the whole time.
Q. Did you make any effort to turn it off?
A. I had to get a brief second so I could sneak away to turn it off.
Q. Did you do that?
A. I eventually did, yes.
Q. After you spoke with Officer Quinoy as related in Government Exhibit 1000, the transcript that you looked at this morning, correct?
A. Yes.
Q. But Government Exhibit 1000, which is the conversation with yourself and Officer Quinoy and Detective Zekus had 33 minutes of additional recording before what's captured on the transcript, right?
A. Yes.
Q. And it was an unintended recording for 33 minutes; is that fair to say?

A. Yes.
Q. You know what was said during that 33 minutes because you were provided with a transcript of the entire 45-minute conversation by Agent Pena, right?
A. Yes.
Q. So when she provided you with the transcript of the first recording, she just didn't give you the pertinent part that's captured in Government's 1000, she gave you the entire transcript, correct?
A. Yes.
Q. And you listened to the tape from beginning to end, correct?
A. Yes.
Q. And you read a transcript that recorded beginning to end, correct?
A. Yes.
Q. And you edited the entire transcript beginning to end, correct?
A. Yes.
Q. By the way, how soon after the recordings were made did you go to the US Attorney's office to make edits to the transcripts?
A. I started doing that 2009.
Q. Not in 2008?
A. No.

Q. Did you listen to the tapes in 2008?
A. No.
Q. So, throughout the entirety of 2008, you never went to the United States' Attorney's office or to Agent Pena's office to listen to the recordings you had captured on the recorder?
A. No.
Q. The second conversation you had with Officer Quinoy was on the same or different recorder?
A. The second one?
Q. Yes.
A. Was on a different recorder.
Q. That was the April 4 recording, correct?
A. Yes.
Q. Captured as Government Exhibit 1001, correct?
A. Yes.
Q. And, again, on that recording, the transcript shows a conversation, but there was a great deal more recording that you listened to, correct?
A. Yes.
Q. And that you captured on the recorder, correct?
A. Yes.
Q. And, again, the voices that are not included on Government's Exhibit 1001 are other officers, correct?
A. I don't recall.

Q. You don't remember, as you sit here today, what else is included on the second recorder?
A. To my knowledge, it was just me and Detective Quinoy.
Q. Did you inadvertently tape-record anybody the second time you got a recorder?
A. No.
Q. The third time you got a recorder, again, it was with Detective Quinoy?
A. Yes.
Q. And you were recording Detective Quinoy at Officer Pena's suggestion, correct?
A. Yes.
Q. Because you were attempting to get him to admit certain actions he took on October 17, 2006, correct?
A. Yes.
Q. The purpose of wearing the wire was to investigate the civil rights violations that occurred in October 2006, correct?
A. Yes.
Q. You weren't wearing the wire because you were trying to get evidence of the obstruction, correct?
A. No.
Q. You were wearing the wire to get evidence, to get admissions from Jose Quinoy as to what happened on October 17, 2006, right, between himself and Mario Gomez?

A. Yes.
Q. And that's why you interviewed Quinoy and Gasko, correct?
A. Yes.
Q. And that's why you interviewed D'Allesandro, correct?
A. Yes.
Q. Because they were present during the incident between Quinoy and Gomez, correct?
A. Yes.
Q. You were also investigating at the time whether or not Officer Quinoy violated the civil rights of Duanny Lara Mota, correct?
A. Yes.
Q. And that was your understanding when you recorded Officer Nelson, correct?
A. Yes.
Q. In fact, the only reason you recorded Officer Nelson was in the hope that Officer Nelson would implicate Jose Quinoy in an alleged civil rights violation of Duanny Lara Mota?
A. Yes.
Q. It had absolutely nothing to do with attempting to see whether or not Jose Quinoy was obstructing any type of investigation, correct?
A. I don't believe so.

Q. It had nothing to do to see whether or not he was tampering with any type of witness or evidence, correct?
A. I don't believe so.
Q. You don't believe so because Agent Pena told you that the reason for the wires was to see if you could develop evidence regarding the Gomez incident and the Lara Mota incident, correct?
A. She never actually told me what the reason was for the wires.
Q. She instructed you what she wanted the witnesses or the persons that you were recording to say, correct?
A. Yes.
Q. She told you the subject matter that you're supposed to raise, correct?
A. Yes.
Q. You went in there with an understanding of what you were going to try to capture, Nelson and Gasko and Quinoy and D'Allesandro to say on tape, correct?
A. Yes.
Q. And it had nothing to do with obstruction, correct?
A. I don't believe so, no.
Q. It only had to do with the alleged civil rights violation, correct?
A. Yes.
Q. Each time you would get a recording device, you would

capture a subject and return the recording device to Officer -- Agent Pena, correct?
A. Yes.
Q. And the recording devices were different, correct, they weren't always the same, right?
A. No, they were always the same.
Q. Each one of them -- so we're clear, was it the same device or same type of device?
A. It was the same type device.
Q. Okay. Now the first time you had it with Jose Quinoy, you inadvertently turned it on and captured recordings you didn't intend to, correct?
A. I turned it on and went into the office and spoke with him.
Q. So you recorded things you didn't intend to record, right?
A. I recorded other people that were in the office.
Q. That you didn't intend to record, correct?
A. No, I didn't intend to record them.
Q. And then the second time also you turned it on and recorded voices and conversations that you didn't intend to record, correct?
A. Yes.
Q. And the third time you turned it on, you turned on the recorder and you captured voices and conversations you

didn't intend to record, correct?
A. Uh-hum.
Q. Yes?
A. Yes.
Q. And the fourth time you got a recorder from Agent Pena, the subject was going to be Officer D'Allesandro, correct?
A. I believe so, yes.
Q. It became known to you that you unintentionally recorded a conversation between yourself and Agent Pena, correct?
A. Yes.
Q. How did you learn that?
A. From the US Attorney's office.
Q. When?
A. May of 2010.
Q. Let me rephrase my question. When did you first know that you accidentally recorded yourself and Agent Pena having a conversation on 1D-4?
A. May 2010.
THE COURT: 1D-4 or 1D-5.
MR. QUINN: 1D-4.
THE COURT: Okay.
BY MR. QUINN:
Q. Did you know -- when was 1D-4 done, do you remember, on or about June 2008?

A. I don't remember the exact days.
Q. May or June?
A. Yes.
Q. While you had 1D-4, did you realize that you had intentionally recorded something on 1D-4?
A. Yes.
Q. And you realized it that day, correct?
A. Yes.
Q. So, in May or June of 2008, you were aware that you were recording what you believed 45 minutes of unintended conversation, correct?
A. Yes.
Q. And you handed the recorder back to Agent Pena.
A. Yes.
Q. And you told her that you said inappropriate things on 1D-4, right?
A. Yes.
Q. But when you did that, she had already given you 1D-5, right?
A. I don't recall.
Q. Have you listened to 1D-5, Session 1, before today?
A. Yes.
Q. Do you know that you are recorded telling Agent Pena that you said inappropriate things about Todd Spota on 1D-4?
A. Yes.

Q. So you were telling the agent that you accidentally and unintentionally recorded a conversation where you said something you shouldn't have said on tape, right?
A. Yes.
Q. And there was no question in your mind when you reported that to Agent Pena that the recorder had captured your inappropriate comment, correct?
A. I believe it did.
Q. And you believed it did because after you realized it was running, you tested it again, correct?
A. Yes.
Q. And you tested it by coughing again, correct?
A. Yes.
Q. And when you coughed, the light flashed, correct?
A. Yes.
Q. And that's what made you realize while you were wearing or in possession of the recorder we now call 1D-4, that you had recorded yourself for at least 45 minutes making inappropriate comments, correct?
A. Radio runs.
Q. And the comment to your father that you fucked Todd Spota, correct?
A. Yes.
Q. And what you meant by that was Todd Spota -- you spoke with Todd Spota about this incident between Quinoy and

Gomez, correct?
A. We spoke about the investigation.
Q. Which you weren't supposed to do, correct?
A. No.
Q. In fact, Pena told you not to tell anybody, correct?
A. Yes.
Q. But you told Todd Spota.
A. No, Todd Spota came to me and started talking to me about it.
Q. And you responded, correct?
A. I gave him very short answers.
Q. Did you tell him you were working with the government?
A. No, I didn't.
Q. Did you tell him you knew Agent Pena?
A. I told him I knew that she was doing the investigation.
Q. What else did you tell him?
A. That's it. I tried to keep the conversation short.
Q. How long was the conversation?
A. Regarding the investigation?
Q. How long was your conversation with Todd Spota?
A. About 20 minutes.
Q. And this was, again, in May or June of 2008, correct?
A. Yes.
Q. Is that the first time you ever spoke to Todd Spota about what happened between Mario Gomez and Jose Quinoy on

October 17, 2006?
A. No, no, it's not.
Q. It's not, is it?
A. No.
Q. You spoke to him the very next day, correct?
A. Very next day when?
Q. October 18.
A. I did.
Q. And at that time you told him that Jose Quinoy looked like he had been hit by a car, right?
A. Mario Gomez, yes.
Q. Mario Gomez or Jose Quinoy?
A. Mario Gomez.
Q. Your testimony is that you told Agent Spota that it was Mario Gomez that looked like he got hit by a car?
A. I'm sorry, can you ask me that again?
Q. Yes. When you spoke to Todd Spota on October 18 -- and, by the way, at the time you spoke to him, you knew he was an FBI agent, correct?
A. Yes.
Q. You told Todd Spota that you observed Jose Quinoy on October 17, 2006, and that he looked like he had been hit by a car, correct?
A. I told him when I first pulled up to the scene, it looked like somebody was hit by a car.

Q. You told him Jose Quinoy looked like he was hit by a car, didn't you?
A. Yes.
Q. Why aren't you answering the question the first time, Officer, is there a reason you don't want to tell us that?
A. No.
Q. So we're clear, the day after this incident, you told an FBI agent that Jose Quinoy had such injuries that he looked like he had been hit by car, correct?
A. I told Agent Spota that when I first pulled up to the scene, I thought Jose Quinoy was hit by a car because I saw his feet in the street. I never said he had injuries that looked like he got hit by a car.
Q. So, because you saw his feet on the street, you thought an officer had been hit by a car?
A. When I first rolled up to the scene and I saw somebody's feet dangling, yes, I thought an officer was hit by a car.
Q. That's your testimony as to how you intended to communicate that to Agent Spota?
A. No, I intended to communicate to Agent Spota what I saw that night.
Q. And the way you communicated was by telling Agent Spota that Jose Quinoy looked like he had been hit by car.
A. No, you're taking my words out of context. What I said

to was, I told him, I said, when I first pulled up, it looked like he was hit by a car.

MR. QUINN: If I can have a second, Judge?

THE COURT: Sure.

BY MR. QUINN:

Q. Did you see any injuries to Jose Quinoy on October 17, 2008?

A. I did.

Q. What type of injuries did you see?

A. Where the taser hit him in this face, the trap door of the taser hit him in the face.

Q. No other injuries?

A. Not to my recollection.

Q. And you're saying any injuries on his face and head were caused by the trap door of the taser?

A. I believe so.

Q. How much does a trap door weigh?

A. I don't know.

Q. An ounce, if that?

A. I don't know.

Q. Less than an ounce. You've held it before, haven't you?

A. The trap door itself?

Q. Yes.

A. I've never actually held a trap door.

Q. So you don't know how much a little piece of plastic called a trap door on taser weighs?
A. No.
Q. You're saying whatever injuries Jose Quinoy had on October 17, 2006, were caused by that trap door.
A. The one that I observed, yes.
Q. You only observed one injury?
A. That night, yes.
Q. On what side of his face?
A. I don't recall.
Q. By the way, October 17, 2006, did you see Mario Gomez fighting with the police officers?
A. I never saw Mario actually physically fighting with anybody.
Q. Then why did you taser him five times?
A. Because we were attempting to arrest him.
Q. Well, do you normally taser people who aren't resisting?
A. No.
Q. Then why did you tase Mario Gomez?
A. Because he had his arms underneath him, and he wasn't giving us his arms.
Q. So you -- you've been trained in the use of a taser, right?
A. Yes.

