UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x

UNITED STATES of AMERICA,

-against- 09 Cr. 424

JOSE QUINOY,

Defendant.

-----------------------------------x

United States Courthouse
White Plains, New York

June 15, 2010

B e f o r e:

HON. KENNETH M. KARAS,
District Court Judge

A P P E A R A N C E S:

CYNTHIA DUNNE
DAVID KENNEDY
Assistant United States Attorneys

ANDREW QUINN
JOHN D'ALLESANDRO
Attorneys for Jose Quinoy

ANGELA A. O'DONNELL, RPR
Official Court Reporter

P R O C E E D I N G S

THE CLERK: United States of America versus Jose Quinoy, 09CR424. Counsel, please state your appearances.

MS. DUNNE: Good afternoon, Judge, Cynthia Dunne and David Kennedy for the US Attorney's office, and with us is paralegal Shannon Becker.

THE COURT: Good afternoon to you all.

MR. QUINN: Good afternoon, your Honor, Andrew Quinn and John D'Allesandro for Jose Quinoy.

THE COURT: Good afternoon to you all. Please have a seat.

Did you finish your one-day trial, Mr. Quinn?

MR. QUINN: I did, Judge.

THE COURT: One-day trial, that's like unheard of.

MR. QUINN: Jury selection to verdict. From nine to five.

THE COURT: We have to try to do more of that here.

Let me give you the ruling, unless there's something else you want to say before I give you the ruling.

MS. DUNNE: Nothing from the government, Judge.

MR. QUINN: Nothing from the defense, Judge.

THE COURT: Just some procedural background, for the record, more than anything.

Detective Quinoy is charged in a three-count

indictment. Two counts of violating 18 USC Section 242,and one count for violating 18 U.S.C., Section 1512(b). In particular, Detective Quinoy is charged with use of unreasonable force in connection with first the arrest of Mario Gomez on October 17 of 2006; second the arrest of Luis Vilchez on December 17, 2006; and, the witness tampering charge in connection with Detective Michael Hayes on or about April 4 of 2008.

Special Agent Catherine Pena, at least up until recently, has been the lead FBI case agent on the investigation of this case. In 2008, Agent Pena asked Detective Hayes, another Officer in the Sleepy Hollow Police Department with Detective Quinoy and a witness to the Gomez incident to assist in investigation of defendant by wearing a recording device and recording defendant and/or others in the Sleepy Hollow Police Department. Before the court is defendant's motion to dismiss the indictment pursuant to Federal Rule of Criminal Procedure, 12(b)(2) due to the Government's alleged intentional destruction of one such recording 1D-4, and the resulting denial of Detective Quinoy's due process rights.

Now, in terms of some of the procedural background, the trial of this case was originally scheduled to begin with voir dire on May 10 of 2010. Boy does that seem like a long time ago. On May 7, the government

requested, by letter, a one-week adjournment because of an inadvertent recording of Hayes, which had never been before produced to the US Attorney's Office, had just been discovered. This came in a letter from Ms. Dunne to the court dated May 6 of 2010. At a conference held later on that day, that is on May 7, the government explained that on the newly recovered recording Hayes told Special Agent Pena that he had said "inappropriate things" on another recording. The government explained at that time that the only remaining evidence of the US Attorney's office in possession regarding the referenced inappropriate recording was a blank CD, and the government was attempting to recover data from this blank CD, 1D-4.

The court granted the Government's request to adjourn the trial over defendant's objection. The government thereafter submitted preliminary findings from its investigation that it conducted thus far, and the court-ordered hearing held over four days from May 17 through May 20 of 2010. The parties each had respective opportunity to submit memoranda of law and the court held oral argument on June 11.

Now, in terms of the court's findings, first regarding the recording process in general in this case.

Special Agent Pena, in work with Detective Hayes, used what everybody has described as an FBird device to make

audio recordings during the investigation. FBirds are turned on and off by pushing a button on the device. Every time an FBird is turned on and off, a session is recorded. Without special cables and software used by the FBI and other law enforcement agencies, a person handling an FBird cannot access or listen to or otherwise erase a recording or see how much information has been recorded on each session. Neither Hayes nor Special Agent Pena possessed or had access to the cables or software needed to access or download information from an FBird. To put it more bluntly, there's no evidence they used such equipment to download information from any FBird in this investigation. Testimony also establishes that the FBird flashes a light when noise is recorded.

Now, in the normal course, Agent Pena would call Hayes when she wanted him to make recordings using the FBird. They would meet and Hayes would pick up the FBird from Special Agent Pena. Before handing the FBird to Hayes, Agent Pena would turn the device on and record what everybody's been describing as a preamble. A preamble is normally approximately a 30-second recording of an agent identifying herself and the date stating that the device is being given to, in this case, Detective Hayes as part of the investigation. In the normal course, Agent Pena would then turn off the FBird and give it to Hayes. After Hayes would

complete a recording or series of recordings, he would call Agent Pena and meet to return the FBird and sometimes at these meetings a new FBird would be given to Hayes by Pena.

Agent Pena would bring the FBirds to the FBI technicians who would download the data. In this case, the two technicians who testified in this case are Diane Payne and Daphne Warrington-Gaskins. Both these individuals testified that a technician, upon receiving an FBird, would plug the FBird into a computer using a special cable. The computer screen would show the number of sessions recorded on the device, as well as the date and length of each session. The technician would manually record the date and length of each session on the back of a two-page worksheet. The technician would then make three CDs off of the data downloaded off the FBird; an original, duplicate original and a WAV file or copy, as they were called.

Now, in order to download data from the FBird to a CD, the CDs have to be formatted in order to hold the data. This is done by pushing a format button on the computer screen. If the CD is not formatted, nothing will record on the CD. If the technician attempts to copy data to an unformatted CD, the computer shows an error message.

Ms. Payne and Ms. Warrington-Gaskins testified that, in the normal practice, when they were downloading data from FBirds, they would listen to portions of each CD

to which the data had been copied and spot-check, in other words, to ensure that the CDs, in fact, contained the data that had been downloaded. They also testified that it was their normal practice to check the back of the CDs to check that the burn marks are similar in size. After the recordings and checks are done, the technicians would then erase the FBirds and return them for use by other agents. After a download is complete, the original CD is put into an ELSUR, all caps, E-L-S-U-R, evidence envelope. The ELSUR envelope and two other copies of the CD are placed in a larger envelope for the case agent. The original CD is meant to remain in evidence while copies are meant for the field agent's use.

Now, in terms of the specifics, starting with 1D-1 and 1D-2 and 1D-3. In around April of 2008, at Agent Pena's instruction, Hayes made three recordings that include the defendant. The first recording took place on April 3, 2008 at the Sleepy Hollow police headquarters. This is the data contained in the CD identified at 1D-1. The testimony and records demonstrate that Ms. Warrington-Gaskins accepted custody of the 1D-1 FBird, downloaded the data and placed the CDs in storage on April 7, 2008. Agent Pena picked up the ELSUR envelope on April 9 and placed it in storage that same day.

Hayes testified that the transcript of 1D-1,

Session Nine, is accurate and complete based on him listening to the recording and reviewing the transcript and based on his memory of what he says he recalls being said during the recording, although he acknowledges he doesn't independently remember everything that was said.

On this recording, and I have reviewed the recording and also read the transcript, because I had been asked to by Mr. Quinn, there are certain statements that are made. The substance of these statements, the full entirety of the substance of these statements is not relevant for these purposes, but there clearly is a conversation between Hayes and the defendant.

There is no evidence, and the court doesn't find there's any reason to believe that 1D-1 and, in particular, 1D-1, Session Nine, the recording itself or the transcript are somehow incomplete or otherwise have been tampered with. The evidence shows that the other sessions are the preamble, there are short test sessions or other nonpertinent conversations. All that really needs to be said about 1D-1 for these purposes.

With respect to 1D-2, the recordings on 1D-2 took place on April 4 and April 6 of '08, and these, as I said, are contained in a CD identified as 1D-2. Ms. Payne accepted custody of the FBird that became 1D-2, downloaded the data and placed the CDs in storage on April 9, 2008.

Agent Pena picked up the ELSUR envelope on April 9 and placed it in storage that same day. Again, Hayes testified about the contents of at least portion of 1D-2, and in particular identified the transcript of 1D-2, Session Two, as being accurate and complete, again, based on him listening to the recording and reviewing the transcript and based on some memory of what he recalls being said during the conversation.

Hayes also provided testimony, again, the full substance of it is not pertinent to the motion other than to say there is another conversation between Hayes and Detective Quinoy, and this is the one where I had been asked specifically to make an audibility finding.

Again, as with 1D-1, the court finds there's no evidence to suggest that 1D-2, Session Two, the recording or the transcript are somehow incomplete or have otherwise been tampered with. Again, the evidence demonstrates that the other sessions indeed are the preamble or other nonpertinent conversations.