MS. DUNNE: Objection. Getting a little far afield from the purpose of the hearing here, Judge. Sounding a little bit like the trial.

THE COURT: I'll give Mr. Quinn a little leeway on this. Go ahead.

BY MR. QUINN:

Q. You've received training how to use a taser, correct?

A. Yes.

Q. You're supposed to use a taser on a noncompliant or resisting suspect, correct?

A. Yes.

Q. And you're saying the only thing Mario Gomez was doing was keeping his hands underneath his stomach?

A. Yes.

Q. And he was face down?

A. Yes.

Q. And then you decided on your own to tase him five times?

A. Four times.

Q. Four times?

A. Yes.

Q. Nobody told you to tase him, right?

A. No.

Q. Jose Quinoy certainly never told you to tase him, correct?

A. No.
Q. No one asked you to tase him.
A. No.
Q. You made a conscious decision on your own stepping out of a car watching a guy lying on the ground who's not struggling or fighting with the police officers, to walk up and tase him four times?
A. Yes.
Q. At the time did you even know whether or not he was handcuffed?
A. He was not handcuffed.
Q. How could you tell?
A. Because, if he was, he would have been cuffed in the rear.
Q. How do you now know, you've never seen somebody front-cuffed?
A. Because that's a standard procedure in Sleepy Hollow.
Q. That's not my question. Did you ever see somebody front-cuffed?
A. Yes, I have.
Q. Sometimes they're struggling, you can't get them rear-cuffed?
A. Yes.
Q. What you've got to do is front-cuff to gain compliance.
A. I've never done that, no.

Q. You've seen it, have you, Officer?
A. I never seen anybody get front cuffed to gain compliance.
Q. But you've seen individuals front-cuffed.
A. I've seen prisoners handcuffed.
Q. And when you arrived, you couldn't see Mario Gomez' hands, could you?
A. No.
Q. You had no idea whether or not he was cuffed?
A. No.
Q. You didn't ask anybody whether or not he was cuffed.
A. No.
Q. And you tased him four times?
A. Yes.
Q. How long did each tase last?
A. I don't recall.
Q. What was his reaction to the first one?
A. He was screaming.
Q. So you tased him again?
THE COURT: You've got to use words.
A. Yes.
Q. Yes or no?
A. Yes.
Q. I assume he screamed more, correct?
A. Yes.

Q. So you tased him a third time?
A. Yes.
Q. At this time I suggest the screams were probably blood curdling; is that a fair description of what he was doing now?
A. Yes.
Q. And despite blood-curdling screams, you tased him a fourth time?
A. Yes.
Q. Even though he wasn't kicking, flailing his arms, moving his body or doing anything else to resist arrest?
A. No.
Q. And you tased him a fourth time?
A. Yes.
Q. You testified today that the first time you became aware of session 1D-5-1, which is a conversation between yourself and Agent Pena, was in May of 2010, correct?
A. Yes.
Q. Before that, your testimony is you had no idea that you had inadvertently taped the conversation between yourself and Agent Pena, correct?
A. No.
Q. Is that correct?
A. Yes.
Q. And that the first time you ever became aware that that

conversation had been captured on a recorder unintentionally was when you learned this month, right?
A. Yes.
Q. You knew it that day, didn't you?
A. No, I didn't.
MR. QUINN: Judge, if I can queue this up?
THE COURT: Sure.
MR. QUINN: For the record, I'm going to be playing 1D-5, Session 1. It's a 30 minute, 32-second tape. I'm not going to play the whole thing. I'm going to the last two or three minutes.
THE COURT: Okay. I guess what we should do is figure out how we make this part of the record.
MR. QUINN: I'm going to ask him questions about it, so.
THE COURT: No, I know, but I think the whole recording should be made part of the record.
MR. QUINN: Your Honor, you're right. At this point I would move to admit sessions 1D-5-1 and 1D-5-2.
THE COURT: Right. But we're going to need to make some kind of recording of them so there's a record.
MR. QUINN: There are recordings. We'll make you a copy, hand it up to the court.
THE COURT: Should we call these Defense A and B then?

MR. QUINN: Can we make them Defendant's AA and BB?

THE COURT: Sure, sure, that's fine. To accommodate other premarked exhibits. Fair enough.

Any objection?

MS. DUNNE: No objection.

MR. QUINN: Hard to put one past you.

THE COURT: What's that?

MR. QUINN: It's hard to put one past you.

THE COURT: Defense AA and BB are received.

(Defendant's Exhibit AA and BB received in evidence)

THE COURT: For the record, Mr. Quinn, you're going to play the last two or three minutes?

MR. QUINN: We're going to play the last minute, yes, Judge.

THE COURT: Okay.

MR. QUINN: Maybe what we should do, Judge -- John, can you get me the transcripts?

Why don't I do this, Judge, we actually prepared binders with all the potential exhibits. Why don't I hand them out right now?

THE COURT: That's great. Thanks.

MR. QUINN: They're not as nice and neat as the government's.

THE COURT: Don't judge a book by its cover, Mr. Quinn.

MS. DUNNE: Judge, I'd like to point out they're not scanned either.

THE COURT: Touche. What transcript goes --

MR. QUINN: I'm going to point it out right now.

THE COURT: Okay.

MR. QUINN: We didn't have time to put together -- Judge, specifically it's the first one.

THE COURT: So Defense A?

MR. QUINN: Defense A, which is marked A28 through A69.

THE COURT: What page you think we're picking this up?

MR. QUINN: Why don't we pick it up, it will be page 30 on the regular and from --

THE COURT: A-57?

MR. QUINN: I'm sorry, 28. Page 28, A-55.

THE COURT: Okay. All right. Any objection to Defense A coming in?

MS. DUNNE: No, Judge.

THE COURT: All right, so Defense A is received along with AA and BB.

(Defendant's Exhibit A received in evidence)

(Tape played)

BY MR. QUINN:
Q. Officer, while this conversation was being recorded, you had no idea that the recorder was on, correct?
A. No, I didn't.
Q. Completely unaware.
A. Unaware.
Q. And when you ended the conversation with Agent Pena, you still didn't know the recorder was running, correct?
A. No.
(Tape played)
Q. You just left Agent Pena and walked to your car, right?
A. Yes.
(Tape played)
Q. By the way, did you hear what you just said on that? "This kid is sick."
A. No.
Q. You didn't hear that?
A. No.
MR. QUINN: Judge, I'll play that again for just a second.
THE COURT: Sure.
(Tape played)
BY MR. QUINN:
Q. That's you, right?
A. Yes.

Q. And when you say "This kid is sick," you're talking about the whole idea that you're wearing a wire cooperating with the FBI while recording fellow members of the police department, correct?
A. Yes.
Q. What are you talking about?
A. I was talking about a text message I received.
(Tape played)
Q. Right there you're removing the recorder, correct?
A. Yes.
Q. What did you just say there?
A. I coughed.
Q. What did you say after that?
A. I didn't hear it.
Q. Listen closely.
(Tape played)
Q. You coughed and say, "I just did it again." Did you hear that?
A. No, I didn't.
THE COURT: You want to bring it up closer?
MR. QUINN: I think we'll have to, Judge.
THE COURT: Okay.
MR. QUINN: Judge, if the government has better audio with their laptop, I'm willing to accept the offer.
(Tape played)

BY MR. QUINN:

Q. Did you hear that?

A. I said, "She just did it again."

Q. You coughed, right?

A. Yep.

Q. The reason you cough is to see whether or not the recorder is still working or working at all, right?

A. Yes.

Q. And then you say, "I just did it again"?

A. I believe there I said, "She just did it again."

Q. Who are you referring to?

A. Agent Pena.

Q. She did it again. In other words, she gave you a recorder --

A. That was left on.

Q. So she did it again.

So you knew the day you created 1D-5-1 that it had been recording inadvertently again?

A. I didn't know the whole conversation was recorded.

Q. That's not what I asked you. You testified today that the first time you learned that there was any inadvertent recording made that is now 1D-5-1, the first time you learned that was when the US Attorney told you in May of 2010, right?

A. Yes.

Q. That's inaccurate, that's not true, is it?
A. No.
Q. You knew it that day.
A. I knew the recorder was left on.
Q. And that it was recording inadvertent conversations, correct?
A. I didn't know it recorded the entire conversation.
Q. But you knew you recorded a conversation, correct?
A. I knew it recorded something, yes.
Q. You didn't know whether or not it recorded the last two minutes or the last two hours, correct?
A. Correct.
Q. But you knew to a certain that it recorded that day, correct?
A. I knew that it was on that day, yes.
Q. So why did you tell this court a half hour ago that the first time you learned that there was an inadvertent conversation from that day was when the US Attorney told it to you this month?
A. Because I didn't know if that recorded or not.
Q. In other words, you didn't realize your voice was on the recording I just played back to you?
A. I didn't realize the recorder actually recorded any conversation when I pulled it out, turned it off.
Q. You knew that day, right?

A. Yes.
Q. You say on the tape, "She did it again," meaning she left it on running again, right?
A. Yes.
Q. And, in fact, you cough before you say "She did it again," to test it, to make sure that the light flashes, which confirms in your mind that it's still working, correct?
A. Yes.
Q. So you knew, you knew in May of 2008 that there was an unintended recording, right?
A. Yes.
Q. And you told Agent Pena, didn't you?
A. I told Agent Pena.
Q. You told Agent Pena that we did it again?
A. No, I never told her that.
Q. Wait a second. That day you told her that you made an inadvertent recording of you and Spota and your father, right?
A. Yep.
Q. So when you went to hand her 1D-5, the recording where you captured Richie D'Allesandro denying that my client did anything wrong, didn't you tell her, "By the way, we did it again, we captured another unintended conversation"?
A. No, I didn't.

Q. Why not?
A. Because I forgot all about it.
Q. You forgot?
A. I forgot that the recorder was on when I pulled away.
Q. You forgot. You met with her, what, three days later?
A. Yes. Give or take, three days, yeah.
Q. And, again, this is the first time you've ever worn a recording device for the federal government, right?
A. Yes.
Q. I mean, this was pretty heavy duty stuff for you, right?
A. Yes.
Q. And you wanted to do it right and correct, correct?
A. Yes.
Q. And you didn't want to make mistakes, correct?
A. Yes.
Q. And you were talking to Agent Pena on almost a daily basis, correct?
A. Yes.
Q. And it's your testimony that when you handed her back recorder 1D-5, you just forgot to tell her that you just recorded a conversation inadvertently again?
A. Yeah. I never mentioned it to her.
Q. And the only other voice that could have been on that tape you knew was Agent Pena, right?

A. At the time?
Q. Yeah.
A. No, I didn't.
Q. She hands you the recorder, recorder number 1D-5, 1D-5, when she handed it to you, you speak with her for a half hour, you get in your car and you realize the thing's been running, right?
A. Yes.
Q. You didn't speak with anybody else between when she handed you the recorder and when you realized it was on?
A. Yes.
Q. And you're saying, so you knew that if anybody's voice was on it, it would be yours, it would be Agent Pena's, correct?
A. Yes.
Q. There could be no question in your mind, you didn't speak with anybody else while you were in possession of it, and you testify just now, she did it again, right?
A. Yes.
Q. So that means, in your mind, she handed it to me while it was running, right?
A. Yes.
Q. Not that, oh, I just did it, I must have accidentally just turned it on a few seconds ago, but your immediate reaction was she did it again, right?