Hayes made a third recording involving the defendant on April 16 of 2008, which is now on the CD identified as 1D-3. Ms. Warrington-Gaskins accepted custody of the FBird that became 1D-3, she downloaded the data, she placed the CDs in storage on April 28, 2008. Agent Pena picked up the ELSUR envelope on April 28, 2008 and placed it

in storage that same day.

Hayes testified that he did not make any other recordings of Detective Quinoy other than those contained in 1D-1, 1D-2 and 1D-3. The court finds that testimony to be credible. Again, Hayes testified as to the accuracy of the transcript of 1D-3, Session Two, based on him listening to the recording, reviewing the transcript and some memory and, again, the court finds there's no evidence that there has been any tampering or somehow the recordings are incomplete. Again, the other sessions are preambles or other nonpertinent conversations.

The drama begins with 1D-4, this is the blank recording. The question is what happened to 1D-4?

Well, on May 22, 2008, Agent Pena gave Hayes FBird No. 1659, which ultimately becomes the CD identified as 1D-4. Hayes returned the 1D-4 FBird to Agent Pena on June 4, 2008, and she brought the FBird over to Ms. Warrington-Gaskins for download on June 6, 2008. Currently the "original" CD for 1D-4 that was in the ELSUR envelope is a blank, unformatted CD that appears not to have ever contained any data. Indeed, Ms. Payne testified, credibly, that the disk contained no burn mark and that it was never formatted and there is no duplicate original or copy of 1D-4.

Now Agent Pena testified that, although she did

not specifically recall a technician telling her that the 1D-4 FBird or CD was blank when she picked up the ELSUR envelope on June 6, this "would have had to have" occurred. Page 531 of the transcript. She testified that the gist of what she was told by the technicians was that "it's blank" and "there's nothing on here" at 539.

Agent Pena testified that she assumed that the FBird had malfunctioned and that there was no recording but she did not recall the technician giving her a specific explanation. She further testified that, if she was told that an FBird was blank, she would prepare a 302 in "a timely manner." But she did not complete a 302 at the time she might have been told that the FBird was blank.

Agent Pena testified that, if she was informed that the FBird was blank, she would not ask the technician to try and retrieve the data and "would accept that it was blank." Agent Pena explained this would not be unusual because she's experienced other occasions when an FBird did not have data. And she also explained she could have had Hayes reattempt the conversation if there was an equipment failure, which she says she had done in the past in other cases.

Agent Pena also explained that she returned the ELSUR envelope to evidence with the blank 1D-4 CD in order to maintain certain information, such as the date and the

identity of the intercept, the date of the attempted download and the chain of custody.

In light of all the evidence presented at the hearing and the other evidence that the court was given, the court finds that Agent Pena's version of events is simply not credible.

To begin, she was contradicted by Ms. Warrington-Gaskins and Ms. Payne. Specifically, according to Ms. Warrington-Gaskins' records, the 1D-4 FBird was not blank when she plugged it into the computer, rather her log clearly shows that three sessions of data were recorded on the FBird that became 1D-4: Session One was recorded on May 22 of 2008 and lasted approximately 118 minutes; Session Two was also recorded on May 22, 2008 and lasted approximately 24 minutes; Session Three was recorded on May 4 -- excuse me, May 24, 2008 and lasted approximately 20 minutes. Total length, approximately, of these recordings was approximately 162 minutes, as logged in by Ms. Warrington-Gaskins. If nothing had been on the FBird, Ms. Warrington-Gaskins could not have known and otherwise recorded this information. Indeed, Ms. Warrington-Gaskins credibly testified that, although she did not specifically remember downloading 1D-4, her normal practice was to spot-check CDs by listening to portions of the CDs and she testified that she would take "every precaution" to make

sure that data was properly downloaded onto a CD before erasing an FBird. And this is for obvious reasons. She also testified she would never put a blank disk into evidence knowing that data had not been recorded from the FBird, that she would never erase an FBird before knowing the download was successful, and she testified that she never had a CD fail to format or copy without the computer showing the error message, and she's never had an agent tell her that a CD she put into evidence was not formatted or was otherwise blank.

Now, Ms. Warrington-Gaskins candidly admitted that mistakes can happen, but she testified, in accordance with normal FBI procedures which she normally followed, she would have documented any problem, either in obtaining data from the FBird or downloading data from the FBird to the CD. Indeed, she testified that, if she could not have downloaded the data, she would have sent the FBird to other FBI units to fix the problem. She testified that she did not create a document stating that there was problems with either data on the FBird or with downloading the data to the CD that became 1D-4.

Thus, while she doesn't have an independent memory of downloading the data onto 1D-4, Ms. Warrington-Gaskins testified that, based on her records, the download was successful and she did not tell Agent Pena that the disk was

blank.

As I said, the court found all this testimony to be entirely credible. This is somebody who has worked with the FBI for six years, she's created thousands of CDs, her testimony was more than corroborated by the records regarding 1D-4, as well as the testimony of Ms. Payne, her co-worker.

There were other inconsistencies and problems with Agent Pena's version of events. Agent Pena testified that she did not recall the date that she told AUSA Dunne and Kennedy about 1D-4 being blank, but that she was "sure" it was within a week of picking up the ELSUR envelope on June 6 of 2008. That's at 544.

Later she testified she was not sure when she told the AUSAs about 1D-4 but that it would have been by September of 2008 when the decision was made to stop doing the consensual recordings.

AUSAs Dunne and Kennedy have signed on to a stipulation stating that they received a 302 regarding 1D-4 in early 2009 and that they were first directly informed that 1D-4 was blank via an email dated June 22, 2009.

Now Agent Pena also testified that for six out of the seven recordings the FBI technicians gave her the three CDs I referenced earlier, as is the their normal practice. At the hearing Agent Pena testified she was not certain

whether the technician gave her three CDs for 1D-4; however, according to AUSAs Dunne and Kennedy, Agent Pena told them at an interview on May 6, 2010 that she was given three CDs of 1D-4 and discarded the two extra CDs probably because they were blank. That's at paragraphs eight and nine of the stip.

According to Special Agent Mike D'Alonzo, Agent Pena's supervisor, he took away from his conversation with Agent Pena on May 8, 2010 that she once did have copies of 1D-4 but that she disregarded them because she believed they were blank. That's at 703 of the transcript.

Agent D'Alonzo also stated that at some point Agent Pena told him that she did not know that she had been given two copies of 1D-4. On May 14 of 2010, Agent Pena told AUSAs Dunne and Kennedy that she was unsure whether she had been given two copies of 1D-4. That's paragraph 11 of the stip.

When confronted with these apparent inconsistencies at the hearing, Agent Pena testified that in all these meetings she stated that it was "possible" that she received three CDs, but that she "didn't remember." But yet AUSAs Dunne and Kennedy state that, during the May 6, 2010 interview, Agent Pena did not say that it was only "possible" that she was given the two other CDs.

On October 28 of 2008, five months after Agent

Pena picked up 1D-4 from the technicians, she removed the ELSUR envelope containing 1D-4 from evidence. On November 7, 2008 she completed a 302 form writing that 1D-4 was blank and returned the envelope to evidence. Agent Pena testified she removed the CD from evidence in order to see if she could hear anything, that there was nothing on the CD and she did not ask anyone for help. She further testified that she must have taken the original CD to listen to it because she did not have the copies, and she had no explanation, none, as to why she reviewed 1D-4 five months after learning it was blank.

Now the record evidence is that the FBI technical unit uses a certain type of CD. Agent Pena acknowledged agents have different disks than those used by the technicians and agents do not have access to the technician's CDs; however, Ms. Payne and Warrington-Gaskins testified that agents can and sometimes do ask technicians for extra CDs and that it's not difficult for an agent to get one of these CDs. Ms. Payne testified that, if a technician gave an agent a CD, it would not be formatted. Neither Ms. Payne or Ms. Warrington-Gaskins remembered Agent Pena ever asking for a blank CD.

There was much said about handwriting. Ms. Warrington-Gaskins testified that the handwriting on the "original" 1D-4 disk looks like her handwriting. Ms. Payne

also testified that the handwriting on 1D-4 looked like Ms. Warrington-Gaskins' handwriting. Although, on cross examination, Ms. Warrington-Gaskins believed that some of the numbers on the CD were not consistent with her own handwriting on the CD. Excuse me, on 1D-4. Indeed, she identified some of the specific numbers and letters that were consistent and some that were inconsistent with her own handwriting when compared to the 1D-4 paperwork.

Now defendant asks the court to find that the writing on 1D-4 was not done by Ms. Warrington-Gaskins. The court notes that the evidence on this is not entirely conclusive, as Ms. Warrington-Gaskins nor anybody else is a handwriting expert, and the court did not hear any testimony from any handwriting expert, but I don't think it can be said that the defendant's version of the handwriting piece of this conundrum is without basis. Indeed, in light of the other "weight of the evidence" as Ms. Dunne put it last week, the inference is clear that Agent Pena did swap the disk, that's certainly a reasonable inference that can be drawn from the evidence, which subsumes the handwriting question.