A. Yes.
Q. Meaning she handed me the recorder while it was still recording, right?
A. Yes.
Q. And you knew that for the entire time from when she first handed it to you to when you got in your RMP and discovered it was running, that it was running for that full half hour while you were with Agent Pena, correct?
A. Yes.
Q. And during that conversation, you're telling Agent Pena, hey, I said inappropriate things on 1D-4, correct?
A. Yes.
Q. You're saying things you know you shouldn't have said, right?
A. Yes.
Q. And you're telling Agent Pena, while the recorder is on, that you screwed up on 1D-4?
A. Yes.
Q. And you knew that conversation was captured on 1D-5, Session 1, right?
A. I believe it was, yes.
Q. And you're saying you simply forgot to tell Agent Pena?
A. Well, it was a few days later when I handed her back the device.
Q. Right. So in that three to four-day period, it

completely slipped your mind when you handed her the recorder to tell her, oh, by the way, remember that conversation where I told you I screwed up on 1D-4? Guess what? That was recorded, too. Your testimony in this court is that you forgot to tell her that?
A. About 1D-5?
Q. Yes.
A. Yeah, I just never thought about it.
Q. And at no time for the next year and a half to two years, until May of 2010, did it suddenly dawn on you, by the way, I better go back and tell her about that recording that we made unintentionally, is that your testimony?
A. I never told her about that.
Q. Why not?
A. Because I forgot all about that, that the recorder was on for 1D-5 when she handed it to me.
Q. You forgot. You were talking to Pena on virtually an everyday basis, correct?
A. Every other day.
Q. All about recordings, correct?
A. Yes.
Q. Remember when she's telling on you 1D-5-1, when you were explaining --
THE COURT: 1D-5, right.
MR. QUINN: 1D-5-1.

THE COURT: Session 1.

MR. QUINN: Session 1.

BY MR. QUINN:

Q. And you're saying, look, on 1D-4, I screwed up. On 1D-4 I said something I shouldn't have said. What instructions did she give you?

A. She told me not to worry about it.

Q. She also said, "If it happens again, call me right away"?

A. Yes.

Q. She tells you again, the agent in charge, your handler, that, "If this happens again, tell me right away."

Did you forget that, too?

A. I spoke to her so many times, I can't remember everything she said to me.

Q. And is it your testimony that at no time from the date that recording was made, by recording I'm referring to 1D-5-1, recording that was made on June 4, 2006?

THE COURT: 2008.

MR. QUINN: Check that. 2008. Thank you, Judge.

Q. Until May --

THE COURT: Of 2010.

Q. At no time did you ever tell Agent Pena or anyone else that you knew on June 4, 2008, that you had inadvertently recorded the conversation between yourself and Pena?

A. No, I never told them that Agent Pena left the recorder on.
Q. Now, when the United States Attorney told you a month ago, and said, hey, there's 1D-5-1, there's a recording, and they asked you, did you know about it? You told them, no, correct?
A. That's correct.
Q. That was a lie, wasn't it?
A. No, because at the time I forgot all about that.
Q. So you're saying, in May of 2010, when they told you, hey, there was another recording capturing you and Agent Pena having a conversation for about a half hour the day before you spoke with Richie D'Allesandro, that didn't trigger your recollection and say, you know what, yeah, we sure did; is that your testimony?
A. No, it didn't. It didn't trigger.
Q. So them even telling you the date and the length of this conversation still didn't trigger in your recollection, hey, I remember it because when I got back in my RMP, I realized the tape was still running?
A. No, it didn't.
Q. Forgot that, too?
A. Yes.
Q. Isn't it more accurate to say that you didn't want to tell them that you had made that recording?

A. No.
Q. And isn't it more accurate to say you didn't want to tell them because you and Agent Pena had discussed it and she said, don't worry, she's going to make that one could go away and disappear?
A. No.
Q. Didn't she tell you she was going to get rid of all the transcripts relating to 1D-5-1 so you don't have to worry about it at all?
A. No, she didn't.
Q. You never had a conversation with Agent Pena about 1D-5-1; that's your testimony under oath?
A. Yes.
Q. You saw the transcripts of 1D-5-1, didn't you?
A. Yes.
Q. You saw then in September of 2009, correct?
A. No.
Q. You signed it.
A. I saw 1D-5, Session 2.
Q. I'm going to show you Government Exhibit 1004. That your signature on the bottom?
A. Yes, it is.
Q. Second page, where it says, a header and it says "Session 1" or "WAV 1"?
A. Yes.

Q. Is it your testimony that --

THE COURT: Just so the record is clear, the signature is on the first page.

MR. QUINN: First page.

THE COURT: It's dated 9/1/09.

Q. You signed that, Officer Hayes, on September 1, 2009, correct?

A. Yes.

Q. And the purpose in signing that transcript is just to verify the authenticity that transcript, correct?

A. Yes.

Q. And are you saying you never saw page 2?

A. Yes.

Q. And you never heard 1D-5-1 in September of 2009?

A. No.

Q. Agent Pena never played 1D-5, Session 1, for you in September 2009?

A. No.

Q. And it's your testimony that when she handed you the transcript, page 2 simply wasn't there?

A. Yes.

Q. So that the only part of the transcript you saw was beginning on the third page?

A. Yes.

Q. So that a page was missing when she gave it to you to

verify, correct?
A. Yes. Well, I didn't know what page was missing when she gave it to me.
Q. When you read the transcript, did that trigger your recollection that, hey, wait a second, I remember this, there should be a second session on that, because I inadvertently recorded myself and Agent Pena for 30 minutes?
A. No, it didn't.
Q. So this is something else that somehow did not trigger your recollection to ask either Agent Pena or any member of the US Attorney's office what happened to that 30 minutes of Pena and myself, correct?
A. Yes.
Q. In fact, though, that's not the first transcript you got, is it?
A. I'm sorry, what's that?
Q. The transcripts, the first transcript you got, you edited, right?
A. Yes.
THE COURT: Of 1D-5.
MR. QUINN: Yes, Judge, I'm going to ask the court and I'll provide the witness -- Defendant's B.
THE COURT: Okay.
MR. QUINN: I'll indicate, your Honor, the handwriting on the bottom is my own where it says

"Defendant's B" and it says "SA Pena's files."

THE COURT: And then "CW-Draft," that's not your handwriting?

MR. QUINN: That's not me.

THE COURT: And the rest of the handwriting there is not you?

MR. QUINN: Yes, exactly, Judge. Then I just want to make sure there's nothing else I inadvertently did. Okay.

BY MR. QUINN:

Q. I'm going to offer you what's been marked as Defendant's Exhibit B. Do you recognize that?

A. Yes.

Q. Do you recognize the handwriting on it?

A. Yes.

Q. Whose handwriting is that on it?

A. Mine.

Q. When did you put that handwriting on it?

THE COURT: Can we just be clear? Because there's handwriting --

MR. QUINN: I'm going to get into it.

THE COURT: Okay.

BY MR. QUINN:

Q. When, if you recall, did you first see Defendant's Exhibit B?

A. I don't recall.
Q. When you saw Defendant's Exhibit B --
THE COURT: Was it before May of 2010?
THE WITNESS: Yes.
BY MR. QUINN:
Q. Was it before September of 2009?
A. It could have been.
Q. It had to have been because you edited it, correct?
A. Yes.
Q. So Defendant's B chronologically came before the Government Exhibit 1004, correct?
A. Yes.
Q. And your purpose that day in marking up this transcript was to make it consistent with the tape, correct?
A. Yes.
Q. And looking at the first page, what handwriting belongs to you?
THE COURT: The first page, you mean A-1 or A-2?
MR. QUINN: I'm looking at A-1, Defendant's B, first page. Thank you, Judge.
BY MR. QUINN:
Q. Which is the handwriting that belongs to you?
A. Nothing.
Q. Did you see this first page before September of '09?
A. Not that I recall.

Q. And was she -- Agent Pena would hand you transcripts, they would be unstapled?
A. Yes.
Q. I'm going to ask you to turn to the second page of Defendant's B, A-2. Did you see that page?
A. No, I didn't.
Q. At no point did you see that page?
A. Not when I was reviewing the transcript, no.
Q. I'm going to ask you to turn to the third page, page A-3. Is there handwriting on that?
A. Yes.
Q. Do you recognize the handwriting?
A. Yes.
Q. Whose handwriting is that?
A. That's mine.
Q. And for the remainder of that transcript, from A-3 to A-14, there are edits in handwriting; those are your edits?
A. Yes.
Q. That is your handwriting?
A. Yes.
Q. Did you notice when you first received that document that on the top of A-3 it says, "WAV No. 2"?
A. I don't recall noticing that.
Q. You were familiar with transcripts, correct?
A. Not really.

Q. Well, at this point you had edited at least four other transcripts, right?
A. I don't recall.
Q. Didn't you understand WAV to mean session?
A. No, I didn't.
Q. Drawing your attention to the bottom of Defendant's B, that starts at page 31 --
A. Yes.
Q. -- correct?
A. Yes.
Q. Did you notice on that day that it started on page 31?
A. No, I don't recall. I don't recall what page it started on.
Q. I'm going to hand you back what's been identified as Government Exhibit 1004. I'm going to ask you to look at the third page. The third page of 1004 is the same as A-3, correct?
A. No.
Q. What's different?
A. It's missing WAV 2 at the top.
Q. What else is different?
A. It has the corrections in it.
Q. Yeah. All your edits are now in 1004, correct?
A. Correct.
Q. What page number is on A-3, bottom of the page?

A. Page 31.
Q. What page number is on the third page of 1004?
A. I'm sorry, what page?
Q. 1004, third page.
A. Page 3.
Q. It was repaginated, wasn't it?
A. Yes.
Q. You didn't notice it was repaginated?
A. No.
Q. You never discussed with Agent Pena that we were going to repaginate the transcripts so that we can hide the fact that Session 1 exists?
A. No.
Q. That conversation never occurred?
A. No.
Q. How long were you with Agent Pena when you were going through the edits that now make up Defendant's B?
A. I don't recall.
Q. And when you were doing the edits, by the way, you had the ability to go backwards and forward, correct?
A. I could reverse and fast forward.
Q. You could rewind. She wasn't handling the controls, was she?
A. No.
Q. You were, right?

A. Yes.
Q. When you first started listening to what's now known as 1D-5, Session 2, the third line down, you make your first edit and make that "Unidentified Male" Gasko, correct?
A. Yes.
Q. The first thing you will hear on WAV 2 is an unidentified male, correct?
A. Yes.
Q. How many times did you listen to that voice?
A. Couple times.
Q. You were never able to determine who it was?
A. No.
Q. When you went back, you didn't go into WAV 1?
A. No.
Q. It's your testimony as you here today, at no time did Agent Pena tell you that she was in possession of 1D-5, Session 1, correct?
A. Correct.
Q. And at no time did she provide you with a transcript of 1D-5, Session 1, correct?
A. Correct.
Q. And, in fact, she actually withheld those pages which would have shown the existence of 1D-5-1 from you when she asked you to make the edits to the transcripts, correct?
A. Correct.

Q. Do you have any idea why Agent Pena would do that?
A. No, I don't.
Q. It's your testimony you never had a conversation with her at all regarding this?
A. That's correct.
Q. Did you have a conversation the day after the Gomez incident where you told a friend of yours that depending on what Jimmy Warren does, the Jimmy Warren being the chief of the Sleepy Hollow Police Department, that if he made you detective, you'd write the report one way. If he made you youth officer, you'd write the report a second way. If he made you sergeant, you'd write the report about what happened between Quinoy and Gomez a third way?
A. No.
Q. You never would have said that?
A. Correct.
Q. Because you know, by saying that, you would write the report any way that would best benefit you?
A. I'm sorry, what's that?
Q. You know you would never say that because that would imply you'd write the report any way that best benefits yourself?
A. Correct.
Q. You never would have confided in that to anyone?
A. Correct.

Q. It never happened, correct?
A. Right.
MR. QUINN: If I could have a moment, Judge?
THE COURT: Sure.
BY MR. QUINN:
Q. Now your testimony is that when you mentioned this inappropriate thing that was intentionally recorded on 1D-4, you were referring to how you fucked over, in your words, Agent Todd Spota, correct?
A. Correct.
Q. What exactly did you do to fuck over Agent Spota?
A. I told Agent Pena that me and him had a conversation.
Q. Why, in your mind, would that have fucked over Agent Spota.
A. I don't know why.
Q. There is no reason, correct?
A. No, there isn't.
Q. There's absolutely no reason why telling Agent Spota would -- or telling Agent Pena that you spoke with Agent Spota would in any way hurt or damage him, correct?
A. Correct.
Q. So that couldn't have been the inappropriate thing you were talking about.
A. No, that was the inappropriate thing.
Q. That was not inappropriate thing?