Now, in terms of the contents of 1D-4, as noted earlier, Agent Pena gave Hayes the FBird that became 1D-4 on May 22 of 2008. And, as also previously discussed, the worksheet for 1D-4 indicates that there were three sessions

recorded on that FBird. In particular, Agent Pena had given the FBird that became 1D-4 to Hayes and asked him, tasked him, to have a conversation, a recorded conversation, with Police Officer Richard D'Allesandro, another Sleepy Hollow police officer who apparently witnessed the Gomez incident.

Breaking it down, starting with Session One. This is the session that lasts 118 minutes and was recorded on May 22. Now Hayes testified that he met with Agent Pena for a short period on May 22, 2008 when she gave him the 1D-4 FBird, it became the 1D-4 CD. Another FBI agent, FBI Agent Sabric, was also present during this meeting. According to Hayes, he told Pena that, on May 21, 2008, Todd Spota, an FBI agent, Sleepy Hollow firefighter had approached him and talked about the Quinoy investigation and, in fact, had accused Hayes of telling the FBI that he was a Sleepy Hollow firefighter. Hayes testified that this was not the first time he had spoken to Spota. And on October 18, 2008 the day after -- 2006, excuse me, the day after the Gomez incident, he reported the Gomez incident to Agent Spota.

Now, according to Agent Pena, Hayes told her, on May 22, 2008, that Spota had approached him in public and accused him of cooperating with the FBI. Agent Pena created a FD1023 form memorializing this conversation. According to Agent Pena, Hayes was "furious" at Pena and held her directly responsible for what had happened with Agent Spota.

The 1023 form shows that Agent Pena and Sabric were present during this conversation and Hayes told him about Spota and Hayes was upset.

Now, Hayes testified that after Agent Pena gave him the FBird that became 1D-4, he went to his police car and answered radio calls. At some point he called his father, Lieutenant Gabriel Hayes, who was on duty the night of the Gomez incident. Hayes testified that during this call with his father he told him that he had reported the May 21 conversation between Hayes and Spota to Agent Pena stating that, he "fucked Agent Spota." Hayes explained that he had fucked agent Spota by telling Pena that Hayes and Spota had talked about the investigation. Hayes testified, however, that and acknowledged that he didn't think that Agent Spota would have been in trouble for the conversation itself. He testified that this conversation with his father was inappropriate in his view because he was not supposed to discuss the investigation with anybody, including his father.

Now, as an aside, a transcript of 1D-5, Session One, which mentions Hayes' commentary about "inappropriate remarks" on 1D-4, reflects that Hayes was telling Agent Pena that the recorder, 1D-4, had 45 minutes to a hour of radio runs and a conversation with his father in which he told his father that he spoke with Agent Pena. Hayes had indicated

that his father was going to a Yankee game and that he "said something inappropriate" because he was "still mad at the time. I kind of said I fucked him, I screwed him or something because I'm still a little upset because I, I would never expect that." Neither Hayes nor Agent Pena appeared to be concerned that 1D-4 had inadvertently been recording.

Lieutenant Hayes testified that his son, Detective Hayes, had reported the Gomez incident to Agent Spota. Lieutenant Hayes remembered receiving a call from his son in which Hayes mentioned Spota, but Lieutenant Hayes testified he could not hear the call very well because he was at Yankee Stadium. Lieutenant Hayes did not remember his son saying he "fucked Todd Spota." Lieutenant Hayes did not remember Hayes mentioning Gomez, the defendant or Agent Pena during the call.

Now Hayes testified that he realized that the 1D-4 FBird had been inadvertently recording when he pulled it out of his pocket and saw that the light was flashing. He believed the inadvertent recording his conversation with Agent Pena, his radio runs and his conversation with his father totaled between 45 minutes to an hour. So he, therefore, offered no explanation as to why Session One is 118 minutes long or what could have been recorded during the remaining portion of Session One.

Session Two. Session Two was recorded on May 22, 2008, lasted approximately 24 minutes. Very little evidence has been provided regarding the context of Session Two. The court notes Hayes testified on May 22, 2008 he had difficulty turning the FBird off when he realized it was inadvertently recording and there was other testimony that this FBird was, in fact, repaired later on due to problems with the on-off switch.

With respect to Session Three. Session Three was recorded on May 24, 2008 and lasted, as I said, approximately 20 minutes. Hayes testified that he recorded a conversation with Officer D'Allesandro on this date and it lasted less than 20 minutes. The ELSUR envelope indicates, the ELSUR envelope for 1D-4 that is, indicates the intercept was of Officer D'Allesandro, the recording was, excuse me, of May 24, 2008. And, as I noted earlier, the worksheet for 1D-4 indicates data was recorded for approximately 20 minutes on May 24.

Now, on May 24, 2008, Agent Pena emailed AUSA Kennedy, stating that Hayes had a 15-to-20-minute conversation with Officer D'Allesandro and "I think it was a good one," double explanation point. Agent Pena did not -- testified she didn't know what she meant by this statement but that she could have been referring to the good quality of the audio recording because of previous problems of the

audio quality. This was not a very credible explanation, given the explanation point, and the promise she made to AUSA Kennedy to follow up on the conversations.

Now, according to Hayes, when he recorded Officer D'Allesandro on May 24, D'Allesandro told him that he, D'Allesandro, did not see defendant punch Gomez while restrained and did not see defendant kick Gomez while Gomez was in the police car. According to Agent Pena's email to AUSAs Kennedy, D'Allesandro told Hayes that Gomez was put in the police car head first. According to what the court has been told, this may contradict the Government's theory that Gomez was placed in the car head first allowing the defendant to kick him in the head. In any event, the evidence seems pretty clear that Session Three was, in fact, a recording of a conversation between Hayes and D'Allesandro.

The next chapter in the story is the 1D-5 recording. Now, on June 4, 2008, Hayes returned the 1D-4 FBird to Agent Pena. At this meeting, Agent Pena gave Hayes a new FBird in order to record Officer Gasko, another Officer who apparently had been present at the Gomez incident. 1D-5 ultimately was found to have two sessions recorded on it; Session One was recorded on June 4, 2008 and is approximately 30 minutes long; Session Two was recorded on June 5, was approximately 18 minutes long.

Session One consists of a short preamble and an inadvertent recording of Agent Pena speaking with Hayes. It's during Session One that Hayes told Agent Pena that he made "inappropriate remarks" on 1D-4.

Now, Hayes first testified during the hearing that he did not know that his conversation with Pena in which he referenced the inappropriate remarks on 1D-4 had been accidentally recorded on 1D-5, Session One. In fact, he said he didn't know about it until May 10 of 2010; however, at the end of the 1D-5, Session One, Hayes can be heard taking the FBird out of his pocket, coughing once, the method he admitted he used to check to see if the FBird was recording, and he could be heard saying "she did it again." Hayes admitted on cross examination that "she did it again" meant that Agent Pena had again accidentally recorded a conversation and he realized that the recorder that became 1D-5 had been left on. Hayes first testified he did not realize that the specific conversation had been recorded. He later admitted that he knew the recorder had been running during the conversation with Agent Pena when he referenced the inappropriate comment.

Hayes also testified that, although he realized the FBird had been turned on inadvertently, he did not tell Agent Pena at the time because he forgot about the inadvertent recording; however, when Hayes told Agent Pena

the same day that 1D-4 contained inadvertent recording, he admitted that she told him to call her right away if this ever happened again.

The next piece of this is the US Attorney's office, in particular, the prosecution team's discovery of 1D-5 Session One. Prior to May 3 of 2010, the AUSAs handling the prosecution did not have an audio file for 1D-5 on its computer drive, its share directory. No one on the part of the prosecution team apparently listened to the recording. There had been some discussion, both in email and in person, between AUSA Dunne and Agent Pena about making sure that all the recordings that had been made had been given to the US Attorney's office.

On April 15, 2010, Agent Pena brought all the ELSUR envelopes to the US Attorney's office. Agent Pena, however, did not allow Shannon Becker, a paralegal working on the case with the US Attorney's Office, to sign the ELSUR envelopes and take custody of the evidence, telling her that it was FBI policy not to allow nonFBI personnel to take custody of such evidence.

Agent Pena testified that someone in the FBI Electronic Surveillance Unit had told her about this policy. Because Ms. Becker was not given custody of the envelopes, it was her practice not to open the envelopes.

Now the prosecution team had seen a transcript of

1D-5, but the versions produced to the prosecution team had little or no mention of Session One. I'll discuss more about this in a minute. On May 3, 2010, AUSA Dunne asked Agent Pena, working with Ms. Becker, to create an index of all of the recordings in preparation for the 3500 material deadline the court had set. When Agent Pena was listening to 1D-5 to prepare this index, and in fact, prepare in fact summaries of the conversations, it was Ms. Becker who recognized the voice of Mr. Hayes on 1D-5. Ms. Becker credibly testified that when she asked Agent Pena about this, Agent Pena stated that Session One of 1D-5 was an inadvertent recording in which there was a discussion about giving directions, in fact Hayes giving directions to her because she was lost.