A. At the time I found it inappropriate.
Q. Because you used bad language?
A. No, because I was discussing the investigation.
Q. You were discussing the investigation with your father, too?
A. And I shouldn't have been.
Q. Who else were you discussing this investigation with --
A. Nobody.
Q. -- that you should not have been?
A. Nobody.
Q. So your testimony is that the only people you improperly discussed this investigation with are the two people you're caught admitting on tape that you discussed the investigation with, correct?
A. Correct.
Q. When Agent Pena first came to you -- or withdrawn.
In May of 2008, you had conversations with Agent Spota -- with Agent Pena about working with the FBI to investigate the Gomez incident, correct?
A. Correct.
Q. But, actually, it was your understanding that that investigation was much broader, correct?
A. I don't recall.
Q. Yeah. You were looking into investigate Jimmy Warren, right, the chief?

A. No.
Q. You weren't looking into Jimmy Warren?
A. I wasn't.
Q. Did the FBI tell you they were?
A. They never told me that.
Q. Do you recall recording a conversation with Jimmy Warren?
A. Yes.
Q. Why did you record a conversation with Jimmy Warren?
A. Excuse me?
Q. Why did you record a conversation with Jimmy Warren?
A. Because Agent Pena asked me to.
Q. Did you ask her why?
A. No, I did not.
Q. Well, then, she must have told you what information you needed to get from Jimmy Warren for wearing the wire to have any purpose at all, right?
A. She just told me to go in and accept the subpoena from him.
Q. She told you to wear a wire while the chief of your department handed you a subpoena?
A. She did.
Q. Did she tell you to try to engage him in any type of conversation?
A. Just ask him about what I should do with the subpoena.

Q. And that's it?
A. Whether I need an attorney or not.
Q. Keep going.
A. That's what I recall.
Q. Do you remember he handed you a packet?
Do you remember recording him handing you a packet?
A. Yes.
Q. Why would you record him handing you a packet?
A. Because I was asked to.
Q. Come on, Officer, you're asked to record the chief of your police department handing you a packet and you don't ask the agent why?
A. No, I didn't.
Q. Well, how about before you went with Jose Quinoy, did you ask her why, what should I get him to talk about?
A. I never asked her.
Q. You're saying she didn't give you any instructions?
A. She gave me instructions, but I never asked her for them.
Q. What did she tell you, for instance, before you met with Quinoy?
A. She told me to start the conversation.
Q. What did she tell you?
A. Just to discuss the subpoena that was given to me.
Q. And what else?

A. That's pretty much it.
Q. Did you understand what your purpose was in speaking with Quinoy in May of 2008?
A. Yes.
Q. I'm sorry, April of 2008?
A. Yes.
Q. How did you learn what your purpose was?
A. After I did the recordings.
Q. So you recorded first and found out afterwards why; is that your testimony, Officer?
A. She told me she wanted to see what Quinoy would say.
Q. About what?
A. About the Gomez incident.
Q. And were you directed to get him to talk about the Gomez incident?
A. Yes.
Q. By the way, in April of 2008, you let Jose Quinoy, as well as other members of the department, believe that you were also suspected and a possible target of this incident, correct?
A. Yes.
Q. So at the time you weren't talking to Jose Quinoy as a witness, you were talking to him as a potential target of a Grand Jury and possible co-defendant, correct?
A. I was talking to him as a witness.

Q. Who was potentially also a target of the same Grand Jury, correct?
A. Potentially.
Q. And that's what he was telling you, correct?
A. Potentially.
Q. Yeah, he was telling you, look, they're looking at both of us, get a lawyer, right?
A. That was his opinion, yes.
Q. Yeah, because you're a potential target of a criminal indictment, correct?
A. I never thought I was.
Q. You told Quinoy that you thought you were, right?
A. That was part of the conversation.
Q. You specifically led him to believe that you believed you were going to be indicted if there was an indictment along with them, right?
A. No. I never made him believe I was going to be indicted.
Q. Really? I mean, really, Officer? Then why are you talking about what you're going to say in front of the Grand Jury and you can get a lawyer and plead the Fifth?
A. I'm sorry, excuse me?
Q. In the conversations, you're talking to Quinoy specifically about, I got to go into the Grand Jury and testify, I can say something like I tasered the five guys --

the guy five times, which could -- and you asked him, could that be looked at as criminal. And he tells you, yes, and then you tell him, he tells you, get a lawyer, correct?

THE COURT: Hang on. You're just stretching or do you have an objection?

MS. DUNNE: I do have an objection. I just wanted him to finish before I raised the objection. I think we've gone way far afield of the purpose of the hearing, which is to determine what was done with the recordings, chain of custody of the recordings, et cetera. What he was thinking when he was making the recordings, those that are not in dispute, doesn't seem to be --

THE COURT: This goes back to the chief, why he was recording the chief. I'm going to allow it. You might want to ask the question again, though.

MR. QUINN: You bet.

BY MR. QUINN:

Q. Add the time you were talking to Jose Quinoy in April of 2008, you knew that Quinoy believed that you were also a target of the Grand Jury, correct?

A. That was his opinion, correct.

Q. And he expressed that to you, correct?

A. Correct, he did.

Q. And then he told you to get a lawyer, correct?

A. He told me I should seek a lawyer.

Q. When you were talking about Solfaro and Grant, those are actually your PBA attorneys, correct?
A. Correct.
Q. By the way, with respect to the Gomez incident, you testified today that you were on the driver's side of the RMP at the time that you claim to have seen my client kick Mario Gomez in the head, correct?
A. Correct.
Q. That has not always been your testimony, correct?
A. Correct.
Q. And the reason you say that now, the reason you say that you were on the driver's side of the RMP is because the video shows you clearly standing on the driver's side of the RMP, correct?
A. Correct.
Q. In fact, the video shows you entering the door to the RMP, so the court is clear, where Mr. Gomez is placed after he's arrested, which is parked in front of Sleepy Hollow headquarters, correct?
A. Correct.
Q. And Mr. Gomez is put in the passenger side?
A. Correct.
Q. You claim, as he was being put in the passenger side, you saw Officer Quinoy kick Mario Gomez in the head, correct?

A. Correct.
Q. You testified in the Grand Jury you were standing at the passenger door when that happened, correct?
A. Correct.
Q. And, in fact, you testified under oath in a Grand Jury on this case that you closed the passenger door, correct?
A. Correct.
Q. That was completely untrue, wasn't it, Officer?
A. That's how I recalled it at the time.
Q. Before the US Attorney put you in the Grand Jury, they met with you a couple of times, right?
A. Correct.
Q. In fact, they met with you repeatedly, correct?
A. Correct.
Q. And this was after you had already worn a wire for the government, correct?
A. Correct.
Q. While you were wearing a wire, you were trying to get other officers to corroborate your story that you saw Jose Quinoy kick Mario Gomez in the head while they were putting him in the car, correct?
A. Correct.
Q. And not a single officer corroborated that story, correct?
A. Yes.

Q. D'Allesandro said it never happened, right?
A. Yes.
Q. Gasko said it never happened?
A. Yes.
Q. And you were briefed repeatedly by the United States Attorney's office to make sure you were in a position to have seen what you claim you have seen, which is Jose Quinoy kicking Mario Gomez in the head?
A. I'm sorry.
Q. You wanted the US Attorney's office to believe you were in a physical position where you cold have to see Jose Quinoy kick him in the head, right? That's what you told the US Attorney?
A. Yes.
Q. And you told them that repeatedly before they put you in the Grand Jury, right?
A. Yes.
Q. And it was all wrong, wasn't it?
A. No. Just the fact me standing on the passenger side at the time, because that's how I recalled it.
Q. And closing the door?
A. Yes, because that's how I --
THE COURT: So did they close the door on the driver's side?
THE WITNESS: Yes.

BY MR. QUINN:

Q. You testified in the Grand Jury you closed the door on the passenger side, right?

A. Yes.

Q. And you didn't even close the driver's side door, did you?

A. I don't recall at this time.

Q. Officer D'Allesandro did when he got in the driver's side car and drove away, right?

A. I don't recall.

Q. Officer, you've seen the video, right?

A. Couple weeks ago.

Q. You never close any doors, do you?

A. I don't recall.

Q. So when you testified in the Grand Jury under oath that my client kicked Mario Gomez and that you were standing at the passenger door, watched it happened and then slammed, in your words, slammed the door shut on Mario Gomez, that was completely inaccurate, wasn't it?

A. That's how I recalled it at the time.

Q. So your recollection wasn't very good regarding the details of this incident, correct?

A. I remember him kicking him in the face.

Q. Now you remember seeing it from where?

A. From the videotape.

Q. The videotape doesn't show him kicking in the face.
A. No, but the videotape helped jump my memory.
Q. As to what?
A. As to where I actually saw the kick.
Q. Were where were you standing when you saw the kick?
A. I was sitting in the driver's seat, looking back.
Q. So now you're saying you were actually in the car and watched it happen?
A. I was, yes.
Q. And that you looked over your shoulder and saw the kick?
A. Yes.
Q. And where was Detective Quinoy, Officer?
A. At the passenger side door.
Q. Who was with him?
A. Officer D'Allesandro started making his way around the back of the car.
Q. Officer D'Allesandro was putting Mario Gomez in the car; was he not?
A. No, I believe -- yes, actually, you're correct.
Q. Yes, I sure am. So how could Jose Quinoy be standing at the door kicking him in the head if Richie D'Allesandro is at the door kicking him in the head?
A. After Officer D'Allesandro placed him in the car, that's when the kick happened.

Q. And you did, by the way, nothing, correct?
A. No.
Q. You didn't report this to anyone, correct?
A. I told the lieutenant.
Q. Your father?
A. Correct.
Q. Your dad?
A. Correct.
Q. But you never put it in a record, correct?
A. Correct.
Q. You never wrote it down anywhere, correct?
A. Correct.
Q. And in your taser report, where you acknowledge tasering Mr. Gomez four times, you specifically say he was fighting and struggling with the officers, correct?
A. Correct.
Q. And that he was actively resisting, correct?
A. Correct.
Q. Those were all lies?
A. Correct.
Q. You lied in your report?
A. I had an officer help me write that report.
Q. You signed it, right?
A. I did.
Q. So you filed a false report, correct?

A. Correct.
Q. You filed a false document that is maintained by a governmental agency upon which the governmental agency relies, correct?
A. Yes.
Q. Were you aware that's a crime?
A. Yes.
Q. So you're admitting to committing a crime?
A. I'm admitting to having an officer help me write the report that night.
Q. And you knew it to be false?
A. Some of it.
Q. And you signed it?
A. I did.
Q. And you submitted it?
A. I did.
Q. And that's a crime. Yes or no?
A. Yes.
Q. Have you received immunity for your testimony today?
THE COURT: I was about to ask the same question.
THE WITNESS: No.
THE COURT: Hang on. I never know what the government's relationship is with its cooperators. Does this gentleman have an attorney?
MS. DUNNE: No, Judge, and there's no agreement

with the government.

MR. QUINN: Want to take a break, Judge?

THE COURT: Let's take a break.

Go out to the witness room. You're on cross, please don't talk to the prosecutors about your testimony.

(Witness excused)

THE COURT: I never would have allowed the question if I thought -- if I realized he didn't even have an attorney and he hadn't been granted immunity or wasn't testifying pursuant to some kind of agreement.

MR. QUINN: Judge, I'll indicate for the record, I didn't know. I had no idea. That's why I was asking. I assumed he did.

THE COURT: Ms. Dunne, your thoughts.

MS. DUNNE: My thoughts were that I thought from the beginning the scope was a little over the top. When he got to credibility issues, that it was just going to be permissible and allowed. I mean, the issue is --

THE COURT: But the worst that happens when you object is I say, overruled. It's not like you lose your law license. But, in any event, quite apart from whether or not you think it was going beyond the scope, clearly this went to credibility. And I understand, if I were Mr. Quinn, I would try to push it as much as I could, too, beyond the scope, but it clearly went to credibility. This witness'

Anything else that anybody thinks would be appropriate or inappropriate for me to do?

MS. DUNNE: That's all, Judge.

MR. QUINN: I have no objection to that, Judge. Thank you.

THE COURT: All right. Okay. If we can bring the witness in. And assuming he does not want to invoke or consult, we'll continue with your cross, Mr. Quinn. Actually, no, we'll then break and take the other witness.

MR. QUINN: I would appreciate that, Judge.

THE COURT: Okay. And I'll explain that to him.