Ms. Becker testified she told Agent Pena that someone had to listen to entirety of Session One. Ms. Becker left the room where they were listening to the conversation, eventually advised AUSA Dunne a recording had been found, and it was after this incident that the US Attorney's office first learned of the context of Session One and its reference to 1D-4.

It's also important to note that the summary Agent Pena prepared of Session One of 1D-5 had no mention of the inappropriate conversation comment that was on the recording.

Now, with respect to the transcripts in 1D-5, this, too, has its own story. On June 24 of 2008, Agent Pena forwarded 1D-5, the 1D-5 CD to an FBI word processing unit for transcript to be typed of the entire conversation. Ms. Dolores Paliseno testified that she typed the transcript and she returned it via email to Agent Pena on July 7 of 2008. That transcript was 42-pages long and contains all of Session One and Session Two.

On August 7, 2009, Agent Pena sent a hard copy of a 1D-5 transcript to Julie Knapp for a retype. This hard copy contained handwritten changes evidently done by Hayes who had been asked by Agent Pena to listen to the recordings and fill in gaps and names of the speakers. This particular transcript is missing pages 3 to 30, which includes reference to the inappropriate remarks comment about 1D-4 and, in fact, the transcript is not even consecutively paginated. Agent Pena gave no explanation for the missing pages. Hayes testified that he made corrections to the transcript of Session Two of 1D-5 but the version he viewed did not contain the entirety of Session One. When shown what, in effect, was version two of this transcript, Hayes acknowledged that the only handwriting starting at "WAV 2" was his. It's also important to note that, when asked on cross examination about this, Hayes indicated that, looking at even the piece of the transcript of Session One of 1D-5

did not remind him of the inadvertent recording of the conversation that he had with Agent Pena and, in particular, his inappropriate-comment remark in reference to 1D-4.

Just for the record, there had been some discussion about this version of the transcript being on a CD that was found ultimately in Agent Pena's files containing a note saying "scan copy no good." Agent Pena testified that she placed this note on the CD because she was unable to open the document. The US Attorney's office acknowledges it had no trouble opening the file. There's another version of this transcript, Government Exhibit, well, it's actually DX double E that also appears to be version two of the transcript, also missing pages 3 to 30. And there are some differences in the edits. There are some additional edits that strike out the letters "UM." I think it's important to note, nobody suggests, the court doesn't think that these slight differences in the versions of this transcript are relevant for purposes of this motion.

Now, in terms of what could be called version three of the transcript, what happened is, Ms. Knapp sent the retype back to Agent Pena on August 7, 2009, this is the retype that contains the edits made by Hayes, and Agent Pena acknowledged receipt of this on August 13, 2009. The retype is 14 pages long and it contains a preamble, a reference to WAV 1 -- and WAV, by the way, is without the "E," W-A-V and

the number sign 1 -- one page of transcript from WAV 1 and a reference to WAV 2 at the bottom of the first page of the transcript. Pages are repaginated, and the cover of this transcript says, "1D-5."

Now, in September 1 of 2009, Hayes signed this version of the transcript, which apparently was meant to indicate that the transcript had been reviewed by him and was final. He testified he didn't see the second page containing a portion of WAV 1 when he signed it. A piece of testimony that I recognize the defense doesn't think is credible.

Then there is a version four of the transcript. On September 28 of 2009, Hayes signed another transcript and this time there's a handwritten word "final" on the bottom, Defense Exhibit J. This version of the transcript is 13 pages long and no longer contains the preamble or any reference to WAV 1 or the short portion of the transcript from WAV 1.

This transcript also has in the body of the transcript deleted reference to WAV 2 and replaced with Session Two and the header on the first page is changed now to say 1D-5 Session Two instead of just 1D-5.

Now, Agent Pena testified that she didn't change the transcript from Version Three to Version Four. The court finds this testimony not to be credible. Ms. Knapp

testified that she did not create Version Three because she had no paperwork indicating she'd performed this job. An FBI search of Agent Pena's computer to get the metadata, done at defense request, found two versions of the 1D-5 transcript: The first being 14 pages long and last modified on August 14, 2009, the day after Agent Pena acknowledged receiving the 14-page retype from Ms. Knapp; and, the other version, the next version, which was only 13 pages long and last modified on September 17, 2009 in between the time when Hayes signed versions three and four of the transcript.

Agent Pena also acknowledge that, even if another FBI typist had made these changes, there's no evidence suggesting who that might be, the request for such changes would have had to come from her, and there's nothing substantiating that.

Finally, with respect to 1D-6 and 1D-7, so the record is complete, on August 19, 2008, Hayes recorded a conversation with Officer Nelson, which is now on a CD identified at 1D-6, Ms. Warrington-Gaskins sent custody of the FBird that became 1D-6, downloaded the data on the CD that became 1D-6 and placed the CD in storage on August 27, 2008. Agent Pena picked up the ELSUR envelope and placed it in storage September 2, 2008.

1D-7. On October 14, 2008, Hayes recorded a conversation with Officer Gasko now on a CD identified as

1D-7. Again, Ms. Warrington-Gaskins accepted custody of the FBird that became 1D-7, downloaded its data and placed the CDs in storage on September 23, 2008. Agent Pena picked up the ELSUR envelope, placed it in storage on October 23, 2008.

Hayes testified that the transcripts of 1D-6 and 1D-7 are accurate, there is no evidence suggesting otherwise nor is there any evidence to suggest these recordings or transcripts are tampered with. I should also note there's no evidence that there were any other recordings made by Hayes at the request of Pena and somehow they have gone missing. I'll talk more about that in a minute.

Now, in terms of the legal analysis, as a threshold matter, the government has, at least in part, interpreted the defense motion as, one, rooted on a claim of outrageous government conduct, and this alone warrants dismissal of the indictment, irrespective of the destruction of evidence claim. I didn't read the motion as making that claim, but I don't want to read it as the defense motion as having waived the claim, so I just want to address it.

Indeed, I think Mr. Quinn would admit that he's used fairly strong language in characterizing Agent Pena's conduct, both during the investigation and during her testimony in this hearing, and I don't remember specifically, but I think that he used, if not the word

outrageous, synonyms thereto.

Now, United States versus Russell, the Supreme Court noted that it might be "some day presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolute bar the government from invoking judicial processes to obtain a conviction." 411 US 423 at 431-32. In order to satisfy such a claim, the government conduct must shock the conscience. Second Circuit has noted that in US versus Chin, 934 F.2d 393 at 398, of course, quoting the Rochin case we all remember from law school. Indeed, in that case, the Supreme Court found that police officers breaking into the defendant's bedroom, attempting to pull drug capsules from his throat and forcibly pumping his stomach constituted outrageous acts.

The Second Circuit also has noted that a claim of outrageous government conduct might be shown if a defendant demonstrated that "the government engaged in outrageous behavior in connection with the alleged criminal events, and that due process considerations bar the government from" prosecuting the matter. That's noted in, among other cases, Cuervelo, 949 F.2d 559 at 565, and also Judge Sand's decision in Bin Ladin, 2001 Westlaw 30061 at *7.

The court agrees with the government here that the defendant has not shown outrageous conduct of the type that

would merit dismissal of the indictment under this strain of due process analysis. Here there was no allegation of extreme physical coercion by anybody connected with the government, nor is there any allegation that Agent Pena participated in or was somehow involved in the crimes underlying the indictment but, of course, this is not the end of the inquiry. As I said, I had interpreted the defense motion more predicated on allegations that Agent Pena destroyed material exculpatory evidence intentionally and in bad faith. Indeed, the Government's destruction of evidence can deprive a defendant of his constitutional right to a fair trial, that is, his due process right to access to evidence. That itself can be the basis for sanctions, including dismissal of the indictment. Second Circuit has noted that in US versus Rachman, 189 F.3d 88 at 139 and, of course, more familiar, all with the Trombetta and the Youngblood decisions from the Supreme Court.

Now, the test that's to be applied seems to be not in dispute, but let me just go through this.

As I said, the test that the Second Circuit applies, of course, has to take into consideration Supreme Court authority on this, both in Youngblood and Trombetta, and I think it's important to note that the Second Circuit following the Supreme Court have distinguished destruction of evidence cases and claims arising under the Due Process

Clause from Brady claims arising under the due process clause. In Trombetta, the Supreme Court addressed whether the results from a Breathalyzer test should have been this suppressed because of the state's failure to preserve the breath sample. The Supreme Court found the state's destruction of the samples was not a constitutional violation because the samples were not constitutionally material to the defense. According to the Supreme Court, this standard required "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." That's at page 49 of that decision. The breath samples in that case failed the test because they were unlikely to have been exculpatory, and because the respondent could challenge the Breathalyzer test through other means, such as using data from the machine and cross examining the machine's operator.