The other witness is available, Mr. Kennedy?

MS. DUNNE: Yes, I asked her to be outside the courtroom.

THE COURT: All right, thanks very much.

You can have a seat, Detective. Thank you.

MICHAEL HAYES, having been duly sworn, was called as a witness and testified as follows:

THE COURT: Before we resume with your testimony, Detective, I just wanted to advise you of certain things and ask you some questions. Okay?

THE WITNESS: Yes, sir.

THE COURT: When we broke, Mr. Quinn had been asking you questions about this report that you were involved in filing, and there were questions asked about

whether or not the filing of a false report was something that was illegal and whether or not you had done something that might be illegal that, in fact, could be a crime.

What I want to advise you, and you shouldn't read anything into this, just listen carefully, is that you do have the right not to incriminate yourself, that is, not to say anything that could be used to incriminate you in a criminal case directly or indirectly. Do you understand that?

THE WITNESS: Yes, sir.

THE COURT: Okay. And you, therefore, would have the right not to answer any questions where the answers might incriminate you. Do you understand that?

THE WITNESS: Yes, sir.

THE COURT: You also have the right to consult with an attorney before you decide whether or not you want to answer any questions that might incriminate you. Do you understand that?

THE WITNESS: Yes, sir.

THE COURT: And that, if you wanted to consult with an attorney but could not afford an attorney, one could be provided for you at public expense. Do you understand that?

THE WITNESS: Yes, sir.

THE COURT: All right. Now it's my understanding,

you'll tell me if this is wrong -- well, can you tell me whether or not -- well, let me back up for a second.

You have had meetings with the Assistant United States Attorneys in this case; is that a fair statement?

THE WITNESS: Yes, sir.

THE COURT: Okay. Either before or during those conversations with the Assistant United States Attorneys, did you speak with an attorney yourself to decide whether or not you wanted to speak to the US Attorney's office?

THE WITNESS: No, I didn't.

THE COURT: Did you consult with an attorney about your potential liability, including potentially being charged with a crime in connection with any of your conduct that relates to case, so, the filing of reports, your conduct with respect to Mr. Gomez or any of the incidents that relates to the subject matter of the Gomez incident, as we've been calling it?

THE WITNESS: No, I did not.

THE COURT: So you never formally sought or informally sought the advice of counsel on whether or not you should talk about your role about the filing of any reports?

THE WITNESS: No, sir.

THE COURT: And did you speak with an attorney

formally or informally about your role in the Gomez incident?

THE WITNESS: I did, sir.

THE COURT: Now, you don't need you to tell me what you said to that attorney or what advice that attorney gave you, but do you recall the name of the attorney?

THE WITNESS: Bunting.

THE COURT: Bunting, b-U-N-T-I-N-G?

THE WITNESS: Yes, sir.

THE COURT: Do you remember his or her first name?

THE WITNESS: No.

THE COURT: Was it a he or a she?

THE WITNESS: It was a he.

THE COURT: And when you spoke to this attorney, Bunting, this was on the subject matter of your role in the Gomez incident; is that right?

THE WITNESS: Yes, sir.

THE COURT: Did this include your role in the filing of any reports that were filed in connection with the Gomez incident?

THE WITNESS: No, it wasn't.

THE COURT: And how long ago was it that you spoke to Mr. Bunting?

THE WITNESS: I don't remember, sir.

THE COURT: Was it before you first met with the

US Attorney's office personnel in this case?

THE WITNESS: No, I don't believe it was.

THE COURT: So it was sometime after?

THE WITNESS: Yes.

THE COURT: Let me get back to what I originally said then. Before you answer any additional questions in connection with, for example, your role in the filing of this police report that was the subject of cross examination or your role in the Gomez incident in general, as I said, you should understand that, if you think your answers to those questions might incriminate you, then you can invoke your rights under the Fifth Amendment not to answer those questions. Do you understand that?

THE WITNESS: Yes, sir.

THE COURT: You also, as I said, have the right to consult with an attorney before you decide whether or not you want to answer those questions. And, as I said, if you could not afford an attorney, one could be provided for you at public expense. Do you understand that?

THE WITNESS: Yes.

THE COURT: The question to you then, sir, is: Do you want to speak with an attorney before you answer anymore questions about either the Gomez incident in general or, in particular, your role in the filing of any police reports that were submitted in connection with the Gomez incident?

MICHAEL HAYES, having been previously sworn, was recalled as a witness and testified further as follows:

CROSS EXAMINATION

BY MR. QUINN: (Cont'd)

Q. Detective, in the last two hours, have you had conversations with any FBI agents or any members of government --

A. No.

Q. -- regarding your testimony here today?

A. No.

Q. Has anybody made any promises or representations to you or any comments whatsoever regarding your decision to seek the advice of legal counsel?

A. No.

THE COURT: Let me say one other thing I didn't mention earlier. If at any point during this process you change your mind and you either want to invoke your rights not to incriminate yourself or your right to seek counsel, you can do that at any point. Okay? So just speak up. Okay?

THE WITNESS: Yes, sir.

THE COURT: Thank you, Detective.

Go ahead, Mr. Quinn.

MR. QUINN: Thank you, Judge.

BY MR. QUINN:

Q. Tape 1D-4 is a tape pertaining to your knowledge, a conversation you had with Officer D'Allesandro, right?
A. Yes.
Q. And that conversation was some point between May 22 and May 24, 2008, correct?
A. Right.
Q. Do you know how long that conversation lasted?
A. Couple of minutes.
Q. Approximately 20?
A. Less than that.
Q. Have you reviewed any documents indicating the length of recordings contained on disk 1D-4?
A. No.
Q. Can you explain for any reason why there would be a recording for 148 minutes which is approximately two and a half hours?
A. No.
Q. Do you recall at any time when you are in possession of the recorder in May 22 and May 24, 2008, realizing that the tape was running when you hadn't turned it on?
A. I'm sorry, what's that?
Q. At any time on May 22 or May 24 when you were in possession of a recorder given to you by Agent Pena, do you recall whether or not you realized the tape recorder was on?
A. I don't recall.

Q. So it's your recollection each and every time you turned the recorder on and off is because you wanted to tape a conversation?
A. Yes.
Q. How many conversations did you tape on the device that you taped the D'Allesandro conversation with?
A. Just D'Allesandro.
Q. And no one else?
A. No one else.
Q. So, as you understand it, other than the tape-recording of D'Allesandro, there should be nothing else on that recorder.
A. Just the radio runs and the conversation I had with my father.
Q. And that's that approximately 45 minutes when you realized that the tape was on?
A. Yes.
Q. Why do you say 45 minutes?
What makes you think that was the length of time?
A. I was just estimating.
Q. Do you know when the tape was first turned on?
A. No, I don't.
Q. So you only know when the tape was turned off.
A. Yes.
Q. Then on what possible basis could you say that the tape

was on for 45 minutes?
A. Because it wasn't that long that I met with Agent Pena.
Q. When did you meet with Agent Pena?
A. I don't recall that.
Q. And then she handed you the recorder?
A. Yes.
Q. How long were you in the presence of Agent Pena when she handed you the recorder that you recorded the D'Allesandro conversation with?
A. Not long.
Q. And she handed you that recorder and your best recollection is approximately 45 minutes later you realized it was still on.
A. To my best recollection, yes.
Q. Could it have been two and a half hours later?
A. No.
Q. What were you doing with Agent Pena while you are were in her company?
A. We were talking.
Q. Nothing else?
A. No.
Q. Where were you?
A. Behind the hospital.
Q. Sleepy Hollow?
A. The Phelps Hospital.

Q. Phelps Hospital, Tarrytown?
A. Sleepy Hollow.
Q. Okay. Were you in her car, was she in yours, did you meet outside?
A. I don't recall.
Q. Is that where you always met her?
A. Sometimes.
Q. How do you recall that the day she gave you the recorder that you used to record the D'Allesandro conversation, you met her in the back of Phelps Hospital?
A. Because whenever I was working I'd meet her there.
Q. And you were working there that day?
A. Yes.
Q. And then she handed you the recorder, correct?
A. Yes.
Q. And to your best recollection, 45 minutes later, you realized it was still running.
A. Yes.
Q. And it was during that 45 minutes that you knew that you had made inappropriate comments, at the very least, regarding Todd Spota, as well as conversing with your father, correct?
A. Yes.
Q. Based on your knowledge and understanding, there should be no two-and-a-half-hour tape or two-and-a-half-hour

session on that recorder, correct?
A. No, there shouldn't be.
Q. And if there was, you would have no explanation as to why there's a two-and-a-half-hour recording on that, correct?
A. To my best recollection, it was 45 minutes.
Q. Did Agent Pena ever tell you what happened to 1D-4?
A. No.
Q. When did you first learn that 1D-4 was blank?
A. May 2010.
Q. After you handed 1D-4 back to Pena, did you brief her on what D'Allesandro told you?
A. I don't believe so.
Q. Did you tell her you had a good conversation?
A. I don't recall.
Q. Did you tell her whether or not Mario Gomez was put in the back of the RMP head first or feet first?
A. I don't recall what I told her.
Q. When she came back and collected the recorder, did you tell her the substance of the conversation you had with the individual you recorded?
A. No. I talked to her the next day.
Q. So you would give her the recorder and then call her the next day?
A. No, I called her the next day.

Q. At the time that you returned the corder to Agent Pena, the recorder, I'm sorry, to Agent Pena, you were face to face, correct?
A. Correct.
Q. At that time would you tell her, for instance, hey, I met with Jose Quinoy yesterday and this is essentially what he told me?
A. Sometimes.
Q. You would debrief her, correct?
A. Sometimes.
Q. Which times?
A. If I didn't speak to her right after I did the recording.
Q. And there were occasions when you did the recording and then called her immediately?
A. Yes.
Q. Which occasions were those?
A. When I taped Detective Quinoy.
Q. Anyone else?
A. I don't recall.
Q. When you spoke with Agent Pena after you had recorded Officer D'Allesandro, did you tell her that Officer D'Allesandro denied seeing Jose Quinoy kick or punch Mr. Gomez while he was handcuffed?
A. I don't recall exactly what I told her.

Q. So, as you sit here today, you have no independent recollection of that conversation; is that fair to say?
A. Of talking to her or telling her what happened?
Q. Both.
A. I remember talking to her, but I don't recall what I said to her.
Q. How long did the conversation last?
A. Five minutes.
Q. Did you tape-record Officer Ebel?
A. No.
Q. Sergeant Hood?
A. No.
Q. Officer Bueti?
A. Not -- accidentally, possibly.
Q. But he was never a subject or target --
A. I was never ask to record, no.
Q. Who made the decision on who to record?
A. Agent Pena.
Q. Going to Mario Gomez, did you speak with Mario Gomez on October 17, 2006, moments before he arrived at the Sleepy Hollow police station and had the altercation with Officer Quinoy?
A. No.
Q. Are you aware that he telephoned your cell phone?
A. I'm sorry, what?

Q. Are you aware that Mario Gomez on his way from his house to Sleepy Hollow police station where he ultimately had the altercation on October 17, 2006, called your cell phone on the way?
A. I was aware that he called my cell phone.
Q. Why did he call your cell phone?
A. That I don't know.
Q. Did he leave you a message?
A. No, he didn't.
Q. Why did he have your cell phone number?
A. I knew him from around town.
Q. Lastly, you indicated that you told your father what you observed on October 17, 2006; is that correct?
A. Correct.
Q. What exactly did you tell him?
A. I gave him a brief description what happened outside that night.
Q. Did you tell him you saw Jose Quinoy kick Mario Gomez in the head while he was restrained?
A. I don't recall if I told him that, but I recall telling him that I saw him punch Mario.
Q. While he was restrained?
A. Yes.
Q. And at the time your father was the lieutenant of the Sleepy Hollow Police Department?