Now, in Youngblood the Supreme Court again addressed the issue, this time in the context of the state's failure to perform certain analysis of semen and blood samples after the evidence was gathered to keep the victim's clothing properly refrigerated so it could be tested at a later date. The Supreme Court noted that "the possibility that the semen samples could have exculpated respondent if

preserved or tested was not enough to satisfy the standard of constitutional materiality in Trombetta."

Supreme Court found that while due process principles, as interpreted under Brady, make the Government's bad faith irrelevant when it fails to disclose exculpatory evidence, "the due process clause requires a different result when dealing with the failure of the government to preserve evidentiary material of which no more can be said than it could have been subjected to tests the results of which might have exonerated the defendant." Page 57 of that decision.

Indeed, as the Supreme Court noted in Trombetta, "whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and very often disputed." That's from Trombetta at 486. For such potentially useful evidence, the Supreme Court held in Youngblood that a defendant must show bad faith in order to demonstrate a denial of due process. The Supreme Court also noted that the Government's bad faith "must necessarily turn on the Government's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed."

As the Youngblood court noted, "We think that requiring a defendant to show bad faith on the part of the police both limit the extent of the police's obligation to

preserve evidence to reasonable bounds and confines it to that class of cases the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." That's at 58.

More recently in Illinois versus Fisher, the Supreme Court further explained the Youngblood bad faith requirement stating that its applicability "depended not on the centrality of the contested evidence to the prosecution's case or the defendant's defense but on the distinction between 'material exculpatory' evidence and 'useful' evidence." Because, in that case, the destroyed evidence, which was cocaine seized from the defendant ten years earlier was only potentially exculpatory, the Supreme Court found that the bad faith requirement applied regardless of how important the evidence might have been.

Following all this, the Second Circuit, in a number of cases in District Court decisions within the Second Circuit, Second Circuit has analyzed the problem as follows: First the loss has to be chargeable to the government. As the Abdel Rahman court noted, as a threshold matter, "sanctions are not warranted unless the record shows that the evidence has been lost and that this loss is chargeable to the state."

Here it is undisputed that the loss of this

evidence is chargeable to the government, again, as Ms. Dunne acknowledged last week, the weight of the evidence suggests that Agent Pena had somehow swapped out the disks and the copies have gone missing as a result of her conduct. Clearly the FBird and the recordings were in the custody of the FBI, they were ultimately given to Agent Pena, and the paperwork shows that there was data downloaded from the FBird that became 1D-4 and the ELSUR envelope remained in the custody of Agent Pena until she checked it out in October of 2008 and this places the loss of the evidence as being chargeable to the government.

Now, the Second Circuit, as I said, District Courts within the circuit, have interpreted Trombetta and Youngblood to mean the following: "Destruction of evidence by the government only rises to a constitutional violation when three requirements are met: One, the government must have acted in bad faith in destroying the evidence; two, the evidence must possess an exculpatory value that was apparent before it was destroyed; and, three the defendant must be unable to obtain comparable evidence by other reasonably available means. This is noted in US versus Tyree Federal Appendix, 279 Federal Appendix 31 at 33, US versus Williams, 205 F.3d, 23 at 29, 2000 decision; US versus Bakhtiar, 994 F.2d 970 at 975, noting that the case law suggested that defendants asserting destruction of evidence claims "are

deprived of a fair trial only if the government acted in bad faith" and rejecting the claim by a defendant that, even if bad faith destruction of tapes were shown because the defendant failed to show the loss prejudiced his defense when they were not exculpatory. Also US versus Rastelli, 870 F.2d 822 at 833.

I do think it's worth noting, as I discussed during argument with counsel, that this is not the view outside the Second Circuit. For example, in Olszewski versus Spencer, the First Circuit found that Trombetta had laid out the requirement in the due process context that evidence had to be materially exculpatory and irreplaceable before its destruction could constitute a due process violation, but the Circuit went on to explain that, in Youngblood, the Supreme Court decided that the samples there were not constitutionally material because of the possibility only of being exculpatory, that is, that the exculpatory value was not apparent before it was destroyed. Thus, according to the First Circuit, the Supreme Court in Youngblood laid out a new standard for such evidence, that is potentially exculpatory evidence, requiring a showing of bad faith on the part of the government. The court, the First Circuit then stated "in contrast, the Supreme Court recognizes a bad-faith showing is not required when the evidence is apparently exculpatory. By the way, the cite

for Olszewski, 466 F.3d 47 at 56. Other circuits have held similarly that Trombetta, Youngblood and Fisher, when read together, require a defendant show either that the destroyed evidence is materially exculpable and not replaceable, or that evidence is only potentially exculpatory and was destroyed in bad faith. US versus Moore, 452 F.3d 382 at 388, it's a Fifth Circuit decision from 2006 noting that unpreserved evidence must either be material and exculpatory or potentially useful in combination with a showing of bad faith on the part of the government, Yaris versus County of Delaware 465 F.3d 129 at 142, also a 2006 decision. US versus Estrada, 453 F.3d 1208, 1212, 1213, Ninth Circuit decision from 2006, and Bulock versus Carver, 297 F.3d 1036 to 1056, 2002 decision from the Tenth Circuit.

Some of these courts have pointed out the Youngblood bad faith requirement applies to potentially useful evidence in order to eliminate constitutional violations to "those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." And, indeed, that's from the Sixth Circuit decision in Moldowan versus City of Warren, 578 F.3d 351, 86, quote from Youngblood.

Now, back to our home circuit. As I said, there are three requirements; bad faith, exculpatory value that was apparent before the evidence was destroyed, and that the

defendant must be unable to obtain comparable evidence by other reasonably available means. Those are the three things that have to be established. The question is, whose burden is it to establish it. Here, as I said, the evidence, in the court's view, after having listened to all the witnesses and reviewed all the testimony, really doesn't leave much dispute that there was a bad faith destruction of the evidence. There certainly was intentional destruction of the evidence. I have to say, in reading cases and in trying to find cases that have a fact pattern similar to this, I was unable to find a case, and that doesn't mean they're not out there, but I was unable to find a reported decision where you had a law enforcement official -- there's lots of cases where law enforcement officials intentionally either don't preserve or destroy evidence, and they do so pursuant to policy or practice or instructions but they acknowledge it.

Here we have a situation where the evidence shows that we had an agent swap out the CD, make the two copies disappear and then wasn't truthful about it when she testified here at this hearing. Now I looked at the cases in the Second Circuit, for example, US versus Morgenstern. There the Second Circuit specifically rejected the defendant's argument that it was error to put the burden on him to show that documents had been destroyed, even

considering the Government's gross negligence. And, in fact, the Second Circuit there agreed with the district court's ultimate rejection of sanctions when if defendant failed to prove by a preponderance of the evidence either the documents had been destroyed in bad faith or that their destruction had substantially prejudiced the defendant, that's at 933 F.2d 1108 at 1116. Other courts within our circuit have also placed the burden on the defendant who seeks sanctions to "show the government acted in bad faith," and that the defendant was "prejudiced by the loss of evidence." That's about the Bin Ladin decision at *7. But the Second Circuit in a case called US versus Bufalino, had a different set of circumstances, and I think Morgenstern and Bin Ladin are different. In Morgenstern, Judge Sweet had held that there was, in fact, gross negligence, and the circuit specifically rejected the defense argument it was improper to have the defendant prove the burden of prejudice. As I said, I don't think there's a question about bad faith here, because there had not been intentional destruction of evidence, even though grossly negligent and cited Bufalino. And in Bufalino what did the Second Circuit say? "Where destruction is deliberate, sanctions normally will follow, irrespective of the perpetrator's motivation, unless the government can bear the heavy burden of demonstrating no prejudice resulting to the defendant."

That's from 576 F.2d 446 at 449, it's a 1978 decision. I note, of course, this case predates Trombetta, it predates Youngblood, but it has been cited, it was cited with approval in Morgenstern, it's been cited by other District Courts within the Second Circuit, it certainly has not been overruled. Among other cases, it was quoted in the Grammatikos case, 633 F.2d 1013 at 1020.

As I said, here, and I'm going to go through the reasons, I think that the evidence is pretty clear there was intentional and bad-faith destruction of the evidence. I want to make sure I put bad faith in the Youngblood context. But Agent Pena's explanation as to what happened to 1D-4 is contradicted by pretty much every other witness who testified at this trial. So with respect to whether or not the FBird simply failed to record, Ms. Warrington-Gaskins' testimony, her log, conclusively shows it did not fail, it did record, three sessions, and that she did not tell Agent Pena, because her own data suggests it would have been inaccurate for her to tell Agent Pena, that the FBird did not record.