A. Yes.
Q. And he was the highest ranking police officer in the department, correct?
A. No.
Q. On duty, correct?
A. On duty? Yes.
Q. There was nobody higher than him working at Sleepy Hollow that night, correct?
A. No.
Q. Your testimony is you told your father, the lieutenant, highest ranking member of the Sleepy Hollow Police Department working, that you observed Jose Quinoy strike Mario Gomez while he was handcuffed?
A. I gave him a brief description, yes.
Q. Did your father -- did the lieutenant tell you to commit that to any type of report?
A. He didn't tell me anything, he just told me to go over to the back.
Q. He didn't tell you to report it to Internal Affairs or the chief of police, anything else?
A. He didn't say anything.
Q. It's your testimony, your father, the lieutenant, was aware of this misconduct on the night it happened and took no action to investigate it or take anything else?
A. Yes.

MR. QUINN: No further questions.
THE COURT: Redirect.
MS. DUNNE: One second. I had difficulty finding a record that I need.

REDIRECT EXAMINATION

BY MS. DUNNE:

Q. Detective Hayes, on the date you were given 1D-4 May 22 of 2008, do you recall the specifics of every single thing you said to Agent Pena on that day?
A. No, I don't.
Q. Do you recall if she was accompanied by another Officer on that day?
A. Yes.
Q. Excuse me?
A. Yes.
Q. Do you recall who it was?
A. No, I don't.
MS. DUNNE: May I approach, Judge?
THE COURT: Yes.
MS. DUNNE: Need to mark it. Sorry.
THE COURT: That's okay.
MS. DUNNE: Mark this as Government's Exhibit 1031 for identification.

BY MS. DUNNE:

Q. Ask you to take a look at this report of Special Agent

Pena, specifically directing your attention up to the top. Does this refresh your recollection of who was with her when she delivered 1D-4?

A. Yes.

Q. Who was it?

A. Another male agent.

Q. Do you recall his identity?

A. I remember his first name.

Q. What was his first name?

A. Mike.

Q. And this report reflects his name is Michael Sabric?

A. Correct.

Q. Does that refresh your recollection as to who it was?

A. A little bit, yes.

THE COURT: Do you remember Sabric or just remember Mike.

THE WITNESS: I just remember Mike.

BY MS. DUNNE:

Q. Did you know him as a special agent of the FBI?

A. Yes.

Q. You weren't alone with her on the day 1D-4 was delivered to you?

A. No.

Q. Do you know where Agent Pena was before she came to you?

A. No, I don't.
Q. Mr. Quinn asked you whether or not you reported what you observed with regard to Jose Quinoy and Mario Gomez. Do you have an IAD, Internal Affairs Division, in Sleepy Hollow Police Department?
A. No, we don't.
Q. Did Jose Quinoy on the night of October 17, 2006, report to your father?
A. I don't recall.
Q. Did detectives report to lieutenants?
A. No, they did not.
Q. Who did they report to in 2006?
A. Directly to the chief.
Q. Who reported to lieutenants?
A. The way it was supposed to work is sergeants were supposed to report to the lieutenants.
Q. Yet you went to your father and told him what you observed?
A. Correct.
Q. Did you report the incident to the chief?
A. No.
Q. Why didn't you do that?
A. Because I've already reported it to my father, and I wasn't sure if I could trust the chief or not.
Q. You were asked by Mr. Quinn about recordings you made

with Officer Nelson and Officer Gasko?
A. Yes.
Q. Did you at any time review transcripts of those recordings that you made?
A. I did.
Q. Did you spend as much time reviewing those transcripts as you did for the conversations that you had with Jose Quinoy?
A. Yes.
Q. Did you review more versions of the Quinoy transcripts than the Gasko and Nelson transcripts?
A. I don't recall.
Q. I'm going to show you what has previously been marked as Government Exhibit 1028 and 1029.
MS. DUNNE: May I approach, Judge?
THE COURT: Yes.
BY MS. DUNNE:
Q. Do you recognize the signature that appears on page 1 of 1028 and 1029?
A. Yes.
Q. Whose signature is that?
A. Those are mine.
Q. The dates that appear below it?
A. Yes.
Q. What does that indicate?

A. Those are the dates I signed them.

Q. And when you listened to the recordings that are referenced in 1028 and 1029, do they appear to be complete as to what the substance of the conversations that you had and recorded on those dates?

A. They did.

THE COURT: You say they did or did not?

THE WITNESS: They did.

THE COURT: Okay.

MS. DUNNE: The government would like to offer 1028 and 1029.

MR. QUINN: Judge, I believe the first time I've ever seen 1029 is right now. So if I could have a minute?

THE COURT: Sure.

(Pause)

MR. QUINN: If I may, the confusion is I've never seen these transcripts before. They are apparently of 1D-6 and 1D-7, Session 2. We've been provided the tapes, we were never been provided the transcripts.

THE COURT: Is that right?

MS. DUNNE: The transcripts were never finalized. These were prepared for Mr. Collins to determine if they were pertinent. They were considered not pertinent and the tapes were short conversations. The tapes were produced without the transcripts because the transcripts had never,

in fact, been --

THE COURT: I guess my only point is, I understand they may not have been thought to be pertinent to the trial, but what has become pertinent has expanded somewhat in the last week. I'm guess I'm just kind of wondering why you wouldn't have provided it even over the weekend to Mr. Quinn.

MS. DUNNE: Judge, I didn't realize that we were going to be challenging through 1D-7, frankly. I thought that we were going to try to focus on 1D-1 through 3, primarily, and 4 and 5 be an issue, but since an issue has been raised about 6 and 7 it was --

THE COURT: Okay.

MR. QUINN: Judge, I mean, these have the witness' voice on them. I mean, they're 3500 material.

MS. DUNNE: And they were produced when 3500 material for this witness was produced.

THE COURT: I mean, the government is not required, at least my reading of 3500, the government's not required to produce a tape and a transcript, especially if it's in the English language, which these are. To the extent they produce the audio recording, then they satisfy their Jencks obligation. To the extent they intended to introduce these in their case in chief as it were during this hearing, I would have preferred they turned them over.

But it sounds like, Mr. Quinn, the government did not intend to introduce these exhibits. They were not in the binder I was provided as exhibits that the government had expected to introduce. If you need time overnight to study them and you want to recall the witness on these, I'm perfectly happy to give that to you.

MR. QUINN: No, no, Judge. I guess my larger question then is, maybe I'm just tired, I don't understand the relevance of these transcripts at this hearing.

THE COURT: I think I have an idea what Ms. Dunne's answer is.

MR. QUINN: Fine, Judge.

MS. DUNNE: Mr. Quinn has inferred that there are all sorts --

THE COURT: Implied.

MS. DUNNE: I'm sorry, implied.

THE COURT: He wants us to infer.

MS. DUNNE: He would like your Honor to infer that there's all sorts of huge universe of conversations that somehow were not reported or not recorded or mysteriously disappeared. In addition, he was challenging the witness' memory and recollection of these specific recordings in his cross examination. So it's just to establish that -- I feel uncomfortable telling the witness why I'm going to ask questions.

THE COURT: I think that proffer is sufficient. I think that they are relevant.

So, again, Mr. Quinn, if you need some time to do something with these on some kind of a recross, I'll give you that leeway.

MR. QUINN: Appreciate that, Judge.

THE COURT: But I'll go ahead and receive these exhibits.

Go ahead, Ms. Dunne.

(Government's Exhibit 1028 and 1029 received in evidence)

BY MS. DUNNE:

Q. Direct your attention to specifically Government Exhibit 1029. Specifically reference to the date of the recording being June of '08. Do you have a specific recollection of the exact date that recording was made?

A. Yes.

Q. 1D-7?

A. Yes, ma'am.

Q. Do you recall when it was?

THE COURT: Without looking at it.

A. I don't recall the exact day.

Q. Was it the final conversation that you recorded?

A. Yes.

Q. So it would have been after 1D-6?

A. Yes.

Q. And 1D-6 is dated August 19, 2008?

A. Yes.

Q. So the date for 1D-7 on the transcript where it says June of '08, is that incorrect?

THE COURT: Where it says "6-23-08."

THE WITNESS: Yes, I believe so.

THE COURT: So does that mean that you're saying that that's inaccurate?

MS. DUNNE: I don't think I can establish it through this witness, but I just wanted to make sure that his recollection of the chronology was that that was the last recording that he made. I'm going to have to establish it through somebody else as to the date the recordings were actually transcribed. I mean, that the FBird showed for the date.

BY MS. DUNNE:

Q. After making 1D-6 and 1D-7, did you make any other recordings for the FBI?

A. I don't recall.

Q. You don't recall making them or you don't recall if you did?

A. I don't recall if I did.

Q. Do you recall recording anybody else other than whose recordings we reviewed today?

A. No.

Q. When you look at 1D-6 and 1D-7 transcripts, do those transcripts refresh your recollection about the conversations that you had in 1D-6 and 1D-7?

THE COURT: Just for the record, 1D-6 transcript is 1028 and 1D-7 is 1029?

MS. DUNNE: Yes.

THE COURT: Just so the record is clear.

BY MS. DUNNE:

Q. Do those transcripts refresh your recollection about the conversations you had?

A. Yes.

MS. DUNNE: I'd like to offer 1028 and 1029 into evidence, if I didn't already.

THE COURT: You already did.

MS. DUNNE: Oh, okay.

THE COURT: If you offer them twice, then they're out. Double negative. All right. They're received again.

MS. DUNNE: Thank you, your Honor.

Just one second, Judge. Again, we have another misplaced piece of paper.

BY MS. DUNNE:

Q. Do you recall speaking with Agent Pena in April of 2008, April 17, 2008?

A. I do.

Q. Do you recall having a conversation with her on that day?
A. No, I don't.
MS. DUNNE: May I approach?
THE COURT: Yes.
MS. DUNNE: I show the witness what has been marked as Government Exhibit 1032.
BY MS. DUNNE:
Q. Ask you to take a look at that and see if it refreshes your recollection about the substance of any communication you had with Agent Pena in April of 2008.
MR. QUINN: Judge, I would indicate, by the way, the witness has not testified he had no recollection of a conversation he had with the agent in 2008.
THE COURT: He just didn't remember the specific date.
BY MS. DUNNE:
Q. Does this refresh your recollection about a conversation you had with Agent Pena --
A. It does.
Q. -- on or about April 17, 2008?
MR. QUINN: That would be the basis of my objection.
THE COURT: No, I got that.
MR. QUINN: The horse is out of the barn, of

course.

THE COURT: Yes.

BY MS. DUNNE:

Q. Do you recall what day you spoke with Agent Pena in April of 2008?

A. I don't recall the exact day.

Q. And do you recall having a conversation with her at any time about limiting the kinds of questions that you would ask people when you were wearing a recording device?

A. I don't recall.

Q. Does that document, GX1032, refresh your recollection of any conversation that you had with her about that topic?

MR. QUINN: Judge, I would object. Now he was just read the report. This is the problem with the way the sequence of questions was asked.

THE COURT: I know. I mean, we're not in front of a jury, Rules of Evidence don't strictly apply here. He actually did answer the question he didn't remember; so, even though the sequence may be a little out of the norm, I will allow it. Go ahead.

Does that refresh your memory, Detective?

THE WITNESS: It does.

BY MS. DUNNE:

Q. And what was the substance of the instruction that she gave you in April of 2008?

A. If anybody tried to approach me and discuss, I should put it off.
Q. Okay. And was there discussion about reporting to her any attempts to witness tamper or obstruct justice?
A. There was.
Q. What was the nature of that instruction?
A. I'm sorry?
Q. Who were you supposed to report to her if they contacted you?
A. Agent Pena.
Q. What were you supposed to report?
A. If anybody tampers with me or does anything against me.
Q. While you were assisting Agent Pena in the investigation, were you employed or paid by the FBI?
A. No.
Q. Were you involved in any discussions with FBI staff or supervisors about the direction of the FBI's investigation?
A. No.
Q. Other than Detective Quinoy, did you know of anyone else who the FBI considered a target or a subject or person of interest or any kind of status? Was there discussion about status with you of various people that you were recording?
A. No.
Q. Did you have any input in the decision as to who was of

what status during the course of the investigation?
A. No.
Q. When you made the recordings with the defendant, 1D-1, 2 and 3, did you understand yourself to be a target of the investigation?
A. No, I did not.
Q. When you -- in 2006, when the event occurred, the Gomez incident occurred, did you report the incident to anyone other than your father?
A. Agent Spota.
Q. And what did you tell him?
A. I told him what happened outside that night.
Q. Did you tell him about an assault on a police officer or did you tell him about a police officer using excessive force during the course of an arrest?
A. I told him that a police officer had used excessive force.
Q. And when you -- Mr. Quinn asked you earlier about a reference to believing Detective Quinoy had been hit by a car, what was the context of that statement to Agent Spota?
A. That when I first was arriving on the scene, I didn't know what was going on, I thought an officer was hit by a car.
Q. And why did you think that?
A. Because all I saw was feet hanging out.