To the extent that the disk is unformatted, Ms. Warrington-Gaskins testified that, if she had tried to download data on an unformatted disk, an error message would have come up. And is it conceivable, is it metaphysically possible in this one instance Ms. Warrington-Gaskins simply

just put a disk in, forgot to push the right buttons, pulled it out and stuck it in the ELSUR envelope? Sure. That came out on her cross examination; nobody's perfect. But I think that the coincidence that that happens, given everything else we know about 1D-4, including what gets said about it in 1D-5, which I agree with Mr. Quinn is the red herring, that ultimately is what makes Agent Pena concerned about people looking at 1D-4, is not necessarily the inappropriate comment but the reference to the inappropriate comment is going to cause the prosecutor and others to review 1D-4 carefully. But getting back to the human error. Ms. Warrington-Gaskins and Ms. Payne both struck the court as not only credible but very professional, testified that they carefully spot-check. This is what they do. They download data knowing, once it's downloaded, that FBird is going to be erased forever. So they have the software, the hardware, they have the practice of spot checking and they look for the burn marks.

What's more is that the explanation that Agent Pena gives about when she tells the AUSAs that this is blank is inconsistent with what the AUSAs have stipulated to. It's also inconsistent with what the agent said in her email to Mr. Kennedy that she was going to follow up on this. So the notion that she would just get a blank CD and by her own admission at the hearing basically do nothing to see if it

could be retrieved, she never goes back to the technician, she never sees if it can go to this other FBI office or, indeed, the manufacturer, as the technicians testified to. It literally is: Ho-hum, it's blank, I'll put it back. There was inconsistent testimony about what she did with the copies of the disk and their disappearance strikes me as way too coincidental to not be part of what it is happened here.

There was nothing in her report, after picking up 1D-4, saying that it was blank, there was nothing in her report saying that she had been told that there had been no data either captured by the FBird or downloaded. There was no follow-up email to Mr. Kennedy explaining any of this, and her testimony was inconsistent, it differed both when she testified and it differed when she met with other FBI people, including her supervisor, as well as the Assistant US Attorney. There is the oddity of her reviewing the CD in October of 2008 months after she supposedly picks up a CD that she knows is blank, and it's unclear when she told anybody about this.

And, as I said, even assuming somehow there was this highly improbable confluence of mistakes, unknowing mistakes made by the technicians, forgetting to tell the AUSAs about blank disks that supposedly were good recordings, the whole saga of the transcript regarding 1D-5 I think ends any mystery about this.

The first version of the transcript is 42-pages long, it has all of Session One. When Hayes is given the transcript, it's missing 27 pages and it has all but one page of Session One missing. Then when there are changes made, the final version, which appears on her computer on the dates between when Hayes is reviewing it and when it gets finalized, goes from 14 to 13 pages all reference to Session One is eliminated and, in fact, the transcript is made to look like the only thing that was recorded on 1D-5 was Session Two.

And as I noted earlier, when Agent Pena created the summary of the recordings at AUSA Dunne's request, she leaves out the inappropriate comment which is, as I said, is the lightening rod that would get anybody else to focus on 1D-4.

So, in the end, the court finds that the evidence establishes that Agent Pena was aware of 1D-4's contents before its disappearance, which, in Youngblood terms, makes it bad faith. And, as I said earlier, I think it's important to note again, that I recognize that Detective Hayes' testimony about when it is that he knew that he and Pena were being recorded on 1D-5, his handling of the transcript, I recognize that there are pretty strong terms and a view he wasn't truthful; and I understand why Mr. Quinn says that. I don't think that it's relevant here

because I don't think there's any evidence that Hayes actively participated in switching 1D-4, that he had any knowledge of it, but I do think there certainly are credibility issues about what Hayes had to say about 1D-5, Session One, and the transcript of that recording.

So, in the end, the court finds that there's no other credible explanation that explains how it is that 1D-4 ends up blank. And, as I said, the evidence pretty clearly shows that Agent Pena had access, she had access when she was given 1D-4 back, she had access when she took it out of the ELSUR envelope in October of '08, which means that, to the extent there is any exculpatory content or other content, it may be otherwise personally embarrassing to her or whatever, she was aware of it before 1D-4 disappeared, and that establishes bad faith. Among other cases, US versus Yevakpor, 419 F.Supp 2d 242 at 251, a Northern District decision where the court there found bad faith when the evidence demonstrated that customs agents had deliberately preserved only inculpatory portions of a videotape while deleting the rest of the tape knowing that "the evidence could have been used in prosecution or defense." Bakhtiar, 994 F.2d at 975 where the circuit noted that Secret Service procedures might have been inherently deficient in preserving evidence to show bad faith when it was possible that "the government's agents recognized some

exculpatory value in the tapes and destroyed them or that government agents made use of the lost evidence before it was lost."

Now I do think something else needs to be said here, so that it's clear. The finding that the government is responsible for this or that the government acted in bad faith is limited to Agent Pena. As profoundly disturbing as Agent Pena's conduct was, both during the course of the investigation and her testimony here, which the court has found not to be credible, I think it needs to be said, from the court's perspective, the conduct of the Assistant United States Attorneys and those directly supervising them in this case, is exemplary, both in terms of their diligence in staying on Agent Pena. This all happens because AUSA Dunne doesn't feel right about she's got all the evidence. And her persistence, which I think was met, from Agent Pena's perspective, understandable resistance, is ultimately what leads to 1D-5 being listened to and then leads to Shannon Becker, whose professionalism also I think has to be commended explicitly here, it was her persistence in listening to the recording, hearing Hayes, going to AUSA Dunne, and from that moment on, the AUSAs, Ms. Becker, those immediately supervising them, have been diligent in trying to get to the bottom of this. The letter they sent to the court after the request for the hearing candidly laid out

the facts. There was no advocacy in that letter. There was a report as to their investigation. They had every request made by Mr. Quinn, diligently tried to get the information he sought, including the metadata, which literally I think was handed to Mr. Quinn as we were about to finish the hearing. So, in saying the government was responsible, sometimes the government gets equated with the US Attorney's office, sometimes that's fair game, but, in this case, the prosecution team has been diligent, has been professional and forthcoming, and so I think that needs to be clearly stated for the record.

Now this leaves the two other requirements: That the evidence possess an exculpatory value that was apparent before the evidence was destroyed; and, was of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

I think the best way to start with this is to look at Session Three, because I think here it's the third prong where a due-process violation is avoided.

As I said, the evidence demonstrates that Session Three was a recorded conversation between Hayes and Officer D'Allesandro, and apparently during this conversation there is a denial by D'Allesandro of seeing the defendant hit or kick Gomez while restrained and there's some statements he makes about the way in which Gomez was placed into the

police vehicle. And I'm willing to assume that this all contradicts the Government's theory. I don't know the details of the Government's case, but I'm willing to assume that because that point has been made.

First of all, the loss of the tape itself, it's not evidence, it's inadmissible hearsay. So the tape itself never could have been admitted for the truth of the contents, and the defense doesn't suggest otherwise. So it's not the case that Session Three just could have been introduced as a defense exhibit and that has now been denied to the defense.

Second, the defendant clearly has access to comparable evidence. D'Allesandro could be called as a witness to testify at trial to provide the same exculpatory statement, McGoey versus Sullivan, 923 F.2d 10 at page 12. There the circuit found that the defendant had access to comparable evidence of an accomplice's exculpatory statement when a police officer testified that the accomplice had exculpated the defendant. Similar rulings in US versus Rastelli, 870 F.2d at 833. Where there the finding was the defendant had comparable evidence for lost recordings because the defendant could call the FBI agent who monitored the recordings to testify as to the content of the recordings.

In this instance, as I said, the defense has

access to D'Allesandro, and he could testify consistent to whatever he said on 1D-4. To the extent that there is the possibility he would testify differently and 1D-4 could be used as an inconsistent statement for impeachment purposes, the government has agreed to stipulate that D'Allesandro stated on 1D-4 that he did not see the defendant kick or hit Gomez. And, again, I don't want to pigeonhole everybody in this, but in any event, the government made clear that it will stipulate to what it believes the contents were of the conversations captured on 1D-4 and the government has backed this up by offering, I think it's already provided it, but it has offered D'Allesandro's Grand Jury testimony, which, it's been represented to the court, substantially mirrors the alleged contents of 1D-4. So this would provide comparable impeachment material to the conversation in 1D-4.

I recognize, of course, that this is not the same as 1D-4, but the cases don't say it has to be the same, it says it has to be comparable. Courts use this type of analysis all the time, including in the Classified Information Procedures Act where a substitution, if you will, if it provides substantially the same defense, it's deemed to be sufficient for due process purposes. Now, to the extent that there is a suggestion that there are other exculpatory comments made by D'Allesandro or Hayes on Session Three, it's pure speculation. The conversation

lasted for only approximately 20 minutes. It's not been made clear to court at all what it is D'Allesandro might have said other than what has been reported to be already exculpatory to the defendant. Any event, D'Allesandro can be called as a witness not only to what he thinks happened during the Gomez incident but what he might have said to others about what happened during the incident.