MS. DUNNE: May I approach, Judge?

THE COURT: Yes.

MS. DUNNE: I'd like to show the witness again what is in evidence as 1001.

BY MS. DUNNE:

Q. What is that document?

A. It's a recording I did with Detective Quinoy.

Q. That's 1D-2, Session 2?

A. Yes, ma'am.

Q. I'd like to direct your attention to page 33 of that transcript. Specifically on the bottom of that page where the transcript, if you could just read it to yourself, on where it starts "Halfway in the space."

A. Yes, ma'am.

Q. Had you told Detective Quinoy in this conversation as well that you thought he had been hit by a car when you rolled up?

A. I believe I did.

Q. Does the transcript accurately reflect that you did?

A. Yes.

Q. And why was that that you thought he had been hit by a truck -- or a car?

A. Because there was a car in the middle of the road and all I saw was feet hanging outside on the floor.

Q. I'd like to back up to Spota again. When you reported

the incident to Agent Spota, what did you hope to accomplish?

A. That he would give me a number to call somebody in the FBI.

Q. Did Agent Spota ultimately take action on your complaint?

A. I don't believe so.

Q. Did he give you a number to contact?

A. No, he did not.

Q. During the course of debriefings by the FBI, what, if anything, did you tell them about Spota's status as the fire chief in Sleepy Hollow?

A. I just told them he was fire chief in Village of Sleepy Hollow.

Q. Did you share that information with Agent Pena?

A. Yes, I did.

Q. And did Spota ultimately tell you that that caused him a problem?

A. He alluded to it.

Q. Did he tell you -- was he angry that you had shared that information?

A. He was.

Q. Did he say why?

A. No, he didn't.

Q. Do you know why?

A. No.

Q. I'd like to direct your attention to 1D-5, Session 1, in the conversation that was recorded inadvertently before 1D-5, Session 2. In Session 1, in your opinion, did you say anything inappropriate in that conversation in 1D-5?

A. The recording that was recorded by accident?

Q. Yes.

A. No.

Q. When you realized it was turned on, did you think it was a big deal?

A. No, I did not.

Q. Did you have any reason to hide 1D-5, Session 1?

A. No, I did not.

Q. The process, with regard to the process of reviewing transcripts, did you select which excerpts to listen to when you came in to look at transcripts?

A. No, I didn't.

Q. You stated on cross that you could rewind; did you skip around to different tracks when you did this review?

A. No, I could only rewind on the track I was on.

Q. So it was queued up to a track you were in?

A. Yes.

Q. Mr. Quinn made reference to conversations you had with Jimmy Warren; who is Jimmy Warren?

A. He was the police chief in 2006.

Q. Did he ever suggest to you that you alter any reports in connection with the Gomez incident?
A. No, he didn't.
Q. When you witnessed Mario Gomez being kicked in the head by the defendant, where was he sitting?
A. In the back of the police car.
Q. And where were you sitting?
A. In the front seat of the police car.
Q. And what position was Mr. Gomez sitting?
A. He was sitting with his legs in the car.
Q. And where were his hands?
A. Handcuffed behind his back.
Q. What did he do to provoke the kick, if anything?
A. I don't believe he did anything.
Q. From where you were sitting, did you have a clear view of the kick?
A. Yes.
Q. And what occurred to Mr. Gomez upon the impact of the kick from the defendant's foot?
A. He fell over onto the seat, the back seat of the police car.
Q. Was your view obstructed as this occurred?
A. No.
Q. Do you recall it clearly?
A. Yes.

Q. In your experience as a police officer, have you ever witnessed such conduct before?
A. No.
Q. After making the recordings that you made for the FBI, did you have any responsibility for handling or transporting or downloading the recorders?
A. No.
Q. Were you ever threatened or coerced in order to make the recordings that you made of the defendant?
A. No.
Q. Why, Mr. Hayes, did you agree to testify and cooperate with the FBI's investigation?
A. Couple of reasons. One, I thought what the detective did that night was wrong and, two, I thought I did nothing wrong; so, I didn't see why there would be a problem with me doing it.
Q. Why didn't you follow the defendant's advice and just say you were looking the other way?
A. Because what he did that night was wrong.
Q. Mr. Hayes, has your -- Detective Hayes, has your experience at the police department been a pleasant one since you decided to cooperate with the government and your cooperation became known?
A. No, it hasn't.
MS. DUNNE: I'd like to show the witness

Exhibit 1033. It has previously been produced as a potential trial exhibit. I didn't premark it because I didn't think it was going to be an issue, it's a potential trial Exhibit numbered 130-A. I'm going to show it to defense counsel before I bring it up to the witness, if I may.

BY MS. DUNNE:

Q. What is Government's Exhibit 1033?

A. It's a copy of the Sleepy Hollow Police Department taser report.

Q. It's also been --

MS. DUNNE: It's also been marked 3511-B for the court's reference.

BY MS. DUNNE:

Q. What information on this is either false or incomplete?

A. The information that's false is that subject was resisting arrest.

Q. When you approached him, what was he doing?

A. He was laying on his stomach.

Q. What was being done to him while he was laying on his stomach?

A. He was being tased and punched.

Q. And who was tasing him?

A. Officer Gasko.

Q. What was happening with his body when he was tased?

A. He would just scream out, and his body would stiffen up.
Q. Would what?
A. Stiffen up.
Q. Involuntarily?
A. Yes.
Q. Approximately how many volts of electricity went through his body each time he was tased?
A. 50,000.
Q. And in between tasings, you said he was also being punched?
A. Yes.
Q. Who was punching him?
A. I saw Detective Quinoy punch him.
Q. And when you arrived, what position was he in?
A. Mr. Gomez was on his stomach.
Q. And where were his hands?
A. Underneath him.
Q. And what did you do upon your arrival?
A. I exited my vehicle and ran over to the incident.
Q. And what did you think was happening when you arrived?
A. I thought somebody was resisting, resisting arrest.
Q. So what did you do?
A. I pulled the taser out.
Q. What did you do?

A. I attempted to tase.
Q. And did you tase him?
A. I eventually did, yes.
Q. And in the course of the incident, did you come to the conclusion at some point that he was not, in fact, resisting?
A. Yes.
Q. And when was that?
A. Once we got him handcuffed.
Q. And why was that?
A. Because after we got him handcuffed and got him off the ground, I saw Detective Quinoy hit Mr. Gomez.
Q. Before that, while he was on the ground, did you stop tasing him at some point?
A. Yes, I did.
Q. And why did you do that?
A. Because nobody was attempting to handcuff him.
Q. He was just being --
A. And punched, yes.
Q. -- tased and punched?
While he was on the ground being tased and punched by people, including yourself, did anybody at any point attempt to restrain Detective Quinoy?
A. No.
Q. And he did ultimately, he was cuffed and restrained

after that?
A. Yes.
Q. It was after that that Detective Quinoy punched him again?
A. Yes.
Q. And that was before the car incident you previously testified about?
A. Yes.
MS. DUNNE: I have no further questions.
THE COURT: Recross.

RECROSS EXAMINATION

BY MR. QUINN:

Q. Who cuffed him?
A. The left wrist, myself and Detective Quinoy got cuffed.
Q. What about the right wrist?
A. The right wrist, Detective Quinoy and Officer D'Allesandro.
Q. So you're saying that Quinoy assisted in cuffing both hands?
A. Yes.
Q. Has that always been your testimony?
A. Yes.
Q. That was your testimony in front of the Grand Jury?
A. Yes.
Q. That Officer Quinoy, yourself and D'Allesandro, the

three of you cuffed him; that's your testimony today under oath, right?
A. Yes.
Q. Now, you indicated that you came forward because you did nothing wrong, right?
A. Yes.
Q. By your own admission, you tased a guy who was not resisting, correct?
A. At the time I thought he was.
Q. What made you think he was?
A. I didn't get a full grasp of exactly what was going on when I first arrived.
Q. So rather than wait to get a full grasp, you tased him?
Is that the policy of the Sleepy Hollow PD; tase first, ask questions later, Officer?
A. No.
Q. I'll ask you again, what made you think he was resisting such that, even though another officer was on the scene deploying a taser, you thought on your own independently, I'm going to tase him.
A. Because I saw three police officers trying to effect an arrest.
Q. And why were they not being successful?
A. Because he was lying on his stomach.
Q. And nothing else. Wasn't kicking, wasn't flaying; is

that your testimony?
A. Not that I saw.
Q. He wasn't resisting in any way, correct?
A. Just laying on his stomach and not giving his hands up.
Q. And you felt that the three officers and one taser wasn't sufficient, that you should bring a second taser into the melee; is that what you're testifying to?
A. I thought if I was able to tase him, we would get his hand out from underneath him and handcuff him right away.
Q. Gasko was already tasing him, right?
A. I believe so.
Q. You think he needed 100,000 volts of electricity to effect the arrest?
A. I don't know what I was thinking that night.
Q. What do you mean?
A. It was a chaotic scene. You didn't have a lot of time to react.
Q. You're trained when to use the taser, right?
A. Correct.
Q. And there was already one officer out deploying the taser on Mr. Gomez, correct?
A. He was dry stunning him.
Q. Mr. Gomez, according to you, was merely lying on the ground, stomach down with his hands underneath his stomach, correct?

A. Correct.
Q. He wasn't offering any other resistance whatsoever, correct?
A. Not that I saw.
Q. And you assessed all of that before you elected to tase him, correct?
A. I took a -- I only had a couple of seconds to assess what to do.
Q. That's pretty much true of every decision you make as a police officer, right?
A. Yes.
Q. So in that few seconds, the only decision you could come to was to deploy your taser and dry stun the guy, right?
A. Correct.
Q. Put 50,000 more volts into his body, correct?
A. Correct.
Q. And when it didn't work the first time, you thought, well -- withdrawn.
After you did it the first time, did it have any effect whatsoever?
A. No, it didn't.
Q. So what prompted you to think it was a good idea to do a second time?
A. I don't know.

Q. But you did it a second time.
A. Correct.
Q. Against all your training, correct?
A. What training? The taser training?
Q. Taser training.
A. Doesn't say how many times we can or cannot tase somebody.
Q. But you're told when you're trained that if you tase somebody, it's ineffective, you just don't continue to gratuitously tase them, right?
A. I don't recall.
Q. You don't know?
A. I don't recall that part of the training.
Q. Well, once you tase somebody and it's ineffective, you think it's smart to tase them a second time?
A. Probably not, but I wasn't thinking that night.
Q. How about the third time, still weren't thinking?
A. No.
Q. By the way, have you ever been tased?
A. I've tased myself.
Q. Those things hurt, right?
A. Yes.
Q. They actually hurt a hell of a lot more than being kicked in the head, wouldn't you say?
A. I've never been kicked in the head.

Q. Isn't it true the injury and pain you inflicted on Mario Gomez was significantly greater than the injury or pain you allege Jose Quinoy inflicted when he punched or kicked?

MS. DUNNE: Objection.

THE COURT: Sustained.

BY MR. QUINN:

Q. How many times did Gasko tase him?

A. I don't know.

Q. But he was tasing at the same time you were, correct?

A. I don't know if he was tasing at the exact same time.

Q. You saw Gasko use the taser before you did, right?

A. When I first got out of the car, yes.

Q. By the way, any other weapons being used?

A. Not that I saw.

Q. Did you take your handcuffs off your belt?

A. No.

Q. So your handcuffs were never used?

A. No.

Q. When you say you saw Officer Quinoy punch Mario Gomez twice, what type of punches did he use?

A. He used a closed fist.

Q. From what angle did he hit him?

A. He was standing to the right of Mario.

Q. And where did those blows land?

A. On Mario's face.
Q. What part of his face?
A. I don't recall.
Q. What do you mean, you don't recall? You don't recall where you saw him hit?
A. I recall seeing him hit him in the face. I just don't recall where in the face he got hit.
Q. Top of the head, chin, nose, ear, back of the head, anything?
A. I don't recall.
Q. Were they jabs, were they full punches?
A. They were full punches.
Q. So he took them from where? Can you describe or show me what you mean when you say punch?
A. He took his fist from next to him and swung at Mr. Gomez.
Q. And Rich D'Allesandro was standing right next to him, right?
A. Standing behind him.
Q. Behind Mr. Gomez?
A. Yes.
Q. Looking directly at Quinoy, right?
A. I can't say which way he was looking.
Q. But he was actually holding Gomez at time you claim Jose Quinoy took two full punches and struck him, correct?