Now this brings us back to Session One and Two. Part of Session One is, at least in terms of the type of conversation that's picked up is knowable. That is, Hayes testified that he had been inadvertently recorded answering radio runs in his police vehicle and having a conversation with his father. The whole story about Spota, and I recognize that Mr. D'Allesandro has taken a view that the reference to who got F'd, if you will, I'm getting tired of saying that word, was, in fact, a reference to the defendant. It just doesn't line up with the evidence. The 1023 makes pretty clear that there was a lot of tension over the whole Spota saga in this; Hayes is mad at Pena, Spota is mad at Hayes and so forth. And that all lines up, as I said, with the other evidence in this case. And so I do think that the reference to who it was that Hayes supposedly F'd is to Spota and not to the defendant.

I recognize that Lieutenant Hayes didn't perfectly corroborate what his son had said, but he also didn't

contradict him in terms of what he said. At the end of the day, the inappropriate comment to which Hayes has referred I do think is a reference to the fact that Hayes spoke to his father about the investigation and, in particular, mentions the whole Spota saga. But I agree with Mr. Quinn, I don't think that that's, at the end of the day, what it is that's motivating Agent Pena to do what she did. I can't say that definitively. Does she think that's the smoking gun for the defense? I suppose it's conceivable, I think it's unlikely. Remember, we're not talking about an AUSA here, she doesn't necessarily know what Brady is. But, at the end of the day, I don't think the loss of that reference and to the whole Spota thing is material to the defense. The Spota thing is a soap opera, it's got nothing to do with whether or not the government can prove its case and whether or not the defendant has access to evidence to defend himself in this prosecution.

The reason that matters is because it explains what happens to the transcript because there is perhaps something else that Agent Pena is concerned about. So I don't find that that piece of Session One is in any way exculpatory and, therefore, has prejudiced the defendant from its loss.

Now, there are unknown pieces of Sessions One and Two. Almost nothing is known about Session Two, which is

approximately 24 minutes long. It's possible, as the government suggests, that Session Two was recorded when Hayes was attempting to turn the FBird on and off. And, in fact, he testified he was struggling with the on/off button. And, of course, the evidence is that the FBird was later repaired because of problems with the on/off switch.

What does seem to be clear is that there's nothing about Session One and Two that indicates and really no evidence to indicate that the defendant was recorded, that there were any other witnesses to any of the incidents or either of the incidents charged in this case. In other words, it seems as though the only people who could have been recorded would be Pena, Sabric or Hayes. As I said, there's certainly no evidence to suggest and indeed the defense doesn't even suggest there's anybody connected with this case who was recorded during Session One and Two.

Now, the argument that's been made, and it's rooted in the case law, is that solely based on Agent Pena's bad-faith conduct can it be presumed that the unaccounted-for portions of 1D-4 are highly exculpatory. As I said, there's no evidence detailing what the exculpatory evidence is. The government has suggested that perhaps there was something personally embarrassing to Agent Pena that would explain her doing this. Whatever it was, it was a powerful motivator. It may very well be that that's true,

but given that, I think that under Bufalino, it's the Government's burden here to show no prejudice to the defendant. Even if that is a rational theory, it is no more rooted in the evidence than the other notion that somehow Agent Pena's conduct here demonstrates that she made a bunch of other recordings and destroyed them. I mean, just because Agent Pena may have done something here that was inappropriate, and how inappropriate and what the consequences to her should be I'm going the leave to others. It doesn't mean that all of a sudden she's the second shooter in the Grassy Knoll and responsible for the Gulf oil spill and everything else bad in the world. We just don't have a way to do know that. But it's the Government's burden, and given that the case law does suggest that, when there is intentional bad-faith conduct it can be very well assumed that their reason for that type of conduct is because the recording might have contained something that could be exculpatory, potentially exculpatory, and because I find it's the Government's burden, I don't think that the Government's explanation, while rational, meets its heavy burden of showing no prejudice.

So even if it's the case that the fairest inference is that she recorded herself prior to her meeting with Hayes saying something or doing something that would be personally embarrassing to her, if that's all it was and we

knew that, I think the defense would have a very hard time with this motion. But we don't know it.

But the question then is, the question then is, even assuming the government hasn't met its burden, met all three prongs of the test at least with respect to Session One and Two have been established, the question is: What is the sanction? As the Second Circuit noted in Bakhtiar, sanctions should be tailored to redress for any resulting harm to the defendant and perhaps to spur the government to handle things more carefully. And even before the Supreme Court's decision in Trombetta and in Youngblood, the Second Circuit had specifically said, this is in the Grammatikos case, the appropriateness and extent of sanctions depend upon a case-by-case assessment of the Government's culpability for the loss, together with a realistic appraisal of its significance when viewed in light of its nature, its bearing upon critical issues in the case and the strength of the Government's untainted proof. That's at page 1019. Bakhtiar notes the same test. That's important, because Bakhtiar postdates Trombetta and Youngblood.

So, as I said, with respect to the Government's culpability, that's been established as to Agent Pena but not the US Attorney's office. AUSA Dunne has indicated last week during oral argument that the US Attorney's office in

conjunction with the FBI is looking into how to deal with what Agent Pena did here, and I take her at face value. Then the question is, looking at a realistic appraisal of the significance of the lost evidence in light of its nature and how it bears on the issues of the case, and the court notes that, at least in other circuits, there has been, in fact, dismissal of the entire case as opposed to preclusion when the government destroyed evidence that had, while potential exculpatory value, it was explainable and it was at the heart of the case. So, for example in US versus Bohl, 25 F.3d 904, a Tenth Circuit's case, there the Tenth Circuit felt it proper to dismiss the prosecution where the government had destroyed radar tower legs that had been made by the defendants that were themselves the subject of fraud charges because the defendants wanted these radar legs and had made clear they wanted them to demonstrate, in fact, the radar components, the radar legs had been made to spec and that, therefore, had been no fraud. The Tenth Circuit decided that destruction prevented the defendants from their proving that they had, in fact, complied with the specs and not committed fraud.

In similar vein, the Ninth Circuit held in US versus Cooper, 983 F.2d 928, that it was proper to dismiss an indictment where the government had destroyed certain lab equipment that the government thought it had been used to

make methamphetamine, which the defendant said, if they had the lab equipment still available, they could have used to prove they could not have made the methamphetamine.

Here the evidence isn't of that type. It's true we don't know exactly what was on Session One and Session Two, and even taking that there could be some inference that there's at least the possibility and at least it can't be discounted that Agent Pena destroyed 1D-4 because she thought it had some exculpatory evidence, we just don't know what it is. And so while I'm willing to assume that there is some prejudice to the defendant, it is not of the type where the exculpatory nature of the evidence is at the heart of the case. It is not of the type where it would be essential to the defense. This recording was made two years after the incidents that are the subject of the indictment. As I said, it doesn't appear to involve any of the witnesses to the two incidents that are the subject of the indictment, it does not appear to involve a recording of the defendant. There's nothing else to suggest that there's anything about the recording that is somehow central to the defense, and so I think that's very important in looking at the analysis.

Now, that doesn't mean that no sanction is appropriate. I've considered preclusion. In fact, at the very beginning, Mr. Quinn had asked that the other

recordings, and I think all recordings be precluded. I realized that that was not in the motion papers. I think, to put in it baseball terms, why go for the stand-up double when you can go for the home run. Fair enough. But so nobody thinks the argument has been waived, I've considered that.

As I said, the sanction has to be tailored to the harm. Now the courts have acknowledged that preclusion of other evidence concerning the subject matter of the undisclosed material may be appropriate as a sanction for destruction of evidence. In fact, the Second Circuit phrased it that way in US versus Miranda. 526 F.2d 1319 at 1325, Note Four. So, for example, in the Jeff Yevakpor case, the court there precluded the government from using the remaining inculpatory portions of the videotape when the government had destroyed other portions of the same tape. Here there's no suggestion that there's a relationship between 1D-4 and 1D-1, 1D-2 and 1D-3. They were recorded at different times. They involve the recording of the defendant. There is nothing about the change of custody of those recordings, including the log sheets, the ELSUR files or anything else to suggest that there's anything about those recordings that somehow has been tainted, that they've been tampered with, nor, as I said, is there any evidence to support the notion that there were other recordings of the

defendant that simply have been destroyed. That is pure speculation that cannot be founded just on the fact that Agent Pena may have committed misconduct with respect to 1D-4. So the court finds that precluding the other recordings or the testimony of Hayes about those recordings would not serve to mitigate any potential prejudice to defendant from the missing contents of 1D-4. Among other cases, the In Re: Terrorist Bombings of the Embassies in East Africa, 522 F.3d 93 at 148, that lays out the test for spoliation, noting that the sanction should be designed to deter parties from engaging in spoliation, place the risk on the wrongful party who wrongfully created the risk and restore the prejudiced party to the position he would have been in absent the wrongful destruction of wrongful evidence by the opposing party. It's this last prong the court finds does not justify preclusion of the use of those recordings.