A. Yes.
Q. You don't know where the punches landed.
A. They landed in his face, I just don't know where on his face.
Q. Where were you?
A. I was standing to the left of Mr. Gomez.
Q. How about Officer Quinoy?
A. I don't know.
Q. What do you mean, you don't know?
A. I don't recall.
Q. Were you 10 feet, were you 2 feet?
A. Less than 5 feet.
Q. Officer, you testified in a Grand Jury that resulted in my client facing 242 civil rights charges in federal court, you observed this assault, you don't recall how far away you were when you observed them or where the punches landed?
MS. DUNNE: Objection.
THE COURT: Sustained.
BY MR. QUINN:
Q. What happened after the first punch as you claim was thrown?
A. He threw another punch.
Q. Before that happened, did Mr. Gomez do anything?
A. Not right away.
Q. Did he say ouch?

A. He yelled.

Q. He did?

A. He yelled.

Q. Have you ever testified about that anywhere?

A. I don't recall.

Q. Have you ever told anybody ever, once, before I just asked you that question, that after he's punched the first time, he yelled?

A. I don't recall.

Q. The answer is, no, correct? You never told anybody that before today?

A. I don't recall.

Q. After the second punch, what happened?

A. Mr. Gomez went down to the ground.

Q. As did Quinoy, right?

A. Correct.

Q. As did D'Allesandro, correct?

A. D'Allesandro never went to the ground.

Q. D'Allesandro never fell down?

A. No.

Q. And throughout this time, Mr. Gomez was compliant and not combative at all?

A. That I saw, yes.

Q. Well, you were looking at him, right?

A. Yes.

Q. You were a couple of feet away from him, right?
A. Right.
Q. You were assisting in arresting him, correct?
A. Correct.
Q. You just tasered him four times, right?
A. Correct.
Q. So you were paying attention to him, right?
A. Yes.
Q. Was he being combative or resisting at the time you claim Jose Quinoy struck him?
A. No, he wasn't.
Q. He was standing perfectly still.
A. He was standing up.
Q. He wasn't moving his body?
A. He was just yelling.
Q. What was he yelling?
A. I don't recall what he was yelling.
Q. He was yelling before he was punched, right?
A. Yes.
Q. Angry, screaming?
A. Uh-hum.
Q. Is that a "yes"?
A. Yes.
Q. Cursing, vulgarities, right?
A. Yes.

Q. So he wasn't calm, was he?
A. He was yelling.
Q. He wasn't calm, was he?
A. He seemed a little agitated.
Q. A little -- he just got tasered at a minimum five to six times and you're saying he seemed a little agitated?
A. Well, once we got him off the ground, he actually started to calm down. He was just still yelling and screaming.
Q. Before or after you claim Jose Quinoy struck him twice?
A. Before.
Q. He was calming down before Jose --
A. He was calming down once we got him handcuffed.
Q. By the way, did you see any injury as a result of the punches that Quinoy threw?
A. That night? I saw Mr. Gomez had a black eye, two black eyes.
Q. You don't know when that occurred, do you? Yes or no?
A. No.
Q. Now going back to 1D-5, you estimate it was 45 minutes that the tape was on because that's when, approximately when Agent Pena gave it to you, 45 minutes earlier when you realized it was on, correct?
A. Yes.
Q. So if there is a two-and-a-half-hour recording, that

means that the tape-recorder or recording device was on for approximately hour and a half before she gave it to you; that fair to say?
A. Could be.
Q. By the way, at the time, going back quickly, at the time that Jose Quinoy struck Mr. Gomez according to your testimony, do you know whether or not Jose Quinoy knew that he was handcuffed?
A. Yes.
Q. You know that Quinoy knew he was cuffed?
A. Detective Quinoy helped me cuff him.
Q. He helped you cuff one hand.
A. And helped Officer D'Allesandro cuff the other hand.
Q. You watched that happened?
A. I watched that happen.
Q. How far away were you then?
A. He was still kneeling down right next to him.
Q. By the way, you said that you thought Officer Quinoy was hit by a car because you saw his feet dangling from the front. What exactly do you mean by that?
A. At the time I didn't know who got hit by the car. But then after the conversation -- after the whole incident was over, I thought to myself that possibly it could have been Quinoy.
Q. No, no, no. You testified that, upon your arrival, you

saw feet and you thought Quinoy was hit by a car. What about his feet led you to believe he was hit by a car?
A. I don't recall. I don't remember what.
Q. Do you deny telling Agent Spota that you saw, quote, a bloody and bruised Quinoy and at first thought Quinoy was hit by a car?
A. I don't recall that.
Q. Does that mean you didn't say it or you might have you just don't remember --
A. I don't remember saying it.
Q. Now, and, finally, you indicated that you reported to your father that you saw my client punch Gomez because you didn't trust the chief, correct?
A. Correct.
Q. But you trusted your father?
A. Yes.
Q. You weren't offered any money or anything else by the FBI?
A. Correct.
Q. As a result of your cooperation, my client has now been charged, correct?
MS. DUNNE: Objection.
THE COURT: Sustained.
Q. You're now a detective, right?
A. Correct.

Q. You hold the position that my client held before he was arrested and suspended as a result of this indictment, correct?
A. The position or a position?
Q. You got promoted to detective, right?
A. Right.
Q. That was the position my client held before all this happened?
A. He held the position of detective, yes.
Q. It's your testimony now, by the way, absolutely certain as you sit here today, that you were in the front seat of the police car when you saw Jose Quinoy kick Mario Gomez in the head.
A. Yes.
Q. Even though you testified under oath in the Grand Jury you were standing by the door and then closed the door after you saw Jose Quinoy kick Mario Gomez in the head, correct?
A. Yes.
Q. So you've given two statements under oath flat contradict each other, correct?
A. Correct.
Q. By the way, when you say you were tasing, when you first got there, how long were you on the scene before you tased Mr. Gomez?
A. I don't recall.

Q. 5 seconds, 20 seconds, a half hour, anything?
A. Less than a minute.
Q. And how much time between tases?
A. I don't recall.
Q. You would tase and wait, right?
A. Yes.
Q. You wouldn't continually tase something, right?
A. No.
Q. That would be like torture, wouldn't it? You didn't do that, right?
A. No.
Q. You would tase and wait a while, right?
A. Yes.
Q. And while you were waiting a while, the only thing Mr. Gomez was doing, according to your testimony, was lying on his stomach on his hands, right?
A. Yes.
Q. Then after what, about 10 or 15 seconds, you would tase him again?
A. No, it was less than that.
Q. 5 seconds?
A. I don't recall but --
Q. You're telling him, show us your hands, give us your hands, right?
A. Everybody was yelling it.

Q. Quinoy, Gasko, Ebel, right?
A. I don't know exactly who, but I just know everybody else was yelling it.
Q. And then, when he wouldn't comply, you tased him again, right?
A. Correct.
Q. Nobody told you to do that but yourself?
A. Correct.
THE COURT: Turns out "finally" means I have 20 more questions.
MR. QUINN: Always works out that way.
THE COURT: What are we up to re-redirect?
MS. DUNNE: I'll try to make it brief. You know the promises of lawyers on that.
THE COURT: Go ahead, Ms. Dunne.
REDIRECT EXAMINATION
BY MS. DUNNE:
Q. When you approached the scene on the night of October 17, 2006, when you arrived and saw people on the ground, did you know who was on the ground?
A. No, I didn't.
Q. Did you come to know later that night who it was that was on the ground?
A. I did.
Q. Who did you learn it was?

A. Mario Gomez.
Q. And did you, in fact, know Mario Gomez before that night?
A. I did.
Q. And how had you known him?
A. I knew him from being around Tarrytown.
Q. And when Mario Gomez was -- when you arrived and Mario Gomez was being tased --
A. Yes.
Q. -- and he was being punched by Detective Quinoy --
A. Yes.
Q. And did you know at the time that the dispute that caused this incident was a personal dispute between Mario Gomez and Detective Quinoy?
A. No, I didn't.
Q. How did Mario Gomez appear as he was lifted from the ground?
A. Exhausted.
Q. And where were his arms when he was lifted from the ground?
A. Handcuffed behind him.
Q. Behind what?
A. Behind his back.
Q. And when you saw Detective Quinoy punch Mr. Gomez with his hands behind his back, did you reach a conclusion at

that time about the nature of the incident?
A. I did.
Q. And what was that conclusion?
A. That there was more to the incident than I previously thought.
Q. And you testified on cross about cursing. Was Mario Gomez the only person cursing?
A. No.
Q. Who else was cursing?
A. Detective Quinoy.
Q. And was he also screaming vulgarities?
A. Yes.
Q. In your training as a police officer, do screaming vulgarities, does that warrant the use of force?
A. No, it doesn't.
Q. Does it warrant punching someone with their hands cuffed behind their back?
A. No, it doesn't.
Q. Does it warrant kicking someone who is sitting in a police car with hands cuffed behind his back?
A. No.
Q. When you reported the incident to your father, you testified that you were told to go keep an eye on Mario Gomez?
A. Yes.

Q. What was -- why was that?
A. To watch out for Mario's safety.
Q. And why was that?
A. To make sure Detective Quinoy didn't go after him again.
Q. Is there more than one detective position in the Sleepy Hollow Police Department?
A. There is.
Q. And did you frame Jose Quinoy so you could get his detective position?
A. No, I didn't.
Q. When were you promoted?
A. November of '09.
Q. And prior to that, were you having difficulty operating as a patrol officer?
A. I was.
Q. And why is that?
A. Guys would take their time backing me up on calls or they would cancel me from a call.
Q. What does that mean?
A. They would take their time responding to a call, a radio run I was already on or just cancel me from a radio run.
Q. Was it putting you in jeopardy?
A. I believed it was.

MS. DUNNE: I have no further questions.

THE COURT: Either the peace sign or you've got two questions.

MR. QUINN: The steal sign on my daughter's softball.

RECROSS EXAMINATION

BY MR. QUINN

Q. The time between when he was cuffed and when he was punched, one or two seconds?

A. I'm sorry, what's that?

Q. You say he was cuffed and then Quinoy struck him. From the time he was cuffed to the time Quinoy struck him, one or two seconds?

A. Probably a little longer.

Q. Three or four seconds?

A. More like ten.

Q. Ten seconds after? And you're aware your father started the rumor about Quinoy and Awilda Gomez, correct?

A. No, I was not aware of that.

Q. He didn't tell you that?

A. No.

MR. QUINN: Nothing further.

MS. DUNNE: I was going to object to that being beyond the scope.

THE COURT: We've been way beyond the scope for

the last half hour.

MR. QUINN: Defense attorney, I just keep going.

THE COURT: Yeah, I've got it. Any other questions?

MS. DUNNE: No.

THE COURT: All right, detective Hayes, you're excused. Thank you.

(Witness excused)

THE COURT: How long is the direct of the next witness?

MR. KENNEDY: Probably about a half hour.

THE COURT: We'll do the direct because I imagine the cross will go for a while, we'll call it a day. If he got more than a half hour, I may stop it at that point, unless you want to pick it up tomorrow morning, it's up to you. I don't want to inconvenience the witness. Sounds like she may be back anyway.

MR. KENNEDY: Let's keep it moving, so let's call Ms. Payne. The United States calls Diane Payne.

THE COURT: All right. Come on up, Ms. Payne.

DIANE PAYNE, having been duly sworn, was called as a witness and testified as follows:

THE CLERK: Please state and spell your name for the record.

THE WITNESS: My name is Diane Payne. My name is