Now, the government has argued in its paper, and we talked about this on Friday, that really shouldn't be any other sanction including allowing there to be cross examination of Hayes or Pena or anybody else about the circumstances of 1D-4 and transcript of 1D-5. And the way the government phrased it is it claims government misconduct must be made and resolved by the court and not presented to the jury. Of course, that's true. The court doesn't think that defendants should be allowed to question Hayes or Pena

or anybody else to show outrageous conduct and therefore demonstrate a due-process violation or otherwise argue to the jury the misconduct itself show somehow that the defendant should be acquitted or that the prosecution itself is badly motivated. In fact, is US versus Regan, the Second Circuit at 103 F.3d 1072 at 1082, refused to allow argument to the jury that the defendant's alleged perjury before his Grand Jury testimony was not material because the Grand Jury investigation itself was outrageous government conduct noting that "a motion to dismiss a indictment on account of outrageous government conduct is directed to the court rather than the jury."

But courts faced with evidence destruction claims, especially claims involving alleged intentional destruction, have allowed defense counsel to examine witnesses or government agents regarding the circumstances of the evidence destruction and to make arguments to the jury regarding the potential exculpatory value of the lost evidence. So in Bakhtiar 976, the Circuit noted defense counsel could have raised arguments to the jury regarding destroyed evidence and suggested "that the loss of the tapes was suspicious" and, therefore, the tapes were more likely to be exculpatory than inculpatory.

Similar thing happened in Miranda where the circuit noted that the District Court there allowed defense

counsel to recall the government agent to the witness stand to "cross examine him at length as to the tape and its loss," that the evidence regarding the tape's loss was before the jury and "defense counsel was in a position to make the most of that evidence in summation," and that the jury was entitled to "consider such evidence in reaching its verdict." In Solomon, 1997 Westlaw 232523 at *2 and Note One, Judge Preska noted that the INS agent, back when it was called the INS, who intentionally shredded documents testified in front of the jury regarding the shredding and was "was subjected to vigoros cross examination on his action," and noted that defense counsel had summed up to the jury on the destruction issue. I should note, by the way, that's what happened in Youngblood and in the Olszewski case that I cited, the First Circuit case also is what happened. The point here is not to punt to the jury the question of whether or not the destruction of 1D-4 is a due-process violation but rather to avert a due-process violation by giving the defendant the opportunity to argue to the jury that because of the conduct of Agent Pena that there's something about that recording that could be exculpatory and, therefore, argue to the jury reasonable doubt. For that reason, among many others that the defendant may properly submit to the jury. And, as I said, that's something that has been approved by and done in many cases.

I also think what's appropriate here to further avoid any due process harm to the defendant is the use of an adverse instruction. Now courts have declined, as the government notes, to impose a sanction of an adverse instruction, but in the cases the government cites the reason for the rejection was there was no evidence of bad faith. US versus Nichols, 912 F.2d 598 at 603; Kronisch versus United States, noting that courts, in considering whether to give an adverse instruction, consider whether the party in control of the evidence was under an obligation to preserve the evidence and whether it was intentionally destroyed. Here, as I said, there's been proof of intentional destruction of the recording 1D-4 and, as I said, courts have not only allowed inquiry on this to contest whether or not the government has met its burden beyond a reasonable doubt, but it specifically authorized an instruction. So, for example, in Olszewski, in affirming the denial of the habeas petition, the First Circuit noted the trial court allowed defense counsel in that case to cross examine police officers about destruction of exculpatory witness statement and noted that the trial court gave an instruction to the jury that, if the jury believed that the police had destroyed his statement it may infer that they did so because the statement contained something unfavorable to the prosecution.

Now I have it worked out, and I'm happy to work with counsel on what the specific wording of the instruction ought to be, but the finding of the court is that the three criteria that the Second Circuit says have to be established before finding that there has been a due-process violation have been satisfied, but that the proper sanction and one which preserves defendant's due process rights is to allow inquiry into the circumstances of the destruction of 1D-4 and to allow the defense to have the court give an adverse inference instruction to the jury.

That's the ruling of the court.

There had been a request to pick the jury tomorrow and then open next week, and I gather, Mr. Quinn, you don't oppose that, which means you're okay with it.

MR. QUINN: I mean, Judge, yeah, you know, we have no objection to putting it off a couple of days. Quite frankly, given the hour and the need to digest the court's decision, I don't know if you want to pick a jury tomorrow or Monday. I can pick it tomorrow I can pick it on Monday.

THE COURT: The problem with picking, we have the pool coming in tomorrow.

MR. QUINN: Fair enough.

THE COURT: And there are a considerable amount of resources that get expended on that, I don't think it would affect our ability to pick a jury.

MR. QUINN: That's fine, Judge, I can pick a jury.

THE COURT: I'll grant the request. I understand this has been a long ordeal for everybody, and I won't whinge too much about what this has done to our docket. We have 500 other cases people want to have heard, but that's life. I cannot sit Monday. Because you all were supposed to be done and another trial after you was supposed to be done already, I can't sit Monday. So what we'll do is pick the jury tomorrow and start Tuesday. So by asking for two days, you've got three, Ms. Dunne.

MS. DUNNE: Thank you.

THE COURT: That's not going to be a habit.

And I think I had let you all know that we won't sit Friday of July 4 weekend. I think it's a waste of time to have the jurors come in. I'm unavailable that day, also unavailable June 25, that Friday.

Now, I recognize that this is not an easy question to answer, but doing the best you can, what's the Government's estimate as to how long its case in chief will be?

MS. DUNNE: I believe six to seven trial days.

THE COURT: Okay. Defense case may be a little longer than you imagined.

MR. QUINN: Obviously now.

THE COURT: Yes. I mean, some of what I'm

allowing to you do you're going to do on cross of the Government's witnesses, some of it may be calling people who may or may not invoke, and that's something we're going to also have to talk about. I realize that there are unanswered questions, and we'll try to answer them as we go along.

Before I forget, I'm going to amend the voir dire to include the question that Ms. Dunne I think you asked me to include, so I'm inclined to do that, and I've changed the agent's name, as you had requested.

Were there any other changes either of you wanted with respect to the voir dire?

MR. QUINN: Judge, if there is, I'll fax it to you and the government before tomorrow morning.

THE COURT: If you can do it tonight.

MR. QUINN: Yes, I mean, not first thing in the morning, sometime tonight. We have to talk it over.

THE COURT: Okay. Ms. Dunne.

MS. DUNNE: I don't believe we've given you a witness list either. We'll get you that tonight.

THE COURT: That's fine. That, I just read it. I don't need to worry about incorporating that into the voir dire, but any other questions I need to incorporate because I give them the voir dire. With respect to -- there's one issue I think I owe you an explanation in my ruling. You

all heard from me enough today, so I'll do it later on in the trial.

With respect to the audibility issue on "You can't F'ing say that," I think it's fair game for the government to put that in. I listened to it, I think I hear it, but I think it's certainly close enough for it to be presented to the jury.

Is there anything else I owe you an answer on?

MS. DUNNE: We've already given the 3500 for the people that we anticipated might be this week, but we'll provide next week's witnesses, the balance, this Friday.

THE COURT: Okay.

MS. DUNNE: If that's okay.

THE COURT: That's fine. Thank you for that, Ms. Dunne.

All right anything else?

MS. DUNNE: We have some things between us we have to work out about stipulations and stuff, that's been on hold.

THE COURT: That's why I am perfectly happy to give you all a couple of days, because it may actually streamline the trial to give you all a couple of days to try to figure things out.

Anything else from your standpoint, Mr. Quinn?

MR. QUINN: Not that I can think of, Judge.

THE COURT: One thing I also ask is if I could get obviously the request to charge. I mean, I have a draft charge, but that's been outdated a little bit by subsequent events. So if I could get both sides' proposed adverse inference charge by Monday as well as anything else that you think needs to be done with the jury charge in light of subsequent events. I mean, I've considered what you said last week, Ms. Dunne, about the government's concern regarding jury nullification. If you've got any thoughts on how to give an instruction, I mean, I've read some of the adverse instruction charges, the judge's instructions don't address that head on, and there's a reason maybe why you don't do that. That's your call as to how you want to propose it.

MS. DUNNE: Well, we'll get you something by Monday.

THE COURT: All right. Anything else that you want in the charge? It sounds like there's at least some theoretical possibility we could be summing up the week of June 28. Theoretical. Not likely.

Anything else? I do want to thank counsel for -- I know how hard you all have been working on it, and I do want to thank you for your diligence and, as I said, your professionalism, and this is what it is but I do appreciate all of your work.

If there's nothing else, I'll bid you all a pleasant evening. See you tomorrow 9:45.

MR. QUINN: Thank you, Judge.2.

MR. KENNEDY: Thank you, your Honor.

(Proceedings concluded at 4:47 p.m.)

CERTIFICATE: I hereby certify that the foregoing is a true and accurate transcript, to the best of my skill and ability, from my stenographic notes of this proceeding.

___________________________________

Angela A. O'Donnell, RPR,Official Court Reporter, USDC, SDNY